**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

In re: **NORDIC AVIATION CAPITAL DESIGNATED**          **Case No. 21-33693-KRH**
**ACTIVITY COMPANY, et al.,**                                              **Chapter 11**
               **Debtors.**                                                              **(Jointly Administered)**

## MEMORANDUM OPINION

This matter comes before the Court[1] on the following final applications for compensation and reimbursement of expenses (collectively, the "Fee Applications") filed in the above-captioned jointly administered Chapter 11 cases (collectively the "Chapter 11 Cases") by certain retained professionals (collectively, the "Retained Professionals"):

A.     *First Interim and Final Fee Application of Kirkland and Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Interim and Final Fee Period from December 17, 2021, Through and Including June 1, 2022* [ECF No. 972] (the "Kirkland Fee Application") filed by Kirkland & Ellis LLP and Kirkland & Ellis International LLP (together, "Kirkland");

B.     *First Interim and Final Fee Application of Kutak Rock LLP, Co-Counsel for the Debtors and Debtors-In-Possession, for the Period from December 17, 2021 Through June 1, 2022* [ECF No. 1004] (the "Kutak Rock Fee Application") filed by Kutak Rock LLP ("Kutak Rock");

---

[1]     As a matter of practice, this Court generally issues a memorandum opinion when there is a controversy that may lead to an appeal. These Fee Applications were uncontested. The Court diverts from its usual practice to provide guidance to practitioners on the facts they need to develop in support of fee applications filed in bankruptcy cases pending before this Court. It is not the intention of the Court to issue a memorandum opinion on uncontested fee applications in the future provided the appropriate factual foundation has been laid. The Court will continue its prior practice of analyzing the pleadings filed, the exhibits submitted in connection therewith, and any additional evidence adduced at a hearing (if one is deemed necessary), and entering an order consistent with the Court's independent analysis.

C.    *First Interim and Final Fee Application of William Fry LLP as Special Irish Counsel for the Debtors for the Interim and Final Period from December 17, 2021, Through and Including June 1, 2022* [ECF No. 1010] (the "William Fry Fee Application") filed by William Fry LLP ("William Fry");

D.    *First and Final Application of Clifford Chance LLP for Compensation for Services Rendered and Reimbursement of Expenses Incurred as Special Counsel to the Debtors for the Period December 20, 2021 Through June 1, 2022* [ECF No. 1020] (the "Clifford Chance Fee Application") filed by Clifford Chance LLP ("Clifford Chance");

E.    *First Interim and Final Fee Application of Gorrissen Federspiel Advokatpartnerselskab as Special Danish Counsel for the Debtors for the Interim and Final Fee Period from December 17, 2021 Through and Including June 1, 2022* [ECF No. 1025] (the "Gorrissen Fee Application") filed by Gorrissen Federspiel Advokatpartnerselskab ("Gorrissen");

F.    *First and Final Fee Application of Quinn Emanuel Urquhart & Sullivan, LLP for Allowance of Compensation and Reimbursement of Expenses for Services Rendered as Counsel to Nordic Aviation Capital Designated Activity Company for the Period of December 19, 2021 through June 1, 2022* [ECF No. 1015] (the "Quinn Emanuel Fee Application") filed by Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel");

G.    *First Interim and Final Fee Application of Katten Muchin Rosenman LLP, Attorneys for NAC Aviation 29 Designated Activity Company, at the Sole Direction of its Disinterested Directors, for the Interim and Final Fee Period from December 19, 2021 Through and Including June 1, 2022* [ECF No. 1024] (the "Katten Muchin Fee Application") filed by Katten Muchin Rosenman LLP ("Katten Muchin");

H.    *Amended First and Final Fee Application of McDonald Hopkins LLC, Special Counsel to the Represented Entities, at the Sole Discretion of the Disinterested Directors of the Boards of the Represented Entities, for the Period from December 17, 2021, Through and Including June 1, 2022* [ECF No. 977] (the "McDonald Hopkins Fee Application") filed by McDonald Hopkins LLC ("McDonald Hopkins");

I.    *First and Final Fee Application of Spiro & Browne PLC, Special Local Counsel to the Represented Entities, at the Sole Discretion of the Disinterested Directors of the Boards of the Represented Entities, for the Period from February 23, 2022, Through and Including June 1, 2022* [ECF No. 987] (the "Spiro & Browne Fee Application") filed by Spiro & Browne PLC ("Spiro & Browne");

J.    *First and Final Fee Application of Cole Schotz P.C., Conflicts Counsel to Debtors NAC Aviation 33 Limited and NAC Aviation 34 Limited, at the Direction of the Disinterested Directors of the Boards of the Represented Entities, for the Period from December 19, 2021 Through June 1, 2022* [ECF No. 992] (the "Cole Schotz Fee Application") filed by Cole Schotz P.C. ("Cole Schotz");

K.    *First and Final Fee Application of Ronald Page, PLC for Allowance of Compensation and Expenses for the Period January 10, 2022 Through June 1, 2022 as Virginia Conflicts Counsel to Debtors NAC Aviation 33 Limited and NAC Aviation 34 Limited* [ECF No. 993] (the "Ronald Page Fee Application") filed by Ronald Page, PLC ("Ronald Page");

L.    *First and Final Fee Application of Cozen O'Connor Conflicts Counsel to Nordic Aviation Capital Pte. Ltd. and Certain Related Debtors for the Period December 17, 2021 Through June 1, 2022* [ECF No. 1028] (the "Cozen Fee Application") filed by Cozen O'Connor ("Cozen");

M.    *First and Final Fee Application of Canfield Wells, LLP, Virginia Conflict Counsel to Nordic Aviation Capital Pte. Ltd. and Certain Realted* [sic] *Debtors for the Period January 4, 2022 Through June 1, 2022* [ECF No. 1030] (the "Canfield Wells Fee Application") filed by Canfield Wells, LLP ("Canfield Wells");

N.    *First and Final Fee Application of McDermott Will & Emery LLP as Special Counsel to the Disinterested Directors of the Boards of the Represented Entities for Allowance of Compensation and Reimbursement of Expenses for the Period from December 19, 2021, Through and Including June 1, 2022* [ECF No. 1012] (the "McDermott Fee Application") filed by McDermott Will & Emery LLP ("McDermott");

O.    *First and Final Application of Klehr Harrison Harvey Branzburg LLP as Special Counsel to NAC Aviation 17 Limited and NAC Aviation 20 Limited for Allowance of an Administrative Expense Claim for Compensation and for Reimbursement of Expenses Incurred for the Period from January 1, 2022 through June 1, 2022* [ECF No. 1001] (the "Klehr Harrison Fee Application") filed by Klehr Harrison Harvey Branzburg LLP ("Klehr Harrison");

P.    *First and Final Application of Hirschler Fleischer, P.C. as Special Counsel to NAC Aviation 17 Limited and NAC Aviation 20 Limited for Allowance of an Administrative Expense Claim for Compensation and for Reimbursement of Expenses Incurred for the Period from January 18, 2022 through June 1, 2022* [ECF No. 1000] (the "Hirschler Fleischer Fee Application") filed by Hirschler Fleischer, P.C. ("Hirschler");

Q.    *Fifth Monthly Fee Statement and First Interim and Final Application of Rothschild & Co US Inc. and N.M. Rothschild & Sons Limited for Compensation for Services and Reimbursement of Expenses as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession for the Period from December 17, 2021 Through and Including June 1,*

*2022* [ECF No. 973] (the "Rothschild Fee Application") filed by Rothschild & Co US Inc. and

N.M. Rothschild & Sons Limited (together, "Rothschild");

R.    *First Monthly, Interim and Final Application of KPMG Ireland as Audit Service*

*Providers to the Irish/UK Debtors for Allowance of Compensation for Services Rendered and*

*Reimbursement of Expenses Incurred for the Period April 4, 2022 Through June 1, 2022* [ECF

No. 1029] (the "KPMG Fee Application") filed by KPMG Ireland ("KPMG");

S.    *First and Final Fee Application of Ernst & Young LLP a Member Firm of EYGL*

*as the Debtors' Restructuring Advisors and Tax Services Providers for Compensation and*

*Reimbursement of Expenses for the Period from December 19, 2021 Through June 1, 2022* [ECF

No. 1036] (the "EY US Fee Application") filed by Ernst & Young LLP, a member firm of Ernst

& Young Global Limited ("EYGL") in the United States, ("EY US");

T.    *First and Final Fee Application of Ernst & Young LLP a Member Firm of EYGL*

*as the Debtors' Restructuring Advisors and Tax Services Providers for Compensation and*

*Reimbursement of Expenses for the Period from December 19, 2021 Through June 1, 2022* [ECF

No. 1033] (the "EY UK Fee Application") filed by Ernst & Young LLP, a member firm of EYGL

in the United Kingdom, ("EY UK");

U.    *First and Final Fee Application of Ernst & Young Business Consultants a Member*

*Firm of EYGL as the Debtors' Restructuring Advisors and Tax Services Providers for*

*Compensation and Reimbursement of Expenses for the Period from December 19, 2021 Through*

*June 1, 2022* [ECF No. 1035] (the "EY Ireland Fee Application") filed by Ernst & Young Business

Consultants, a member firm of EYGL in Ireland, ("EY Ireland");

V.    *First and Final Fee Application of EY Godkendt Revisionspartnerselskab a*

*Member Firm of EYGL as the Debtors' Restructuring Advisors and Tax Services Providers for*

*Compensation and Reimbursement of Expenses for the Period from December 19, 2021 Through June 1, 2022* [ECF No. 1034] (the "EY Denmark Fee Application") filed by Godkendt Revisionspartnerselskab, a member firm of EYGL in Denmark, ("EY Denmark" and, together with EY US, EY UK, and EY Ireland, "EY"); and the

W.    *Second Consolidated Monthly and Final Fee Application of Epiq Corporate Restructuring, LLC as Administrative Advisor to the Debtors and Debtors-in-Possession for Allowance of Compensation and Reimbursement of Expenses for the Monthly Fee Period from April 1, 2022 Through June 1, 2022 and Final Fee Period from December 17, 2021 Through June 1, 2022* [ECF No. 997] (the "Epiq Fee Application") filed by Epiq Corporate Restructuring LLC ("Epiq");

The Court issued a *Scheduling Order* [ECF No. 1047] on July 27, 2022, providing notice to all parties in interest that the Court would conduct an evidentiary hearing (the "Hearing") to consider the Fee Applications on September 13, 2022. In consideration of the evidence[2] and argument adduced at the Hearing, and upon review of the relevant pleadings, the Court makes the findings of fact and conclusions of law set forth in this Memorandum Opinion with respect to each of the Fee Applications in accordance with Rule 52 of the Federal Rules of Civil Procedure, as

---

[2]    The Court heard the testimony of Martin Cooke at the hearing. Mr. Cooke is a fellow of the Chartered Association of Certified Accountants and has over thirty years of executive experience throughout numerous companies in a variety of capacities. *See* Hr'g Tr. 11:5-12:1, Sept. 14, 2022, ECF No. 1132 at 11-12 (providing Mr. Cooke's experience and certifications). Mr. Cooke joined the NAC DAC board of directors in January 2021 as a nonexecutive, independent director. *Id.* 11:5-7, Sept. 14, 2022, ECF No. 1132 at 11. During the Chapter 11 Cases, he served on the boards of directors of approximately fifty of the other Debtors, as well as on the restructuring committee (more fully detailed herein). *Id.* 11:8-11, Sept. 14, 2022, ECF No. 1132 at 11. Post-emergence, Mr. Cooke continues to serve on the new board of reorganized NAC DAC. *Id.* 11:7-8, Sept. 14, 2022, ECF No. 1132 at 11. As a member of the restructuring committee, Mr. Cooke was responsible for reviewing, analyzing, and approving professional fee applications. *Id.* 11:12-14, Sept. 14, 2022, ECF No. 1132 at 11. Through the Court's own examination of the witness, Mr. Cooke was found to be a highly credible and knowledgeable witness. The testimony offered by Mr. Cooke was uncontroverted. The Court rests its factual findings upon the testimony of Mr. Cooke, the exhibits offered and admitted at the Hearing, and the lengthy record established in these Chapter 11 Cases to make findings of fact regarding the fee application process generally, as well as the specific services provided by the Retained Professionals.

made applicable hereto pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[3]

## Jurisdiction and Venue

The Court has subject matter jurisdiction under 28 U.S.C. § 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue is appropriate pursuant to 28 U.S.C. § 1409(a).

## Background

On December 17, 2021, Nordic Aviation Capital Pte. Ltd. and three affiliated Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.  On December 19, 2021 (the "Petition Date"), Nordic Aviation Capital Designated Activity Company ("NAC DAC") and its remaining network of interrelated Debtor affiliates each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. In a period of four months, the Debtors were able to confirm a consensual plan of reorganization that deleveraged the Debtors' balance sheet by approximately $4.1 billion, that raised over $500 million of new money, and that facilitated the orderly exit of certain of the Debtors' funded debt silos from the emerging reorganized Debtors.  These Fee Applications mark the end of that successful restructuring process.  The services provided by the Retained Professionals underpinned the results the Debtors were able to achieve in these Chapter 11 Cases.  The Court must now evaluate the reasonableness of the compensation for which the Fee Applications seek approval.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

## I.      The Debtors' Pre-Pandemic Business

The Debtors' "business is, by nature, international in scope and enormously complex." Hr'g Tr. 15:5-6, Sept. 14, 2022, ECF No. 1132 at 15.  The Debtors are in the business of leasing regional aircraft to airline operators.  Decl. of Justin Bickle in Supp. of Debtors' Ch. 11 Pets. & Restructuring Transactions ¶ 20, ECF No. 6 at 11 [hereinafter "Bickle Declaration"].  Regional aircraft generally seat up to 130 passengers and fly routes lasting up to one and a half hours.  *Id.* As of the Petition Date, the Debtors maintained a fleet of 475 regional aircraft with an aggregate value of almost $5 billion, making the Debtors the largest regional aircraft lessor and the sixth largest commercial aircraft lessor in the world.  *Id.* ¶¶ 19, 23, ECF No. 6 at 11, 13.  Headquartered in Limerick, Ireland, the Debtors maintain offices in Denmark, Canada, Hong Kong, Singapore, and the United States.  *Id.* ¶¶ 20, ECF No. 6 at 11.  The Debtors provided services to seventy-five airline customers across forty-five countries.  *Id.* ¶ 23, ECF No. 6 at 13.

The Debtors' corporate structure was intentionally formed to address specific functions within the larger corporate enterprise.  NAC DAC – a privately held company – is the Debtors' ultimate parent entity, overseeing and managing the Debtors' business generally.  *Id.* ¶¶ 30, ECF No. 6 at 18.  NAC DAC is governed by a nine-member board of directors.  *Id.*  NAC DAC owns 118 other subsidiary entities.[4]  *Id.* ¶ 26, ECF No. 6 at 16.  The subsidiary entities include sixty aircraft owning entities (the "AOEs"), twelve service entities (the "Service Entities"), fifteen intermediate leasing entities ("LILOs"), and one joint venture.  *Id.*  The sixty AOEs house the Debtors' principal assets – the aircraft.  *Id.*  The Service Entities employ the Debtors' employees and perform operational, transactional, and administrative functions for NAC DAC.  *Id.*  The

---

[4]    Of the 119 entities, 117 filed voluntary Chapter 11 petitions in this Court (the "Debtors").  Bickle Decl. ¶ 29 & n.19, ECF No. 6 at 18.  Two of the subsidiary entities are not in bankruptcy.  *Id.*

LILOs serve as intermediaries between AOEs and third-party lessees. The LILOs lease aircraft from the AOEs and then sublease those aircraft to customers. *Id.* NAC DAC is the primary Service Entity for the Debtors, but it does not own any aircraft. *Id.* ¶ 41, ECF No. 6 at 25.

Pre-Petition Date, the majority of the Debtors' cash operating receipts derived from collections on aircraft lease obligations. The cash receipts were deposited into collection accounts held directly by the AOE entities and the LILO entities. Decl. of Briana Richards in Supp. of Debtors' Ch. 11 Pets. & First Day Mots. ¶ 13, ECF No. 15 at 7 [hereinafter "Richards Declaration"]. The cash was then swept upstream to one of six concentration accounts owned by NAC DAC. *Id.* ¶ 13, ECF No. 15 at 7. NAC DAC in turn would disburse cash directly or indirectly through the Service Entities to third parties to fund the Company's operations and pay financial obligations on behalf of itself and its subsidiaries. *Id.* These arrangements allowed the Debtors a flexible way to allocate operating costs, which were primarily borne by the Service Entities, to the AOEs and other entities that benefited from the underlying services. Bickle Decl. ¶ 27, ECF No. 6 at 17.

## II.    Pre-Petition Date Debt Structures

The Debtors financed their business operations through a series of funded debt obligations. As of the Petition Date, the Debtor's estimated that their business enterprise had $6.3 billion in outstanding liabilities ("Total Claims"). *Id.* ¶ 38, ECF No. 6 at 23. Included within the Total Claims amount, the Debtors had $5.9 billion in funded debt obligations. *Id.* Thirty-nine financing facilities provided by eighty-three different lenders comprised the funded debt obligations. *Id.* In order to maximize tax efficiency and business flexibility, the financing facilities primarily took

three forms:  (a) direct facilities; (b) finance leases; and (c) JOLCOs, as defined herein.[5]  *Id.* ¶ 31, ECF No. 6 at 20.

The "Direct Secured Facilities" were funds borrowed by certain of the debtors to acquire aircraft.  *Id.* ¶ 32. ECF No. 6 at 20.  The aircraft were pledged directly to the lender that provided the funding as collateral.  *Id.*  NAC DAC guaranteed all of the Direct Secured Facilities as a primary obligor.  *Id.*  The Direct Secured Facilities and the corresponding guarantees were governed primarily by English or New York law.  *Id.*

The "Finance Lease Facilities," were also primarily governed by English or New York law. *Id.* ¶ 33, ECF No. 6 at 20.  These facilities were structured as a loan to an orphan special purpose vehicle, which was party to a finance lease with the relevant Debtor entity as finance lessee.  *Id.* NAC DAC guaranteed the payment obligations under the finance leases.  *Id.*  A secured lease agent was appointed for the benefit of underlying lenders to hold (i) the right to call the finance lease, (ii) an assignment of both the finance lease and any customer sublease, and (iii) collateral in the form of shares in the Debtor lessee.  *Id.*, ECF No. 6 at 20-21.  For certain Finance Lease Facilities, the underlying lenders also received a guarantee from certain European export credit agencies (the "ECA Financing Arrangements").  *Id.* ¶ 34, ECF No. 6 at 21.

The remaining of the Debtors' financing facilities were arranged as "Japanese Operating Leases with Call Option" (the "JOLCO Facilities").  *Id.* ¶¶ 35-36, ECF No. 6 at 21-22.  These JOLCO Facilities were governed by English law.  *Id.* ¶ 36, ECF No. 6 at 22.  A Japanese-incorporated special purpose vehicle would purchase an aircraft with financing raised from both commercial lenders, which were secured by a mortgage on the aircraft, and Japanese equity investors.  *Id.* ¶ 35, ECF No. 6 at 21.  The Japanese SPV in turn leased the aircraft with a

---

[5]    The Debtors also had a small number of swaps.

purchase option to one of the Debtors. *Id.* The Debtor lessee would subsequently sublease the aircraft to the Debtors' customers. *Id.* The Debtor, as lessee, had the option to purchase the aircraft on a fixed date for a pre-agreed price that was sufficient to repay the outstanding debt under the JOLCO loan and the equity capital advanced by the JOLCO investors. *Id.*, ECF No. 6 at 21-22. Rent was paid in two streams: "A" rent was assigned to the lenders to repay the acquisition loan and "B" rent provided a return to the equity investors. *Id.* ¶ 36, ECF No. 6 at 22. Except for "B" rent and any associated termination fees, NAC DAC guaranteed the JOLCO leases. *Id.*

For each of the three pre-Petition Date financing arrangements, the borrower, its direct and indirect subsidiaries, and any other security grantor under that financing arrangement form a specific security group (or "silo"). *Id.* ¶ 40, ECF No. 6 at 24. To the extent that a Debtor is a borrower (or issuer) under multiple pre-Petition Date financing arrangements and its obligations thereunder are secured by the same collateral, that borrower, its direct and indirect subsidiaries, and any other security grantor under those financing arrangements together constitute a single silo. *Id.*, ECF No. 6 at 24-25.

## A.    NAC DAC

In 2018, NAC DAC entered into a long-term $470 million financing facility (the "PFA Facility") with the largest commercial pension fund in Denmark, PFA Pension, Forsikringsaktieselskab. *Id.* ¶ 41, ECF No. 6 at 25. The PFA Facility is unsecured. *Id.* As of December 6, 2021, the Debtors owed approximately $522.9 million on account of the PFA Facility, accounting for approximately 8% of the amount of the Debtors' Total Claims as of December 6, 2021. *Id.* NAC DAC also guaranteed each facility to which a Debtor was a party. *Id.*

### B.    The NAC 29 Silo

NAC Aviation 29 Designated Activity Company and its subsidiaries (collectively "NAC 29") were each incorporated in Ireland, Malta, Cyprus, or the United Kingdom. *Id.* ¶ 42, ECF No. 6 at 25.    They included a group of AOEs that together owned 234 aircraft financed by approximately $3.6 billion in outstanding obligations ("NAC 29 Debt"). *Id.*, ECF No. 6 at 25-26. These outstanding obligations accounted for approximately 57% of the amount of the Debtors' Total Claims as of December 6, 2021. *Id.*, ECF No. 6 at 26.    As part of an Irish scheme of arrangement,[6] NAC 29's unsecured lenders were provided with a security package including security interests in NAC 29's aircraft and $315 million in restricted cash (of which approximately $300 million remained as of the Petition Date). *Id.*    The NAC 29 Debt consisted of four separate issuances of U.S. private placement notes, a revolving credit facility, four *Schuldschein* loans, one term loan facility arranged by the Korea Development Bank, and two term-loan facilities arranged by the Development Bank of Japan. *Id.*

### C.    The NAC A/S Silos

Nordic Aviation Capital A/S ("NAC A/S") is a Service Entity incorporated in Denmark that is the parent entity of 60 Debtor entities that collectively own 194 aircraft financed by approximately $1.6 billion in outstanding obligations. *Id.* ¶ 43, ECF No. 6 at 26.    These obligations accounted for approximately 25% of the amount of the Debtors' Total Claims as of December 6, 2021. *Id.*    Its subsidiaries are incorporated in Denmark, Singapore, Cyprus, the United Kingdom, France, Ireland, or the United States. *Id.* ¶¶ 44, ECF No. 6 at 26.    NAC A/S's subsidiaries are borrowers under most of NAC's debt facilities. *Id.* ¶ 43, ECF No. 6 at 26.    These facilities include

---

6    *See* discussion *infra* pp. 16.

the ECA financing agreements, *id.*, a direct secured facility with the KfW Syndicated Borrowers, and the JOLCO Facilities, *id.* ¶ 47, ECF No. 6 at 28.

### D.    NAC 33/34 Silo

NAC Aviation 33 Limited and NAC Aviation 34 Limited ("NAC 33/34") are AOEs incorporated in Ireland. *Id.* ¶ 48, ECF No. 6 at 28. They collectively have nine direct or indirect subsidiaries incorporated in Ireland, the United States, Sweden, or the British Virgin Islands. *Id.* NAC 33/34 and their subsidiaries collectively own 37 aircraft financed by approximately $541.9 million in outstanding obligations. *Id.* This accounted for approximately 9% of the amount of the Debtors' outstanding Total Claims as of December 6, 2021. *Id.* NAC 33/34 are borrowers under senior secured term loan facilities arranged by BNP Paribas. *Id.*

### III.    Events Leading up to and Occurring in the Chapter 11 Cases

The Debtors' customers had operating lease agreements under which the lessees were required to make periodic payments for the maintenance of the aircraft based on usage. *Id.* ¶ 24 at ECF No. 6 at 14. Pre-pandemic, lease payments were contractually due regardless of hours flown or actual usage. *Id.* The Debtors' business model worked remarkably well. The Debtors experienced increased profitability year-over-year from 1997 through 2020. Order (I) Approving Adequacy of Disclosure Statement, (II) Approving Solicitation Proc., (III) Approving Forms of Ballots & Notices, (IV) Approving Rights Offering Proc. & Related Materials, (V) Scheduling Certain Dates, & (V) Granting Related Relief Ex. 1 § II, ECF No. 543 at 27 [hereinafter "Disclosure Statement Order"]. In the first half of the 2019-2020 fiscal year, the Debtors posted their strongest six-month financial performance in their thirty-year history. *Id.*, ECF No. 543 at 27-28.

The COVID-19 pandemic ravaged the aviation industry. *See* Bickle Decl. ¶ 50, ECF No. 6 at 29. Entire fleets had to be grounded. *Id.* ¶ 49, ECF No. 6 at 28. The Debtors' customers –

the operating airline companies – lost their source of revenue and were unable to timely perform their lease obligations.  *Id.* ¶ 50, ECF No. 6 at 29.  NAC DAC was unable to collect cash that its customers did not have.  *Id.*  Although the Debtors consensually restructured a number of their customers' leases pre-Petition Date, NAC DAC suffered a $639 million loss in fiscal year 2019-2020.  *Id.*  That was followed by a $2.4 billion loss in fiscal year 2020-2021.  *Id.*  The book value of the Debtors' fleet dropped by more than 30%.  *Id.* ¶ 51, ECF No. 6 at 29.  The steep decline dramatically impacted loan-to-value ratios, triggering covenant defaults.  *Id.*, ECF No. 6 at 29-30.

The Debtors took action as it became clear that the Debtors would need to effectuate a restructuring in order to survive the challenges posed by the pandemic.  The Debtors engaged Clifford Chance, E&Y, and Rothschild to advise them with respect to restructuring options.  *Id.* ¶ 13, ECF No. 6 at 8.  Based on the advices received from these professionals, the Debtors effectuated an Irish scheme of arrangement.[7]

The Debtors also adjusted their corporate governance structure.  First, NAC DAC formed a restructuring committee (the "Restructuring Committee"), consisting of three independent directors (Justin Bickle, Martin Cooke, and Paul O'Donnell), to explore restructuring alternatives.  *Id.* ¶ 14, ECF No. 6 at 8.  The Restructuring Committee engaged Kirkland and William Fry to advise it in connection with restructuring alternatives.  *Id.*  Second, recognizing that intercompany issues would most certainly arise in any restructuring, the Debtors appointed two disinterested directors (collectively, the "Disinterested Directors")[8] each to the boards of NAC DAC, NAC 29,

---

[7]    *See* discussion *infra* pp. 16.

[8]    In addition to the foregoing, at some point, pre-Petition Date, Roger Meltzer and Tim Regan were appointed as Disinterested Directors to NAC 17/20 and engaged Klehr Harrison.

NAC A/S, NAC 33/34, the NAC Pte. Debtors,[9] and the JOLCO Entities.[10]  *Id.* ¶ 30, ECF No. 6 at

18-19.  Each pair of Disinterested Directors was authorized to engage separate legal counsel at

their sole direction to advise them as necessary in connection with any proposed restructuring

transactions and any matters that arise in which a conflict may exist between the applicable Debtor,

on the one hand, and its shareholders, affiliates, or directors and officers, on the other hand.  *Id.*

Specifically, (1) Paul Keglevic and Stefan Selig were appointed as Disinterested Directors to

NAC DAC and retained Quinn Emanuel as special counsel; (2) Jeffrey Stein and Jeff Dane were

appointed as Disinterested Directors to NAC 29 and retained Katten Muchin as special counsel;

(3) Anthony Horton and Jame Donath were appointed as Disinterested Directors to NAC A/S and

retained McDonald Hopkins as special counsel; (4) Jonathan Foster and Jake Wood were

appointed as Disinterested Directors to NAC 33/34 and retained Cole Schotz as special counsel;

(5) Harvey Tepner and Mark Cox were appointed as Disinterested Directors to the NAC Pte.

Debtors and retained Cozen as special counsel; and (6) Gary Begeman and Julian Markby were

appointed as Disinterested Directors for the JOLCO Entities and retained McDermott as special

counsel.  *Id.*, ECF No. 6 at 19.

---

[9]    The "NAC Pte. Debtors" include Nordic Aviation Capital Pte. Ltd., NAC Aviation 21 Ltd., NAC Aviation 2 A/S, NAC Aviation 23 Ltd., NAC Aviation 26 Ltd., Nordic Aviation Financing One Pte. Ltd., NAC Aviation 4 Ltd., Nordic Aviation Leasing Eight Pte. Ltd., Nordic Aviation Leasing Fifteen Pte. Ltd., Nordic Aviation Leasing Fourteen Pte. Ltd., Nordic Aviation Leasing Nine Pte. Ltd., Nordic Aviation Leasing Nineteen Pte. Ltd., Nordic Aviation Leasing Pte. Ltd., Nordic Aviation Leasing Seven Pte. Ltd., Nordic Aviation Leasing Seventeen Pte. Ltd., Nordic Aviation Leasing Twelve Pte. Ltd., and Nordic Aviation Leasing Twenty Five Pte. Ltd.

[10]   The "JOLCO Entities" include NAC Aviation 31 Limited; NAC Aviation 32 Limited; Nordic Aviation Leasing Eighteen Pte. Ltd.; Nordic Aviation Leasing Twenty Pte. Ltd., Nordic Aviation Leasing Twenty One Pte. Ltd., Nordic Aviation Leasing Twenty Two Pte. Ltd., Nordic Aviation Leasing Twenty Three Pte. Ltd., Nordic Aviation Leasing Twenty Four Pte. Ltd., Nordic Aviation Leasing Twenty Seven Pte. Ltd., and Nordic Aviation Leasing Twenty Eight Pte. Ltd.

The Debtors effectuated an Irish scheme of arrangement (the "Scheme"), as sanctioned by an Irish court in July 2020, in an attempt to restructure.[11]  *Id.* ¶ 54, ECF No. 6 at 31.  The Scheme was an agreement among NAC DAC and more than eighty-five lenders holding $5.3 billion in debt whereby the lenders agreed to defer certain internal and principal payments and waive various financial covenants for a set time period.  *Id.*  In exchange for these concessions, the Debtors agreed to a cash sweep payment of all cash exceeding $50 million as of April 30, 2021, which would be swept to the Debtors' lenders on May 17, 2021.  *Id.* ¶ 55, ECF No. 6 at 32.

The Scheme provided a short-term solution.  The Debtors soon realized that the company would need a more comprehensive long-term solution to address outstanding liquidity issues and an unsustainable capital structure given the depression in the market.  Disclosure Statement Order Ex. 1 § II, ECF No. 543 at 28.  Prompted by concerns over liquidity issues, on May 16, 2021, the Debtors and their lenders executed a forbearance agreement (the "Forbearance Agreement"), whereby the cash sweep was deferred until July 31, 2021, on various conditions, which included a June 15, 2021, deadline to obtain the agreement of two-thirds of the Debtors' creditors to a commercial term sheet.  Bickle Decl. ¶ 59, ECF No. 6 at 33.  Although the Forbearance Agreement allowed the Debtors to avoid a precipitous insolvency filing and created a stable platform for the Debtors to continue negotiations with their creditor constituents, Disclosure Statement Order Ex. 1 § II, ECF No. 543 at 29, the Debtors were unable to meet the two-thirds agreement milestone, Bickle Decl. ¶ 60, ECF No. 6 at 33.

---

[11]  The Scheme was subsequently recognized in the United States.  *See* Order Granting (I) Recognition of Foreign Main Proc., (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order & Related Scheme, & (IV) Related Relief Under Chapter 15, *In re Nordic Aviation Cap. Designated Activity Co.*, Case No. 20-11410 (MEW) (Bankr. S.D.N.Y. July 24, 2020).

Only one creditor – Norddeutsche Landesbank Girozentrale ("Nord LB") exercised its right to terminate the Forbearance Agreement with respect to itself and exercised its share charge over the shares in NAC Aviation 9 Limited, which owned five planes.[12] *Id.* ¶ 60, ECF No. 6 at 33.  The remaining forbearing creditors extended the term of the Forbearance Agreement through December 17, 2021 (the "Forbearance Termination Date").  Disclosure Statement Order Ex. 1 § II, ECF No. 543 at 29; Bickle Decl. ¶ 60, ECF No. 6 at 33.  During the forbearance period, the Debtors and their advisors made substantial progress on the terms of a comprehensive and consensual restructuring transaction, as memorialized in a Restructuring Support Agreement (as modified, the "RSA").  Bickle Decl. ¶ 60, ECF No. 6 at 33.

As of the Petition Date, the Debtors had executed the RSA with holders of approximately 73% of the Debtors' Total Claims (together, the "Consenting Creditors").  *Id.* ¶ 61, ECF No. 6 at 34.  The RSA contemplated a flexible transaction structure through its use of various term sheets to effectuate debt-for-equity and debt-for debt swaps.  *Id.*  The RSA also created an opportunity for creditors that did not wish to retain a go-forward relation with the Debtors to exit.  *Id.* ¶ 63, ECF No. 6 at 35.

On Forbearance Termination Date, it was suggested that certain lenders were prepared to exercise their remedies, rather than agree to a further extension.  Disclosure Statement Order Ex. 1 § II, ECF No. 543 at 30.  As collection actions would have been value destructive, Nordic Aviation Capital Pte. Ltd. and three affiliated Debtors commenced their bankruptcy cases at the direction of their directors in order to maintain the status quo.  *Id.*  NAC DAC and the remaining

---

[12]    NAC Aviation 9 Limited ("NAC 9") is in the process of liquidation by an appointed Irish liquidator.  Bickle Decl. ¶ 60, ECF No. 6 at 33.

Debtors followed suit two days later on December 19, 2021, commencing their own bankruptcy cases.

Although the Debtors had the holders of 73% of the nearly $6.4 billion in Total Claims in agreement with the original RSA, the Debtors continued to engage with remaining creditors post-Petition Date, negotiating additional plan transactions in the hopes of further broadening consensus for the Debtors' restructuring. *Id.* To that end, on December 23, 2021, the Debtors and the Consenting Creditors amended and restated the RSA to effectuate modifications to certain restructuring term sheets, including, as amended, the NAC 33/34 Restructuring Term Sheet (which contemplated the exit of certain NAC 33/34 Debtors through a plan), the Alpha Term Sheet (which provided the terms for a new money investment transaction), and the inclusion of the NAC 33/34 Consenting Creditors as parties to the RSA. *Id.* At the time, the NAC 33/34 Consenting Creditors collectively held approximately 9% of claims against the Debtors, which thereby brought the total support for the RSA to approximately 81.7% of the Total Claims. *Id.*

With the NAC 33/34 Consenting Creditors on board, the Debtors continued to engage in further discussions with its other key creditor consistencies. *Id.* On January 13, 2022, the Debtors executed a second amended and restated version of the RSA with the Moelis/Weil/NRF Consenting Creditors, which included the Moelis/Weil/NRF Consenting Creditors as parties to the RSA, thereby bringing total support for the RSA to approximately 89% of outstanding claims against NAC DAC. *Id.*, ECF No. 543 at 30-31.

Thereafter, the Debtors continued to engage in extensive, good-faith negotiations with key creditor groups that were not yet party to the RSA, namely the lenders who were party to the ECA financing arrangements and the lenders who were party to the NYL financing arrangement concerning Debtors NAC Aviation 17 Limited and NAC Aviation 20 Limited (together, "NAC

17/20"). *Id.*, ECF No. 543 at 31.  As the result of months of hard-fought negotiations, consensual agreements between the Debtors and each of the ECA lenders and NYL lenders were memorialized in March 2022, in a third amended and restated version of the RSA. *Id.*  This brought the support for the RSA up to 95% of all Total Claims.  *Id.*

The transactions embodied by the RSA deleveraged the Debtors' balance sheet by approximately $4.3 billion in debt pursuant to various equitization and sale transactions, provided the reorganized remaining Debtors with an infusion of approximately $537 million in new money in the form of a $337 million equity rights offering and the addition of a $200 million new revolving credit facility. *Id.*  At emergence, the Debtors were projected to have almost $500 million of available liquidity.  Ex. 81 4:25-5:2, ECF No. 753 at 4-5.  Most importantly, the restructuring transactions preserved customer relationships, maintained jobs, and affirmed the Debtors' market position as a leader in the aircraft leasing industry.  Disclosure Statement Order Ex. 1 § II, ECF No. 543 at 31.  Specifically, the transactions contemplated under the RSA included, among others:

- the equitization of approximately $583 million of the equitizing creditors' pre-Petition Date secured funded debt, coupled with the issuance of longer-maturity takeback debt to those creditors;

- the amendment and restatement of a pre-Petition Date secured term loan facility arrangement, including a maturity extension;

- the orderly exit of certain silos (including a $100 million new money investment in one exiting silo), coupled with the streamlining of certain silo aircraft portfolios;

- the amendment and restatement of various EDC pre-Petition Date secured credit facility arrangements, including the deletion of all financial covenants;

- the amendment and restatement of various ECA pre-Petition Date secured finance lease arrangements, including a term extension and the deletion of all financial covenants;

- the amendment and assumption of certain pre-Petition Date finance lease arrangements with New York Life, including the deletion of all financial covenants;

- an approximately $337 million equity rights offering, fully backstopped by certain equitizing creditors; and

- a $200 million super senior revolving credit facility, fully underwritten by certain equitizing creditors (or, at the Debtors' election, and subject to certain conditions, an alternative exit facility).

Decl. of Justin Bickle in Supp. of Confirmation of Third Am. Joint Ch. 11 Plan ¶¶ 18, 29, ECF No. 706 at 11-12, 15.

A.    **The Plan Process**

The Debtors properly sought to effectuate the transactions contemplated by the RSA through the plan and disclosure statement process.  On January 19, 2022 – a month after the Petition Date, the Debtors filed their *Joint Chapter 11 Plan of Reorganization of Nordic Aviation Capital Designated Activity Company and Its Debtor Affiliates* [ECF No. 186] (as subsequently amended, the "Plan"); their *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Nordic Aviation Capital Designated Activity Company and Its Debtor Affiliates* [ECF No. 187] (as subsequently amended, the "Disclosure Statement"); and their *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect*

*Thereto, and (VI) Granting Related Relief* [ECF No. 188], whereby the Debtors sought Court approval of their Disclosure Statement. After notice and a hearing, having found that the Disclosure Statement contained adequate information as required by section 1125 of the Bankruptcy Code, the Court entered the Disclosure Statement Order.

After entry of the Disclosure Statement Order, the Debtors solicited votes on the Plan in accordance with the solicitation procedures approved by the Disclosure Statement Order. The votes were near unanimous in favor of the Plan. Ex. 81 6:4-6, ECF No. 753 at 6. Out of 199 votes cast at NAC DAC, 198 were in favor of the Plan, representing well over 99% of the Total Claims. *Id.* 6:6-9, ECF No. 753 at 6. Such consensus is not only overwhelming, it is remarkable.

On April 19, 2022, the Court conducted a hearing to consider confirmation of the Plan. All of the Disinterested Directors on behalf of their Debtor entities testified in favor of the Plan. Nord LB, the sole creditor who declined to extend the Forbearance Agreement pre-Petition Date and instead pursued liquidation by an Irish liquidator, was the only creditor who voted to reject the Plan and the only creditor who objected to the Plan. *Id.* 6:7-8, 11:8-10, ECF No. 753 at 6, 11. After a contested evidentiary hearing, the Court overruled Nord LB's objection, which decision is now final and unappealable.[13] Having found that the Plan satisfied the statutory requirements of section 1129 of the Bankruptcy Code, the Court entered an *Order Confirming the Third Amended Joint Chapter 11 Plan of Reorganization of Nordic Aviation Capital Designated Activity Company and its Debtor Affiliates (Technical Modification)* [ECF No. 743] (the "Confirmation Order") and confirmed the Plan on April 20, 2022. The Confirmation Order is final and unappealable. The

---

[13] The Court notes that after the confirmation hearing, the Debtors and Nord LB settled their dispute. Hr'g Tr. 13:22-24, Sept. 14, 2022, ECF No. 1132 at 13.

Plan became effective on June 1, 2022. *See* Notice of (I) Entry of Confirmation Order & (II) Occurrence of Plan Effective Date, ECF No. 925.

The Debtors' Chapter 11 restructuring was a resounding success. The Retained Professionals accomplished the restructuring at breakneck speed. In just over four months, the Retained Professionals reorganized the Debtors with over 99% percent of the creditors voting in support at NAC DAC. Hr'g Tr. 13:18-22, 14:20-22, Sept. 14, 2022, ECF No. 1132 at 13, 14. Only one vote to reject was cast across twenty classes of creditors. *Id.* 13:21-22, ECF No. 1132 at 13. The reorganization deleveraged and recapitalized the Debtors, streamlined their operations, and implemented necessary organizational changes. *Id.* 13:25-14:13, ECF No. 1132 at 13-14. The Debtors were able to emerge from bankruptcy in just over six months, having preserved their customer relationships, having saved their employee's jobs, and maintaining their market position in the aircraft leasing industry. *See id.* 14:17-19, ECF No. 1132 at 14. This result was by no means guaranteed.[14] The Debtors attribute the success of the present cases to their Retained Professionals[15]. *Id.* 14:22-15:4, ECF No. 1132 at 14-15.

### B.    The Compensation Process

The Retained Professionals had to undergo a thorough procedure involving checks, disclosure, notice, and opportunity for objection from all stakeholders well before the Fee Applications ever became came ripe for the Court's consideration (the "Notice Process"). First, the Retained Professionals had to be engaged by the Debtors. Second, the engagement, including

---

[14]    Namely, just two years prior, the Debtors had attempted a less daunting partial restructuring through the Scheme. While the Scheme offer the Debtors some much needed breathing room, it did not provide the comprehensive long-term solution embodied in the RSA, the Plan, and now the Confirmation Order.

[15]    The Reorganized Debtors also attribute their success to the work of Justin Bickle, the chair of the Restructuring Committee. Mr. Bickle unexpectedly passed away during the pendency of these Chapter 11 Cases. The Court expresses its condolences to his family and friends.

the terms of the compensation thereunder, had to be approved by this Court after notice and an opportunity for hearing. *See* Fed. R. Bankr. P. 2014(a). Third, the Retained Professionals were required to apprise the Debtors and certain creditor constituents of their fees on a periodic basis. Fourth, the Retained Professionals were required to file their final Fee Applications, triggering another period of notice and another opportunity for objection. This period included thorough review by, and customary informal negotiations with, the Office of the United States Trustee for Region 4 (the "United States Trustee"). Fifth and finally, the Court afforded the opportunity for a public hearing on the Fee Applications. Having run this gantlet, the Fee Applications of the Retained Professionals stand unopposed.

The professional business relationship begins with the selection process. Considerable deference must be accorded to the parties right to select the professional of their own choosing. The Debtors, relying on the expertise embodied in its Restructuring Committee, performed their due diligence. Negotiation over the terms of the professional's engagement occurred in the open marketplace. As a court will not countenance premium billing, similarly it should not unfairly impose an artificially depressed rate. The market should control.

In selecting the professionals in the case at bar, the Debtors had to consider the complicated nature of their pre-Petition Date debt structure, which included direct facilities, finance leases, JOLCOs, and swaps. The complexity of these financing facilities required the expertise of experienced, highly trained legal, financial, and administrative professionals. In selecting professionals, it is reasonable for a debtor to consider a professional's specialization. *See In re Retail Grp., Inc.*, No. 20-33113-FJS, 2022 Bankr. LEXIS 2702, at *51-52 (Bankr. E.D. Va. Aug. 30, 2022), *adopted as modified by Patterson v. Mahwah Bergen Retail Grp., Inc.*, No. 3:21CV167

(DJN), 2022 WL 4287200, 2022 U.S. Dist. LEXIS 167953 (E.D. Va. Sept. 16, 2022) (quoting *In re Wash. Furniture Mfg. Co.*, 283 B.R. 201, 203 (Bankr. N.D. Miss. 2002)).

The loan agreements were governed by the laws of various countries, including England, Germany, Ireland, and the United States. The choice of law provisions contained in the loan documents required legal advice from experts in each of those jurisdictions. Hr'g Tr. 15:20-23, Sept. 14, 2022, ECF No. 1132 at 15. Given the unique nature and character of the various loan facilities, the Debtors needed specialized advisors with experience in aircraft finance. *Id.* 15:23-16:1, ECF No. 1132 at 15-16. As the Debtors were contemplating a complex global restructuring, the Debtors also needed expert insolvency counsel with experience not only in analyzing aircraft financing agreements in the context of Chapter 11 of the Bankruptcy Code, but across the various practice areas that would be implicated by placing the Debtors into bankruptcy. *Id.*, ECF No. 1132 at 16. In light of the international character of the Debtors' business enterprise, the atypical complexity of the contemplated restructuring transactions, and the cross-disciplinary expertise required, the Debtors ultimately engaged approximately twenty professionals in the United States, United Kingdom, Denmark, and Ireland. *Id.* 16:7-14.

In selecting these Retained Professionals, the Debtors selected a number of national and international firms that charged rates commensurate with those charged by other firms with similar expertise in their respective jurisdictions. *Id.* 16:15-18. The selection decisions were not made in a vacuum – the Debtors were embarking on a series of complex negotiations with all of their various creditor constituencies. The secured lenders also engaged their own professionals who brought with them the same level of competence, experience, and expertise. *See In re Retail Grp., Inc.*, 2022 Bankr. LEXIS 2702, at *51-52 ("[T]he selection of a non-local professional" may be

warranted when there is "involvement of non-local counsel for several creditors." (quoting *In re Wash. Furniture Mfg. Co.*, 283 B.R. at 203)).

The NAC 29 Ad Hoc Noteholder Group engaged Akin Gump Strauss Hauer & Feld LLP, Woods Rogers PLC, Arthur Cox LLP, Houlihan Lokey Capital Inc., and FTI Consulting, Inc. Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Fin., (B) Grant Senior Secured Priming Liens & Superpriority Admin. Expense Claims, & (C) Utilize Cash Collateral; (II) Granting Adequate Prot.; (III) Modifying Automatic Stay; & (IV) Granting Related Relief Annex A, ECF No. 304 at 114 [hereinafter "Final NAC DAC DIP Order"].  The NAC 29 Facilities Group hired Linklaters LLP, Matheson, Whiteford, Taylor & Preston LLP and Perella Weinberg Partners.  Final NAC DAC DIP Order Annex A, ECF No. 304 at 114.  The Silver Point Creditors engaged Milbank LLP ("Milbank"), Lazard & Co. Ltd. ("Lazard"), Kromann Reumert, LimNexus LLP, and A&L Goodbody LLP ("A&L Goodbody").  *Id.*  The NAC 33/34 Creditor Group engaged Milbank, Lazard, A&L Goodbody, Hunton Andrews Kurth LLP, Cleary Gottlieb Steen & Hamilton LLP, and Alton Aviation Consultancy LLC ("Alton Aviation").  *Id.*   The Moelis/Weil/NRF Creditor Group engaged Weil, Gotshal & Manges (London) LLP and Weil, Gotshal & Manges LLP (together, "Weil"), Norton Rose Fulbright LLP ("NRF"), McGuireWoods LLP, Dillon Eustace LLP ("Dillon Eustace"), Horten Advokatpartnerselskab ("Horten"), Moelis & Company UK LLP, Moelis & Company LLC (together with Moelis & Company UK LLP, "Moelis"), Deloitte Ireland LLP ("Deloitte"), and Alton Aviation.  *Id.*

The ECA Prepetition Secured Parties hired Allen & Overy LLP, Williams Mullen, and Blueberry Aviation SAM.  Stipulation & Agreed Order Regarding Am. Final DIP Order Annex A, ECF No. 578 at 125 [hereinafter "Amended Final DIP Order].  Lastly, SAFE Capital and its related entities engaged Brown Rudnick LLP, Vedder Price, Weil, NRF, McGuireWoods LLP,

DillonEustace, Horten, Moelis, Deloitte, and Alton Aviation, among others.    Final Order
(I) Authorizing NAC 17/20 Debtors to (A) Obtain Postpetition Fin., (B) Grant Senior Secured
Priming Liens & Superpriority Admin. Expense Claims, & (C) Utilize Cash Collateral;
(II) Granting Adequate Prot. to Prepetition SAFE Parties; (III) Modifying Automatic Stay; &
(IV) Granting Related Relief Annex A, ECF No. 638 at 67-68 [hereinafter "Final NAC 17/20 DIP
Order"].

Under the pre-Petition Date loan documents, the costs of the lenders' professionals were
contractually shifted to the Debtors, as is typical in commercial debt instruments.  In the context
of these Chapter 11 Cases, professional fees were paid pursuant to the various cash collateral orders
and debtor-in-possession orders entered by this Court in order to provide adequate protection for
the lenders' claims in accordance with section 361 of the Bankruptcy Code. Ex. 81 41:17-23, ECF
No. 753 at 41; *see also* Final NAC DAC DIP Order ¶ 5(c), ECF No. 304 at 34-36 (providing for
the payment of professionals engaged by the NAC 29 Ad Hoc Noteholder Group, the NAC 29
Facilities Group, the Silver Point Creditors, the NAC 33/34 Creditor Group, and the
Moelis/Weil/NRF Creditor Group); Am. Final DIP Order ¶ 5(c), ECF No. 578 at 40-42 (providing
for the payment of ECA Prepetition Secured Parties' professionals); Final NAC 17/20 DIP Order
¶ 5(c), ECF No. 638 at 22-24 (providing for the payment of the SAFE Capital's professionals).
The Plan further provided for continued payment of such lenders' fees on account of the lenders'
substantial contribution to the Chapter 11 Cases. Ex. 81 41:17-23, ECF No. 753 at 41.  As these
professionals were engaged by the lenders themselves and not by the bankruptcy estate, sections
327, 328, and 330 were generally inapplicable to their engagement and compensation.  The market
controlled the terms of their respective engagements.  The Court finds that it was necessary for the
Debtors to have their own set of competent professionals who could effectively negotiate with the

lenders' various professionals at all levels.  In this context, the Debtor's employment of the Retained Professionals served to maximize value of the Debtors' estates for the benefit of all creditor constituencies.

The majority of these Retained Professionals were not selected on the eve of bankruptcy. Rather, lead counsel and special counsel for the Debtors and certain of the Debtors' financial advisors had been engaged prior to the Scheme.  The various lead counsel for the Disinterested Directors were all engaged in contemplation of the Forbearance Agreement.  These professionals all spent considerable time working on the restructuring contemplated by the RSA, memorialized in the Plan, and finalized by the Confirmation Order.  The Retained Professionals brought their institutional knowledge about the Debtors with them into these Chapter 11 Cases.  The Court finds that the Debtors performed the necessary due diligence and exercised their reasonable business judgment in selecting the Retained Professionals.

Once the Debtors filed for bankruptcy, the Retained Professionals still had to be employed pursuant to either section 327 or section 328 of the Bankruptcy Code.  To that end, each Retained Professional was required to file an employment application.  Pursuant to Bankruptcy Rule 2014, each applications had to contain

> specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee

Fed. R. Bankr. P. 2016(a)*.*  Each Retained Professional was required to publicly file its employment application with the Court with notice to all parties in interest and provide an opportunity for a hearing thereon.  *See* Local Bankruptcy Rule 2014-1 (concerning service and

objection requirements for employment applications in Chapter 11 cases). As more fully detailed herein, there were no objections to the employment of any of the Retained Professionals and, as such, the Court then approved the retention of each of the Professionals.

The employment application disclosed the terms of the Retained Professional's proposed compensation, including hourly rates. All parties in interest had the opportunity to object if the rates appeared to be disproportionate to the market or otherwise excessive. If no objection is filed and if the Court agrees that the terms of the engagement appear to be reasonable, the Court will enter an order approving the employment. But such an order does not allow for payment of the requested compensation. It only sets the rate or other terms upon which approved services will be paid. The allowance and payment of such compensation still requires Court approval.

In these Chapter 11 Cases, the Debtors' Restructuring Committee drafted and distributed a professional fee protocol document that set forth parameters to guide legal professionals and staff and their teams working on these Chapter 11 Cases. Hr'g Tr. 12:15-18, Sept. 14, 2022, ECF No. 1132 at 12. The protocol was designed to promote transparency, discipline, and efficiency in staffing and executing various workstreams, and included, among other things, guidelines for numbers of attorneys participating in certain meetings, partner oversight of associate staffing levels, and disclosure of the names, workstreams, and billing rates of each attorney involved in the Chapter 11 Cases. *Id.* 12:18-25.

To effectuate the protocol and as is common in larger Chapter 11 cases, on January 18, 2022, the Debtors filed a motion seeking formal approval of the protocol (the "Motion to Approve Protocol"). Debtors' Mot. (I) Establishing Proc. for Interim Comp. & Reimbursement of Expenses for Retained Pros. & (II) Granting Related Relief, ECF No. 182; *see also* Local Bankruptcy Rule Ex. 15 ¶ 5 (setting forth permissive guidelines for interim compensation procedures). After notice

and an opportunity for hearing, no objections were filed to the Motion to Approve Protocol.

Accordingly, on February 3, 2022, the Court entered the *Order (I) Establishing Procedures or*

*Interim Compensation & Reimbursement of Expenses for Retained Professionals & (II) Granting*

*Related Relief* [ECF No. 295] (the "Interim Compensation Order").  In accordance with the Interim

Compensation Order, on or after the 21st day of each month, the Retained Professional could file

an application (the "Monthly Fee Statement") for interim allowance of compensation for services

rendered and reimbursement of expenses incurred for the immediately preceding month.  Interim

Comp. Order ¶ 2(a), ECF No. 295 at 2.  In addition to being publicly filed on the Court's docket,

the Monthly Fee Statement was required to be served on the Debtors, counsel for the Debtors,

counsel for the various lenders, and the United States Trustee (the "Application Recipients").  *Id.*,

ECF No. 295 at 2-4.  The Application Recipients had twenty-one days to object to the Monthly

Fee Statement.  *Id.* ¶ 2(b), ECF No. 295 at 4.  In the event of an objection, the Interim

Compensation Order provided for a dispute resolution process.  *Id.* ¶ 2(c), ECF No. 295 at 5.  If

no objections were filed, the Debtors were authorized but not directed to pay up to 80% of the

monthly fees and 100% of the monthly expenses subject to the terms of the Final NAC DAC DIP

Order, as modified by the Amended Final DIP Order.  *Id.* ¶ 2(b), ECF No. 295 at 4-5.

In accordance with the Interim Compensation Order, the Retained Professionals filed

Monthly Fee Statements with the Court and served them on the Application Recipients, including

the Debtors.  When received by the Debtors, the Restructuring Committee would read and analyze

each invoice included in a given Monthly Fee Statement.  Hr'g Tr. 12:5-7, Sept. 14, 2022, ECF

No. 1132 at 12.  If the Restructuring Committee believed that the fees appeared high, it would

request additional information regarding services rendered or changes in hourly rates, clarification

regarding which workstream(s) in which individual professionals were engaged and whether the

number of professionals at a given time was necessary, given changing levels and activity in these Chapter 11 Cases. *Id.* 12:7-14. These informal inquiries, along with the informal inquiries of other Application Recipients, including but not limited to the United States Trustee, resulted in occasional voluntary, agreed-upon reductions in fees.

The Application Recipients also included various lenders. Throughout these Chapter 11 Cases, members of the Restructuring Committee met on a weekly basis with the Committee of Restructuring Creditors (the "CRC"), an ad hoc committee of representatives of the largest equitizing creditors. *Id.* 13:1-4, ECF No. 1132 at 13. As the now-owners of the Reorganized Debtors, the CRC had a direct monetary incentive to monitor the professional fee burden. *Id.* 13:895. Accordingly, at their weekly meetings, the Restructuring Committee would provide the CRC with an update regarding all professional fees, including those of the Retained Professionals, relative to forecasted amounts. *Id.* 13:4-7.

Throughout these Chapter 11 Cases, this efficient monitoring process worked well. No formal objections were ever filed with respect to any of the publicly docketed Monthly Fee Statements. While the Debtors were authorized to pay Retained Professionals certain percentages of their invoiced amounts subject to an agreed-upon holdback, all fees and expenses paid pursuant to the Interim Compensation Order were an on interim basis and subject to further review pursuant to an application for compensation under section 330 and 331. Interim Comp. Order ¶ 4, ECF No. 295 at 7. The Interim Compensation Order specifically provided that "[a]ll fees and expenses paid to Professionals under the Compensation Procedures are subject to challenge and disgorgement until final allowance by the Court." *Id.* ¶ 3, ECF No. 295 at 6. The Interim Compensation Order simply provided a mechanism whereby the Retained Professionals would not be serving as

involuntary financiers of the Debtors for the benefit of their secured lenders, whose professionals were being timely paid in accordance with the cash collateral and DIP financing orders.

The Retained Professionals still had to seek Court approval of payment of their compensation and reimbursement of their expenses in accordance with sections 330 and 331 of the Bankruptcy Code. Typically, interim fee applications are filed every 120 days. *See* 11 U.S.C. § 331 (permitting professional persons to file applications for interim compensation every 120 days "or more often if the court permits"). Given the remarkable speed of these Chapter 11 Cases, no interim fee applications were filed. Instead, in accordance with the timetable established by the Plan, Ex. 80 § II(E), ECF No. 727 at 61, the Retained Professionals each filed their Fee Applications on the Court's docket, seeking final approval of payment of compensation and reimbursement of their expenses. The Fee Applications were served in accordance with the Bankruptcy Rules, the Local Bankruptcy Rules, and prior Orders of this Bankruptcy Court. All parties in interest had notice and an opportunity to respond to the Fee Applications during the notice period (the "Notice Period"). No objections were filed with the Court. This makes sense, given the total fees came in 10% below the Restructuring Committee's forecasts. Hr'g Tr. 13:12-14, Sept. 14, 2022, ECF No. 1132 at 13.

During the Notice Period, the United States Trustee had the opportunity to conduct a thorough review of each of the Fee Applications filed with the Court.[16] Resp. of U.S. Trustee to Final Fee Appls. 4, ECF No. 1078 at 4 [hereinafter "U.S. Trustee Response"]. The United States Trustee is statutorily charged with "reviewing, in accordance with procedural guidelines adopted by the Executive Office of the United States Trustee ("which guidelines shall be applied uniformly

---

[16] Prior to the filing of the Fee Applications, certain of the Retained Professionals had already engaged with the United States Trustee and had voluntarily reduced their fees and expenses in the aggregate amount of $197,632.94 based on those informal discussions. U.S. Trustee Resp. 4, ECF No. 1078 at 4.

by the United States trustee except when circumstances warrant different treatment, applications filed for compensation and reimbursement under section 330" of the Bankruptcy Code.  28 U.S.C. § 586(a)(3)(A)(i).  Consistent with Congress' mandate, the United States Trustee Program (the "USTP") established guidelines for reviewing applications for compensation and reimbursement of expenses filed by attorneys in Chapter 11 cases, excluding single asset real estate cases, with $50 million or more in assets and $50 million or more in liabilities.  App. B Guidelines for Reviewing Appls. for Comp. & Reimbursement of Expenses Filed Under U.S. Code by Att'ys in Larger Ch. 11 Cases, 78 Fed. Reg. 36,248 (June 17, 2013) [hereinafter "USTP Guidelines"].

While the USTP Guidelines are neither binding on this Court nor do they replace the Court's independent duty to evaluate fee applications, the Court nonetheless finds the guidelines helpful in the exercise of its independent duty to evaluate the Fee Applications.  As noted therein, the goals of the USTP Guidelines are, among other things, "[t]o ensure that bankruptcy professionals are subject to the same client-driven market forces, scrutiny, and accountability as professionals in non-bankruptcy engagements" and "that all professional compensation is reasonable and necessary, particularly as compared to the market."[17]  Id. § B(1)(a), (b).

To accomplish such goals, among other things, the USTP Guidelines require disclosure of customary and comparable compensation to ensure that the compensation sought is reasonable as compared to market measured by the billing practices of the applicant and its peers for bankruptcy and non-bankruptcy work.[18]  Id. §§ B(2)(b), (C)(3).  They require the preparation of a budget and

---

[17]    "The United States Trustee will ordinarily object to fees that are above the market rate for comparable services." USTP Guidelines § B(2)(b).  The United States Trustee did not object to any of the Fee Applications.

[18]    As a general guideline, "[t]he United States Trustee will not objection to 'non-forum' rates of professionals when the 'non-forum' rates are based on the reasonable rates where the professionals maintain their primary office, even if the locally prevailing rates where the case is pending are lower (i.e., *a professional may bill the same reasonable rate in any forum*).  Id. § B(l) (emphasis added).

staffing plan.  *Id.* §§ B(2)(m); C(6).  In addition to requiring copies of the billing records be filed

in a searchable format, *id.* § C(10), the USTP Guidelines also require the submission of a summary

of compensation requested not only by timekeeper but also by project category, *id.* § C(14)(b),(c).

At the conclusion of its review, in accordance with the USTP Guidelines, the United States

Trustee provided the Retained Professionals informal comments, concerning: (i) possible

excessive billing for multiple professionals attending court appearances, teleconferences, and

meetings; (ii) vague time entries; (iii) blocked or lumped time entries; (iv) non-compensable

clerical tasks; (v) excessive or duplicative time entries; (vi) transitory timekeepers; and

(vii) services rendered beyond the scope of employment.  U.S. Trustee Resp. 4, ECF No. 1078 at

4.  In light of those informal comments, the Retained Professionals agreed to additional reductions

to their Fee Applications in the aggregate amount of $853,220.01.  *Id.*  Satisfied with the negotiated

reductions, the U.S. Trustee did not object to any of the Fee Applications.

On July 27, 2022, the Court issued its *Scheduling Order* [ECF No. 1047] (the "Scheduling

Order") in these Chapter 11 Cases, thereby scheduling the evidentiary Hearing on the Fee

Applications.  The Scheduling Order required each Retained Professional to submit evidence in

support of its Fee Application, along with corresponding evidentiary deadlines.  Scheduling Order

¶ 2, ECF No. 1047 at 5-6.  In accordance with the Scheduling Order, in the absence of any timely

objection, pre-filed exhibits would be deemed admitted and persons wishing to cross-examine

witnesses disclosed on a pre-filed witness list would be required to file a statement to that effect

in advance of the Hearing.  *Id.* ¶ 2(A), (b), ECF No. 1047 at 6.  No such objections or statements

were filed.  No party objected at the Hearing.  Although the Fee Applications were subjected to

many stages of scrutiny with ample opportunity for objection throughout the Notice Process, not

a single stakeholder has objected to the final fees and expenses sought by any of the Retained Professionals.  It is in this context that the Fee Applications are now before the Court for approval.

### Legal Standard

Modern bankruptcy compensation jurisprudence derives from two hard-won realizations: first, that for reorganizations to be successful, debtors need high-quality professional services; and second, that to attract those services, professionals need to be paid the fair rates they would ordinarily receive outside of bankruptcy.  *See In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 578 (Bankr. D. Utah 1985).  "[I]ntend[ing] for market rates to govern allowance of fees in bankruptcy cases,"[19] Congress enacted the modern statutory regime for compensation of professional services in bankruptcy.  *Id.*  Having statutorily abolished "the economy principle, a time-honored yet curious notion that attorneys practicing bankruptcy should be paid less than those practicing in other forums," Congress enacted sections 327 through 331 of the Bankruptcy Code, which governs these Fee Applications.  *Brooks v. Nachman* (*In re McLean*), 6 B.R. 327, 328 (Bankr. E.D. Va. 1980).  "[A]ttorneys are [no longer] limited by an arbitrary figure; the beacon is reasonableness. What constitutes a reasonable fee will vary from case to case depending upon the complexity of the issues presented."  *Id.*

Section 330(a)(3) of the Bankruptcy Code provides a non-exhaustive set of factors for bankruptcy courts to consider in determining reasonable compensation for professionals retained under section 327.  This analysis applies to all of the Retained Professionals except for Rothschild.  These factors are:

---

[19]    The distinction between local and national rates is of no moment.  The statutory scheme implemented by Congress requires that a court's consideration of the reasonable rate of professional compensation be determined by the *market*.  The appropriate *market* rate will be set by the appropriate market for a comparatively skilled professional, which may be national or local or local for a jurisdiction outside of this Court's district, as appropriate under the circumstances.

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (the "§ 330 Factors").  In addition, bankruptcy courts generally do not allow compensation for unnecessary duplication of services or for services that were neither reasonably likely to benefit the debtor's estate nor necessary to the administration of the case.  *Id.* § 330(a)(4).

The § 330 Factors are not exclusive.  Bankruptcy courts in the Fourth Circuit have supplemented these considerations with the *Johnson* factors.  *See In re Great Sweats, Inc.*, 113 B.R. 240, 241-42 (Bankr. E.D. Va. 1990); *In re Zota Petroleums*, LLC, No. 11-35079-DOT, 2011 WL 6140675, at *1 (Bankr. E.D. Va. Dec. 9, 2011) ("The factors set out in § 330(a)(3) do not preclude consideration of the more detailed lodestar analysis, and either test should produce the same result.").  The *Johnson* factors include:

> (1) the time and labor expended;
> (2) the novelty and difficulty of the questions raised;
> (3) the skill required to properly perform the legal services rendered;
> (4) the attorney's opportunity costs in pressing the instant litigation;
> (5) the customary fee for like work;
> (6) the attorney's expectations at the outset of the litigation;
> (7) the time limitations imposed by the client or circumstances;
> (8) the amount in controversy and the results obtained;
> (9) the experience, reputation and ability of the attorney;
> (10) the undesirability of the case within the legal community in which the suit arose;

35

(11) the nature and length of the professional relationship between attorney and client; and

(12) attorneys' fees awards in similar cases.

*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978). In applying the *Johnson* factors, the Court must heed the Fourth Circuit's admonition against per se rules "beyond those legislatively mandated," noting the Court cannot "abdicate the equitable discretion granted to it by establishing rules of broad application which fail to take into account the facts of a particular case and the overall objectives of the bankruptcy system."[20] *Harold & Williams Dev. Co. v. U.S. Trustee* (*In re Harold & Williams Dev. Co.*), 977 F.2d 906, 910 (4th Cir. 1992).

"In determining the amount of reasonable compensation to be awarded," the plain language of the Bankruptcy Code directs the Court to consider the "customary compensation charged by comparably skilled practitioners in cases other than cases under [title 11]." 11 U.S.C. § 330. The Court must, therefore, look at whether the rates charged are consistent with those set in the relevant market. The marketplace will establish the benchmark for what is a reasonable rate of compensation in any given case. The market rate will be set for the most part by the amount clients are willing to pay for professional services.[21] The factors clients may consider in the selection process might include the reputation of the professional, the specialization of the professional, the need for the professional's experience and expertise, the stakes of the transaction, and the time pressures of the engagement.

---

[20]   In abiding by the Fourth Circuit's admonition against a "rule[ ] of such broad application," this Court may not adopt any additional requirements for fee applications. *See In re Harold & Williams Dev. Co.*, 977 F.2d at 910; *but see Patterson v. Mahwah Bergen Retail Grp., Inc.*, No. 3:21CV167 (DJN), 2022 WL 4287200, 2022 U.S. Dist. LEXIS 167953 (E.D. Va. Sept. 16, 2022).

[21]   In Chapter 11 bankruptcy cases, fees are initially determined under contracts negotiated by sophisticated parties. There is not a statutory fee shifting element at play. Unlike contractual prevailing party provisions where the obligation to pay is triggered to some litigation outcome, the financial instruments utilized by most sophisticated lenders call for the contractual shifting of the obligation to pay professional fees from the lender to the borrower as an ordinary expense of the financing.

Much ink has since been spilled differentiating so-called "local" rates from "national" rates. The distinction is much ado about nothing.[22] The market for professional services cannot be predetermined by geography alone. The Court is aware that business has become more global. No case represents this business reality better than in the case at bar. As the Chief Judge for this bankruptcy court noted, "[t]he statute and case law emphasize the need for a flexible, facts-and-circumstances approach to difficult resource-allocation issues. What is necessary and reasonable in one case may be totally inappropriate in another." *In re Retail Grp., Inc.*, 2022 Bankr. LEXIS 2702, at *67.

The Court can glean a good understanding of the market at play in any given case from a number of sources. One is the rate that the professionals, other than those engaged by the debtor, are charging for their services.[23] Another derives from the DIP financing budgets.[24] The Debtors'

---

[22] Just as the title of the Bard's comedy plays on word references to secrets and trickery, so too does geography play on references to the market rate. *See* William Shakespeare, *Much Ado About Nothing*.

[23] Although other professionals do not file fee applications, their fees are disclosed on the DIP financing budgets, discussed more fully in note 24 *supra*. Here, professionals for the NAC 29 Ad Hoc Noteholder Group, the NAC 29 Facilities Group, the Silver Point Creditors, the NAC 33/34 Creditor Group, the Moelis/Weil/NRF Creditor Group, and the ECA Prepetition Secured Parties were budgeted to spend $28.3 million in fees from January 14, 2022, through April 15, 2022, whereas the Debtors were budgeted to spend $21.6 million in fees for the same time period. Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Fin., (B) Grant Senior Secured Priming Liens & Superpriority Admin. Expense Claims, & (C) Utilize Cash Collateral; (II) Granting Adequate Prot.; (III) Modifying Automatic Stay; (IV) Scheduling Final Hr'g; & Granting Related Relief Ex. 3, ECF No. 171 at 311 [hereinafter "Interim NAC DAC DIP Order"]. For the NAC 17/20 Debtors, the secured professionals were budgeted to spent $1.9 million in fees from March 11, 2022, through June 3, 2022, whereas the NAC 17/20 Debtors were budgeted to spent $600,000 in fees for the same time period. Interim Order (I) Authorizing NAC 17/20 Debtors to (A) Obtain Postpetition Fin., (B) Grant Senior Secured Priming Liens & Superpriority Admin. Expense Claims, & (C) Utilize Cash Collateral; (II) Granting Adequate Prot.; (III) Modifying Automatic Stay; (IV) Scheduling Final Hr'g; & Granting Related Relief Ex. 2, ECF No. 542 at 124 [hereinafter "Interim NAC 17/20 DIP Order"]. The Retained Professionals came in under budget. *See* Hr'g Tr. 13:12-14, Sept. 14, 2022, ECF No. 1132 at 13.

[24] Debtor-in-possession (or "DIP") financing is post-petition financing extended to debtors pursuant to section 364 of the Bankruptcy Code. Although the Bankruptcy Code permits some statutory incentives for DIP financing, *see* 11 U.S.C. § 364(b)-(d), DIP financing usually contains similar loan covenants as sophisticated financial instruments outside of bankruptcy. In addition to these normal and customary terms, a debtor is typically only authorized to use the financing in accordance with the terms of a thirteen-week cash-flow budget, subject to permitted variances. Generally speaking, debtors are required to provide weekly or bi-weekly reports to its

monthly operating reports can provide another source.[25]  The information required by USTP Guidelines can help to establish the relevant market.  The checks and balances built into the fabric of the reorganization process to police the market provide still another source.[26]  The Court generally has a keen grasp on the market with which it is dealing.

Certain compensation arrangements approved under section 328 of the Bankruptcy Code require evaluation under a far more deferential standard.  While set by the market, they use a success-based metric to determine the reasonable amount of compensation.  As construed by at

---

stakeholders.  A variance from the line item on the budget may constitute an event of default under the DIP financing loan documents.

Bankruptcy professionals' fees are a usual line item of a DIP financing budget and were line items in the budgets filed in these Chapter 11 Cases.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.

[25]  With the exception of small business debtors, Chapter 11 debtors are required to file monthly operating reports ("MORs") using a standard form.  28 C.F.R. § 58.8 (2021).  MORs disclose various post-petition financial information, including cash receipts and disbursements, updated balance sheet, and a statement of operations for the month.  *Id.* § 58.8(b).  In addition to the foregoing, MORS are required to disclose "[a]ll professional fees approved by the court in the case during the reporting period and cumulatively since the date of the order of relief."  *Id.* § 58.8(b)(8).  Given the speed of these Chapter 11 Cases, there were no fees approved on an interim basis.  That being said, the MORs disclosed accrued, but unapproved professional fees.  *See* Jan. 2022 MOR, ECF No. 559 at 14 (for January 2022, $0 paid to Debtors' professional fees; $2.859 million paid on account of secured lenders' professional fees); Feb. MOR, ECF No. 615 at 14 (for February 2022, $415,000 paid to Debtors' professional fees in accordance with the Interim Compensation Order; $8.011 million paid on account of secured lenders' professional fees); Mar. MOR, ECF No. 798 at 14 (for March 2022, $1.657 million paid to Debtors' professional fees in accordance with the Interim Compensation Order; $5.896 million paid on account of secured lenders' professional fees); Apr. MOR, ECF No. 937 at 14 (for April 2022, $8.725 million paid to Debtors' professional fees in accordance with the Interim Compensation Order; $10.422 million paid on account of secured lenders' professional fees); May MOR, ECF No. 1022 at 14 (for May 1, 2022 through June 1, 2022 (the Effective Date), $3.015 million paid to Debtors' professional fees in accordance with the Interim Compensation Order; $48.784 million paid on account of secured lenders' professional fees).  As is evident from the MORs, on an aggregate basis the Retained Professionals charged significant less ($56 million) as the secured lenders' professionals (almost $76 million).

[26]  As discussed herein, the CRC would receive weekly reports from Mr. Cooke regarding the professional expenses incurred in these Chapter 11 Cases.  The CRC was comprised of representatives of the largest equitizing creditors.  Hr'g Tr. 13:1-4, Sept. 14, 2022, ECF No. 1132 at 13.  Because all unsecured debt rode through unimpaired, these sophisticated secured creditors were effectively the only parties paying the Retained Professionals' bills.  This was a formidable check on billing.  Moreover, any party in interest could review the copious filings the Retained Professionals made on the public docket, and, if they desired, object.  Again, no objections were filed.

least one court in the Fourth Circuit, in order to change a previously approved fixed fee of a professional retained under section 328 of the Bankruptcy Code, there must be a "specific finding of 'unanticipated developments that rendered the original terms improvident.'" *In re Merry-Go-Round Enters. Inc.*, 244 B.R. 327, 336 (Bankr. D. Md. 2000) (quoting *Pitrat v. Reimers* (*In re Reimers*), 972 F.2d 1127, 1129 (9th Cir 1992); *see also Donaldson Lufin & Jenrette Sec. Corp. v. Nat'l Gypsum Co.* (*In re Nat'l Gypsum Co.*), 123 F.3d 861, 863 (5th Cir 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment. Courts must protect those agreements and expectations, once found to be acceptable.").  The compensation for most of the professionals employed in the case at bar was not approved under section 328 of the Bankruptcy Code, and accordingly, those Fee Applications will be evaluated under section 330 of the Bankruptcy Code.

## Analysis

The Notice Process having now been exhausted, the Court undertakes its own independent review of the Fee Applications.[27]  In so doing, the Court reviews the Fee Applications "much as a sophisticated non-bankruptcy client would review a legal bill."  *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 848 (3d Cir. 1994).  "The most remarkable impact of market reliance under § 330 is that the court's review of fee applications becomes primarily an exercise in fact-finding, with relatively little room for the application of inflexible legal rules."  *Id.*  For the reasons below, the Court approves the Fee Applications as modified in light of the United States Trustee Response.

---

[27]  The analysis conducted herein focuses on whether the amounts of the requested fees are reasonable.  All expenses were actual, necessary, and itemized.  The Court specifically finds that the expenses were reasonable and necessary under the circumstances.  As such, the Retained Professionals are entitled to reimbursement of the requested expenses under section 503(b)(2) of the Bankruptcy Code.

## I.  Use of Local and Lead Counsel

Most of the Debtors' attorney professionals can be classified into one of two categories: lead counsel and separate local counsel.  The Court finds that the employment of both is proper and warranted under the circumstances of this case.  Lead counsel were all engaged prior to the Forbearance Agreement and, in some cases, prior to the Scheme.  The replacement of any of the lead counsel would have increased fees due to lost institutional knowledge and disrupted negotiations.  Pursuant to Local Bankruptcy Rule 2090-1(E)(3), attorneys not admitted to practice in this Court may only appear pro hac vice, "provided that in all appearances said attorney shall be accompanied by a member of this [Court's b]ar."  As lead counsel were not members of this Court's bar, they were required to obtain local counsel. Accordingly, the Court finds that the use of local and lead counsel was reasonable and necessary under the circumstances of these Chapter 11 Cases.

## II.  Debtors' Counsel

The Debtors engaged a number of attorneys to assist them in these Chapter 11 Cases: (1) Kirkland as lead counsel; (2) Kutak Rock as local counsel; (3) William Fry as special Irish counsel; (4) Clifford Chance as special aviation counsel; and (5) Gorrissen as special Danish counsel ("collectively, the "Debtors' Counsel").  As more fully described herein, the Court finds that each of Debtors' Counsel performed a different but critical component of the restructuring process in these cases.  They each brought an expertise that the others could not.  Kirkland had the experience, knowledge, and bandwidth to handle complex international Chapter 11 Cases.  Kutak Rock served the critical role as Kirkland's local counsel.  Kutak held important knowledge and experience about the workings of this Court.  It was aware of the Court's practices, and procedures and served to help streamline the bankruptcy process.  William Fry was employed for its special

knowledge of Irish law, necessary as some of the Debtors were Irish corporations, and therefore subject to Irish corporate and tax law.  Other of the Debtors were headquartered in Denmark or were Danish entities.  Gorrissen was employed for its special knowledge of Danish law.  Finally, Clifford Chance was employed for its special knowledge of aviation law and local laws in regions outside the United States, Ireland, and Denmark.  As more fully described below, the services each performed were both reasonably likely to benefit the Debtors' estates and necessary to the administration of the Chapter 11 Cases.  Accordingly, the Court now turns to evaluate whether each of Debtors' Counsel is entitled to their sought compensation.

### A.      Kirkland

Kirkland served as lead counsel to the Debtors.[28]  Kirkland is widely recognized as an industry leader in the restructuring space, advising approximately 38% of the 257 companies with at least $100 million in assets that filed Chapter 11 between 2019 and 2021.  Hr'g Tr. 16:24-17:3, Sept. 14, 2022, ECF No. 1132 at 16-17.  On January 14, 2022, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of the Petition Date* [ECF No. 178] (the "Kirkland Employment Application").  Ex. 1, ECF No. 178.  The Kirkland Employment Application clearly disclosed the services Kirkland intended to provide and the terms of compensation for such services, including the hourly rates that Kirkland would charge.  *Id.*  The hourly rates did not change from what Kirkland charged in their lengthy pre-Petition Date representation of the Debtors, nor from other comparable Chapter 11 clients, regardless of venue.  Ex. 1 ¶ 15, ECF No. 178 at 7.  Notice of the

---

[28]  Clients are entitled to the counsel of their choice.  That is just as true in bankruptcy as it is in any form of civil litigation or in any business transaction.  In making that selection, a debtor may need to hire a large law firm because of the complexity of legal issues and sheer volume of work involved.

Kirkland Employment Application was provided to all requisite notice parties in accordance with the *Procedures for Complex Chapter 11 Cases in the Eastern District of Virginia* (the "Case Management Procedures") adopted by Rule 1075-1 of this Court's Local Bankruptcy Rules.

As no objection was timely filed to the Kirkland Employment Application, on February 3, 2022, the Court entered the *Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of the Petition Date* [ECF No. 294] (the "Kirkland Employment Order"). Ex. 25, ECF No. 294.  As more fully detailed in the Kirkland Employment Order, the Debtors were authorized to retain and employ Kirkland as their attorneys effective as of the Petition Date in accordance with the terms and conditions set forth in the Kirkland Employment Application and engagement letter submitted therewith, including the hourly rates charged.  Ex. 25 ¶ 2, ECF No. 294 at 3.  Kirkland's services included (i) advising the Debtors with respect to their powers and duties as debtors-in-possession in the continued management and operation of their businesses and properties, (ii) advising and consulting on the conduct of these Chapter 11 Cases, including all the legal and administrative requirements of operating in Chapter 11, and (iii) attending meetings and negotiating with representatives of creditors and other parties in interest.  Kirkland also performed other necessary legal services for the Debtors in connection with the prosecution of these Chapter 11 cases, including (i) analyzing the Debtors' leases and contracts and the assumption and assignment or rejection thereof; (ii) analyzing the validity of liens against the Debtors' assets; and (iii) advising the Debtors on corporate and litigation matters.  Hr'g Tr. 17:3-16, Sept. 14, 2022, ECF No. 1132 at 17.  Kirkland was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  Ex. 25 ¶ 4, ECF No. 294 at 4.

42

In accordance with the Interim Compensation Order, Kirkland timely and properly filed and served its Monthly Fee Statements.  Ex. 60, ECF No. 455; Ex. 75, ECF No. 622; Ex. 93, ECF No. 788; Ex. 109, ECF No. 916; Ex. 132, ECF No. 995.  Kirkland's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 8, 2022, the Debtors timely filed the Kirkland Fee Application.  Ex. 125, ECF No. 972. Kirkland seeks compensation in the total amount of $14,711,895.00 and reimbursement of actual and necessary expenses in the amount of $226,673.76 that Kirkland incurred for the period from December 17, 2021, through and including June 1, 2022.  Ex. 125 at 2, ECF No. 972 at 7.  The Kirkland Fee Application complies with the USTP Guidelines.

Pursuant to issues informally raised by the United States Trustee, Kirkland agreed to a voluntary reduction of $500,000.00 from the amounts initially sought in the Kirkland Fee Application.  Ex. 172 § 1, ECF No. 1078 at 13.  In light of the negotiated reduction, the United States Trustee had no objection to the allowance of fees in the reduced amount of $14,211,895.00 and expenses in the amount of $226,673.76.  *Id.*

The Debtors served the Kirkland Fee Application on all necessary parties on June 24, 2022, in accordance with the Case Management Procedures.  *See* Ex. 176.  Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Kirkland Fee Application were due on or before July 15, 2022.  *See id.*  There were no objections filed with

respect to the Kirkland Fee Application.  *See id.*  Nonetheless, the Court has independently

evaluated the merits of the Kirkland Fee Application under the § 330 Factors and the *Johnson*

factors.

Kirkland billed 14,725.6 hours in connection with the services for which it seeks

compensation.[29]  Ex. 125 ¶ 27, ECF No. 972 at 21.  Given the scope of Kirkland's employment,

this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  Kirkland billed at a blended

rate of $999.07 for all timekeepers.[30]  Ex. 125, ECF No. 972 at 2; *see* 11 U.S.C. § 330(a)(3)(B).

This fell well below the budgeted hourly blended rate of $1,031, Ex. 125 Ex. D, ECF No. 972 at

94, and the blended hourly rate $1,062.77 for all Kirkland domestic timekeepers on

non-bankruptcy matters, *id.* Ex. E, ECF No. 972 at 96.  *See* 11 U.S.C. § 330(a)(3)(F).  The blended

rate for all attorneys was $1,024.79.  Ex. 125, ECF No. 972 at 5.  Kirkland's actual hourly billing

rates for attorneys working on these Chapter 11 Cases ranged from $625 to $1,845.  *Id.* ¶ 73, ECF

No. 972 at 47.  The hourly rates varied based on the experience and seniority of the timekeeper.

*Id.* ¶ 74, ECF No. 972 at 47.  These hourly rates are equivalent to the hourly rates and

corresponding rate structure used by Kirkland for restructuring, workout, bankruptcy, insolvency,

and comparable matters, and similar complex corporate, securities, and litigation matters, whether

in court or otherwise, regardless of whether a fee application is required.[31]  *Id.* ¶ 73, ECF No. 972

---

[29]   Kirkland's role in this case would be undesirable, if not impossible, for smaller, regional firms.  The sheer number of human hours expended at Kirkland in less than half a year is staggering, and would be difficult to accomplish at anything less than a national or international firm.  Moreover, review of the Kirkland Fee Application shows work across a variety of practice areas, including bankruptcy, corporate governance, insurance, tax, regulatory law, and international law.  Ex. 125 ¶ 35, ECF No. 972 at 24-25.  Taken together, work of this magnitude would only be possible at a large firm, and it would be undesirable at anything other than a commensurate rate.

[30]   A blended rate is the total dollar amount billed by all timekeepers divided by the total number of hours billed.  A full breakdown of the hourly rates charged by each attorney timekeeper is included in the Kirkland Fee Application.  Ex. 125, ECF No. 972 at 3-5.

[31]   Considering Kirkland billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

at 47; *see* 11 U.S.C. § 330(a)(3)(F).  Moreover, these rates and this rate structure is within market

for matters that are typically national in scope and involve great complexity, high stakes, and

severe time pressures – all of which were present in these Chapter 11 Cases.  Ex. 125 ¶ 73, ECF

No. 972 at 47; *see* 11 U.S.C. § 330(a)(3)(F).  The compensation sought by Kirkland is similar to

the fee awards in similar complex international bankruptcy cases.  The compensation is consistent

with the terms approved by the Kirkland Employment Order.

Kirkland's services were necessary, essential, and beneficial to the administration of the

Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  Kirkland brought a wealth of specialized

knowledge to this case.  The Debtors' financial condition was urgent.  The Debtors' holdings and

creditors were international in scope.  Many of the creditors involved in these cases engaged

counsel outside the Eastern District of Virginia.  The fees assessed by Kirkland and the other

Retained Professionals were not excessive, but rather they are in the same range as the fees charged

by the Debtors 'secured lenders.  Hr'g Tr. 31:12-15, Sept. 12, 2022, ECF No. 1132 at 31.[32]

Kirkland's lengthy relationship with the Debtors allowed Kirkland invaluable institutional

knowledge as well as assisted in guiding the Debtors into their "soft landing" in Chapter 11,

thereby creating additional value.  *See* Ex. 125 ¶ 8, ECF No. 972 at 9 (noting "months of prepetition

efforts to build consensus across the Debtors' varied creditor constituencies" and the execution of

a soft landing).  Kirkland's representation also enabled the Debtors to, among other things, (i) enter

into the RSA that ultimately garnered the almost complete of their capital structure, (ii) secure the

approval of all of their "first day" and "second day" motions; (iii) retain multiple professionals,

including international advisors; (iv) file the required schedules and statements of financial affairs

---

[32]    Although requiring no Court approval under section 330 of the Bankruptcy Code,  the Debtors were paying those
fees as well.

for the Debtors; (v) secure two debtor-in-possession financing facilities and obtain approval of the consensual use of cash collateral; (vi) obtain approval of the sale of aircraft pursuant to several different transactions; (vii) consummate settlements with key creditor constituencies; (viii) coordinate with advisors in several international jurisdictions to analyze the domestic and international tax implications of several possible reorganizational structures; (ix) file multiple versions of their Plan; (x) secure confirmation of the Plan with the near-unanimous support of creditors; and (xi) facilitate the Debtors' emergence from Chapter 11 in only five and a half months. *Id.* ¶ 9, ECF No. 972 at 9-10.  These services were central to the successful reorganization of Debtors and created enormous benefits for creditors.

Kirkland's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  In just over four months, the Debtors, with the assistance and advice of K&E, achieved nearly universal creditor support and obtained confirmation of a plan of reorganization that deleveraged the Debtors' balance sheet by approximately $4.1 billion pursuant to various equitization, sale, and recapitalization transactions; provided the reorganized remaining Debtors with an infusion of approximately $537 million in new money in the form of an approximately $337 million equity rights offering and a $200 million new revolving credit facility; streamlined the Debtors' organizational structure to maximize future growth; and, most importantly, preserved customer relationships and the Debtors' market-leading position in the aircraft leasing industry.  Ex. 125 ¶ 18, ECF No. 972 at 18.  This was a historically complex restructuring of multiple international debtors engaged in a specialized industry.  *See id.*  As evidenced by their duties, Kirkland was central to the Chapter 11 reorganizational effort from start

to finish.  *See id.* ¶¶ 9-17, ECF No. 972 at 10-17.  Their hours billed are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to Kirkland's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  However, as discussed herein, Kirkland has extensive experience, reputation, and ability in large and complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors, Kirkland is entitled to be awarded the compensation it has requested.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court, therefore, finds that Kirkland is entitled to the aggregate amount of $14,438,568.76 in fees and expenses for its work in these Chapter 11 Cases.

**B.      Kutak Rock**

Kutak Rock served as co-counsel for the Debtors.  Kutak Rock is a national law firm with nineteen offices located throughout the country.  Hr'g Tr. 18:6-9, Sept. 14, 2022, ECF No. 1132 at 18.  The attorneys at Kutak Rock have experience in bankruptcy cases of the size and complexity of these Chapter 11 cases.  Hr'g Tr. 18:7-9, Sept. 14, 2022, ECF No. 1132 at 18.  On January 15, 2022, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing the Debtors to Employ and Retain Kutak Rock LLP as Co-Counsel Effective as of the Petition Date* [ECF No. 180] (the "Kutak Rock Employment Application").  Ex. 2, ECF No. 180.  The Kutak Rock Employment Application clearly disclosed the services that Kutak Rock intended to provide and the terms of compensation for such services, including the hourly rates that Kutak Rock would charge.  *Id.*  Notice of the Kutak Rock Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Kutak Rock Employment Application, on February 2, 2022, the Court entered the *Order Authorizing the Debtors to Employ and Retain Kutak Rock*

*LLP as Co-Counsel Effective as of the Petition Date* [ECF No. 282] (the "Kutak Rock Employment Order"). Ex. 20, ECF No. 282. As more fully detailed in the Kutak Rock Employment Order, the Debtors were authorized to retain and employ Kutak Rock as their co-counsel effective as of the Petition Date in accordance with the terms and conditions set forth in the Kutak Rock Employment Application. *Id.* ¶ 2, ECF No. 282 at 2. Kutak Rock's services included providing legal advice and services regarding local rules, practices and procedures in this Court, as well as providing substantive and strategic advice on how to accomplish the Debtors' goals in connection with prosecuting these Chapter 11 Cases. Hr'g Tr. 18:9-15, Sept. 14, 2022, ECF No. 1132 at 18. Kutak Rock was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code. Ex. 20 ¶ 3, ECF No. 282 at 2-3.

In accordance with the Interim Compensation Order, Kutak Rock timely and properly filed and served its Monthly Fee Statements. Ex. 57, ECF No. 445; Ex. 78, ECF No. 629; Ex. 98, ECF No. 802; Ex. 108, ECF No. 914; Ex. 119, ECF No. 954. Kutak Rock's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 12, 2022, the Debtors timely filed the Kutak Rock Fee Application. Ex. 137, ECF No. 1004. Kutak Rock seeks compensation in the total amount of $440,309.50 and reimbursement of actual and necessary expenses in the amount of $48,499.93 that Kutak Rock incurred for the period from

December 17, 2021, through and including June 1, 2022.  Ex. 137 ¶ 12, ECF No. 1004 at 8.  The

Kutak Rock Fee Application complies with the USTP Guidelines.

The Kutak Fee Application includes a voluntary reduction of $7,874.00 based on prior

discussions between Kutak and the United States Trustee.  Ex. 172 § 2, ECF No. 1078 at 13.  In

light of the voluntary reduction, the United States Trustee had no objection to the Kutak Fee

Application as filed.  Ex. 172 § 2, ECF No. 1078 at 13.

The Debtors served the Kutak Rock Fee Application on all necessary parties on July 12,

2022, in accordance with the Case Management Procedures.   *See* Certification of No Obj.

Regarding Kutak Rock Fee Appl., ECF No. 1094.  Pursuant to the Case Management Procedures,

all objections to the approval of the relief requested in the Kutak Rock Fee Application were due

on or before August 2, 2022.  *See id*.  There were no objections filed with respect to the Kutak

Rock Fee Application.  *See id*.  Nonetheless, the Court undertook an independent evaluation of the

merits of the Kutak Rock Fee Application under the § 330 Factors and the *Johnson* factors.

Kutak Rock billed 867.4 hours in connection with the services for which it seeks

compensation. Ex. 137 Ex. C, ECF No. 1004 at 17.  Given the scope of Kutak Rock's employment,

this was a reasonable amount of labor to have devoted to these Chapter 11 Cases.  11 U.S.C.

§ 330(a)(3)(A).  Kutak Rock billed at a blended rate of $443 for all timekeepers.[33]  Ex. 137, ECF

No. 1004 at 2.  The blended rate for all attorneys was $560.00.  *Id.*; *see* 11 U.S.C. § 330(a)(3)(B).

Kutak's actual hourly billing rates for attorneys working on these Chapter 11 Cases ranged from

$375 to $675.  Ex. 137 Ex. B, ECF No. 1004 at 16.  The hourly rates charged by Kutak Rock's

professionals differed based on, among other things, such professional's experience.  Ex. 2 ¶ 19,

---

[33]   A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Kutak Rock Fee
Application.  Ex. 137 Ex. B, ECF No. 1004 at 16.

ECF No. 180 at 9.  The hourly rates and corresponding rate structure employed by Kutak Rock in these Chapter 11 Cases are comparable to the hourly rates and corresponding rate structure used by Kutak Rock for restructuring, workout, bankruptcy, insolvency, and comparable matters, as well as similar complex corporate and litigation matters, whether in court or otherwise, regardless of whether a fee application is required.[34]  *Id.* ¶ 17, ECF No. 180 at 8.  The terms and conditions of the engagement were substantially similar to those that Kutak Rock has transacted with other clients on a daily basis in a competitive market for legal services.  *Id.* ¶ 15.  The compensation sought by Kutak Rock is similar to the fee awards of counsel in Kutak Rock's role in similar bankruptcy cases.  *See* 11 U.S.C. § 330(a)(3)(F).  The terms of the compensation sought are consistent with the terms approved in the Kutak Rock Employment Order.

Kutak Rock provided numerous services to the Debtors, including but not limited to (i) working to obtain the entry of orders necessary for the Debtors to operate, protect and expand their businesses; (ii) assisting in certain potential litigation matters; (iii) assisting in the administration of the Chapter 11 Cases; (iv) participating in conferences with the Debtors' other professionals regarding administrative, operational, organizational and strategic issues arising in these cases; (v) regularly communicating with professionals for creditors and other parties in interest regarding these cases; (vi) handling issues relating to electronic filing; (vii) communicating with the Court and the U.S. Trustee's office regarding various case administration issues; (viii) assisting with matters relating to the Plan and Disclosure Statement; and (ix) preparing for and participating in all court hearings in these Chapter 11 Cases.  Ex. 137 ¶ 14, ECF No. 1004 at 9.  Kutak Rock was able to bring to bear its experience and specialized knowledge of bankruptcy practice in the United States Bankruptcy Court for the Eastern District

---

[34]    Considering Kutak Rock billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

of Virginia.  Ex. 2 ¶ 7, ECF No. 180 at 4.  Kutak Rock's role as local counsel allowed the Debtors

to prosecute these Chapter 11 Cases in compliance with this Court's rules.  *See* Local Bankr. R.

2090-1(E)(3).    Kutak Rock's services were necessary, essential, and beneficial to the

administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).

Kutak Rock's services were performed within a reasonable amount of time commensurate

with the complexity, importance, and nature of the problem, issue, or task addressed.  *See* 11

U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of

multiple international debtors engaged in a specialized industry.  In addition to the demands of

assisting Kirkland in advising the Debtors with specialized knowledge of bankruptcy law and

practice in Virginia, *see* Ex. 2 ¶ 7, ECF No. 180 at 4, pursuant to this Court's rules, Kutak Rock

needed to review every filing the Debtors made and be present and prepared at every hearing.  *See*

Local Bankr. R. 2090-1(E)(3) (requiring that, generally, "any pleading or notice required to be

signed by counsel must be signed by counsel who is a member of the Bar of this Court, who shall

have entered an appearance of record in the case, with the office address in the state where notice

can be served, and who shall have such authority that the Court can deal with that attorney alone

in all matters connected with the case.").  The hours billed by Kutak Rock are commensurate with

that work, and therefore weigh in favor of awarding Kutak Rock the compensation it has requested.

The Court did not receive any evidence as to Kutak Rock's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).    However, as discussed herein, Kutak Rock is experienced in complex

restructuring matters.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors, Kutak Rock is entitled

to its requested compensation.  This view is apparently shared by the creditors and the U.S. Trustee,

who have not objected.  The Court therefore finds that Kutak Rock is entitled to an award of

compensation in the amount of $440,309.50 and to reimbursement of the expenses it incurred in

the amount of $48,499.93 for its work in these Chapter 11 Cases.

### C.    William Fry

William Fry served as special Irish counsel for the Debtors.  William Fry is a leading

international law firm that ranks among the best firms in the Irish market.  Hr'g Tr. 21:1-3, Sept.

14, 2022, ECF No. 1132 at 21.  William Fry has extensive expertise in a wide range of corporate

areas, including, among others, corporate governance and compliance, financial regulation, tax,

and restructuring and insolvency.  *Id.* 21:3-6.  William Fry had been engaged by the Debtors

pre-Petition Date in March 2021.  Ex. 31 ¶ 7, ECF No. 350 at 4.  As such, William Fry brought

with it into this case the significant institutional knowledge it had acquired of the Debtors and their

business and was intimately familiar with the Debtors' restructuring.  *Id.*

On February 10, 2022, the Debtors filed the *Debtors' Application for Entry of an Order*

*Authorizing Retention and Employment of William Fry LLP as Special Irish Counsel Effective as*

*of the Petition Date* [ECF No. 350] (the "William Fry Employment Application").  *Id.*  The

William Fry Employment Application clearly disclosed the services that William Fry intended to

provide and the terms of compensation for such services, including the hourly rates that William

Fry would charge.  *Id.*  Notice of the William Fry Employment Application was provided to all

requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the William Fry Employment Application, on February

23, 2022, the Court entered the *Order Granting Debtors' Application for Entry of an Order*

*Authorizing Retention and Employment of William Fry LLP as Special Irish Counsel Effective as*

*of the Petition Date* [ECF No. 435] (the "William Fry Employment Order").  Ex. 53, ECF No. 435.

As more fully detailed in the William Fry Employment Order, the Debtors were authorized to

retain and employ William Fry as their special Irish counsel effective as of the Petition Date in

accordance with the terms and conditions set forth in the William Fry Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 435 at 2.  William Fry's services included providing advice to the Debtors on certain Irish law matters in connection with the Debtors' restructuring.  Hr'g Tr. 21:6-8, Sept. 14, 2022, ECF No. 1132 at 21.  As the services provided by William Fry concerned intricacies of Irish law, they were not duplicative of the work performed by other attorneys employed by the Debtors.  Ex. 31 ¶ 10, ECF No. 350 at 5.  William Fry was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  Ex. 53 ¶ 4, ECF No. 435 at 3.

In accordance with the Interim Compensation Order, William Fry timely and properly filed and served its Monthly Fee Statements.  Ex. 79, ECF No. 690; Ex. 101, ECF No. 889; Ex. 113, ECF No. 929; Ex. 114, ECF No. 935.  William Fry's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 13, 2022, the Debtors timely filed the William Fry Fee Application.  Ex. 138, ECF No. 1010. The William Fry Fee Application seeks an award of compensation in the total amount of €1,349,943.20 and the reimbursement of actual and necessary expenses in the amount of €48,311.95 that William Fry incurred for the period from December 17, 2021, through and including June 1, 2022.  *Id.* ¶ 12, ECF No. 1010 at 9.  The William Fry Fee Application complies with the USTP Guidelines.

Pursuant to issues informally raised by the United States Trustee, William Fry agreed to a voluntary reduction of €47,280.00 from the amounts initially sought in the William Fry Fee Application. Ex. 172 § 10, ECF No. 1078 at 16. In light of the voluntary reduction it was able to negotiate, the United States Trustee had no objection to the allowance of fees in the reduced amount of €1,302,663.20 and expenses in the amount of €48,311.95. *Id.*

The Debtors served the William Fry Fee Application on all necessary parties on July 13, 2022, in accordance with the Case Management Procedures. *See* Certification of No Obj. Regarding William Fry Fee Appl., ECF No. 1093. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the William Fry Fee Application were due on or before August 3, 2022. *See id.* There were no objections filed with respect to the William Fry Fee Application. *See id.* Nonetheless, the Court undertook an independent evaluation of the merits of the William Fry Fee Application applying the § 330 Factors and the *Johnson* factors.

William Fry billed 2,545.77 hours in connection with the services for which it seeks compensation. Ex. 138 ¶ 12, ECF No. 1010 at 8. Given the nature and scope of the William Fry engagement, this was a reasonable amount of labor to have devoted to these Chapter 11 Cases. 11 U.S.C. § 330(a)(3)(A). William Fry billed at a blended rate of €530.27 for all timekeepers.[35] *Id.*, ECF No. 1010 at 2. The blended rate for all attorneys was €532.45. *Id.*; *see* 11 U.S.C. § 330(a)(3)(B) These hourly rates are consistent with market rates for comparable services. Ex. 31 ¶ 14, ECF No. 350 at 6; *see* 11 U.S.C. § 330(a)(3)(F). William Fry's hourly billing rates for attorneys ranged from €250 to €660. Ex. 138 ¶ 37, ECF No. 1010 at 19. The hourly rates varied in accordance with the experience and seniority of the individual assigned to each task. *Id.* ¶ 38,

---

[35] A full breakdown of the hourly rates charged by each attorney timekeeper is available in the William Fry Fee Application. Ex. 138 Ex. D, ECF No. 1010 at 57-58.

ECF No. 1010 at 20.  The hourly rates and corresponding rate structure utilized by William Fry in these Chapter 11 Cases are equivalent to the hourly rates and corresponding rate structures used by William Fry for comparable matters, regardless of whether a fee application is required.[36]  *Id.* ¶ 37, ECF No. 1010 at 19-20.  The rate structure approved by the William Fry Employment Order and sought in the William Fry Fee Application is not significantly different from that of other clients in non-insolvency representations and is consistent with the rates that William Fry charges other comparable clients, regardless of location.  Ex. 31 Doorly Decl. ¶ 24, ECF No. 350 at 49. The terms of the compensation are consistent with the terms approved in the William Fry Employment Order.

William Fry advised the Debtors on Irish law pertaining to, among other things, (i) the impact – if any- of the automatic stay on filings in the Irish High Court; (ii) Irish law considerations for various components of the restructuring, including but not limited to the RSA, the Disclosure Statement, the Plan, the debtor-in-possession financing facilities, and the exit facility; (iii) Irish securities law and corporate governance issues, particularly with respect to the Debtors' Irish entities; (iv) Irish employment law; (v) renegotiation of the Debtors' obligations under an office lease located in Ireland; (vi) the liquidation of NAC 9 before the Irish High Court following the exercise of Nord LB's rights and remedies under various contractual agreements; and (vii) compliance with the European Union's General Data Protection Regulation in preparing the Debtors' required schedules and statements.  Ex. 138 ¶¶ 17-34, ECF No. 1010 at 10-18.  These services provided by William Fry were necessary, essential, and beneficial to the administration of these Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).

---

[36]   Considering William Fry billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

William Fry's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry.  A great deal of the Debtors' business was governed by Irish law, *see* Bickle Decl. ¶ 1, ECF No. 6 at 1-2 (noting NAC DAC is incorporated under the laws of Ireland), and, as such, William Fry's role was crucial for a successful restructuring.  The hours billed by William Fry are commensurate with that work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to William Fry's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).   However, as discussed herein, William Fry is experienced in complex restructurings and in Irish law.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, William Fry is entitled to the compensation it has requested.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that William Fry is entitled to an award of compensation in the aggregate amount of €1,350,975.15 in fees and expenses for work it performed in these Chapter 11 Cases.

### D.    Clifford Chance

Clifford Chance served as special counsel to the Debtors with regard to aviation matters. Clifford Chance has significant experience representing and advising the spectrum of constituents in Chapter 11 cases and related proceedings, including debtors, committees, secured and unsecured creditors, independent or disinterested directors, special committees, shareholders, and others, including, but not limited to, in Chapter 11 cases involving debtors in the aviation industry.  Hr'g Tr. 19:22-20:4, Sept. 14, 2022, ECF No. 1132 at 19-20.  Clifford Chance served as counsel to the Debtors since 2013 in connection with a wide array of corporate, securities, mergers and

acquisitions, tax, regulatory, and other transactional matters, including with respect to various aircraft financing, leasing and sale matters, ad hoc diligence on the Debtors' loan portfolio to evaluate the Debtors' restructuring options, and analysis of potential restructuring proceedings and related issues in non-U.S. jurisdictions.  Ex. 9 ¶ 7, ECF No. 212 at 4.  Clifford Chance also served as counsel to the Debtors in connection with the Scheme.  *Id.*  Given Clifford Chance's longstanding relationship with the Debtors, Clifford Chance has extensive knowledge regarding the Debtors, their businesses, and various aspects of their financial affairs and reorganization.  *Id.* As a result of its almost decade-long representation of the Debtors, Clifford Chance is intimately familiar with the complex legal issues that have arisen and did arise in connection with these Chapter 11 Cases.  *Id.*

On January 21, 2022, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Clifford Chance LLP as Special Counsel Effective as of the Petition Date and (II) Granting Related Relief* [ECF No. 212] (the "Clifford Chance Employment Application").  Ex. 9, ECF No. 212.  The Clifford Chance Employment Application clearly disclosed the services that Clifford Chance intended to provide and the terms of compensation for such services, including the hourly rates that Clifford Chance would charge. Ex. 9, ECF No. 212.  Notice of the Clifford Chance Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Clifford Chance Employment Application, on February 23, 2022, the Court entered the *Order (I) Authorizing the Retention and Employment of Clifford Chance LLP as Special Counsel Effective as of the Petition Date and (II) Granting Related Relief* [ECF No. 428] (the "Clifford Chance Employment Order").  Ex. 53, ECF No. 435.  As more fully detailed in the Clifford Chance Employment Order, the Debtors were authorized to retain and

employ Clifford Chance as their special aviation counsel effective as of the Petition Date in accordance with the terms and conditions set forth in the Clifford Chance Employment Application and engagement letter submitted therewith.  Ex. 48 ¶ 2, ECF No. 428 at 3.  Clifford Chance's services included, among other things: (i) providing legal advice and services related to aircraft owned by the Debtors, including the financing of such aircraft and the restructuring, negotiating, and terminating of such financings; and (ii) advising on non-U.S. local law issues, including matters related to security enforcement, recognition, employment, and negotiation of corporate and financial transactions. Hr'g Tr. 20:5-12, Sept. 14, 2022, ECF No. 1132 at 20.  As the services rendered and functions performed by Clifford Chance are specialist aviation, corporate, and non-U.S. local law services, they are not duplicative of work performed by any other attorney engaged by the Debtors. Ex. 9 ¶ 11, ECF No. 212 at 6.  Clifford Chance was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  Ex. 48 ¶ 4, ECF No. 435 at 3-4.

    In accordance with the Interim Compensation Order, Clifford Chance timely and properly filed and served its Monthly Fee Statements. Ex. 64, ECF No. 479; Ex. 77, ECF No. 628; Ex. 94, ECF No. 790; Ex. 110, ECF No. 919; Ex. 128, ECF No. 986.  Clifford Chance's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the Clifford Chance Fee Application.  Ex. 141, ECF No. 1020.  The Clifford Chance Fee Application seeks an award of compensation in the total amount of $9,096,534.76 and the reimbursement of actual and necessary expenses in the amount of $39,873.72 that Clifford Chance incurred for the period from December 17, 2021, through and including June 1, 2022.  *Id.* ¶ 17, ECF No. 1010 at 10.  The Clifford Chance Fee Application complies with the USTP Guidelines.

The Clifford Chance Fee Application already included a voluntary reduction of $112,073.00. Ex. 172 § 9, ECF No. 1078 at 15.  In addition to the pre-filing voluntary reduction, pursuant to issues informally raised by the United States Trustee, Clifford Chance agreed to a further voluntary reduction of $115,292.06 from the amounts initially sought in the Clifford Chance Fee Application.  *Id.*  In light of the voluntary and negotiated reductions, the United States Trustee had no objection to the allowance of fees in the reduced amount of $8,981,242.70 and expenses in the amount of $39,873.72.  *Id.*, ECF No. 1078 at 15-16.

The Debtors served the Clifford Chance Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures.  *See* Ex. 171, ECF No. 1076.  Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Clifford Chance Fee Application were due on or before August 5, 2022.  *See id*.  There were no objections filed with respect to the Clifford Chance Fee Application.  *See id*.  Nonetheless, the Court has independently evaluated the merits of the Clifford Chance Fee Application under the § 330 Factors and the *Johnson* factors.

Clifford Chance billed 11,600.9 hours in connection with the services for which it seeks compensation.  Ex. 141 ¶ 18, ECF No. 1020 at 10.  Given the scope of Clifford Chance's

employment, this was a reasonable amount of time to have devoted to these Chapter 11 Cases.  11

U.S.C. § 330(a)(3)(A).  Clifford Chance billed at a blended rate of $794.00 for all timekeepers.[37]

Ex. 141 Ex. F, ECF No. 1020 at 73.  It billed at a blended rate of $865.00 for all attorneys.  *Id.*,

ECF No. 1020 at 2; *see* 11 U.S.C. § 330(a)(3)(B).  Hourly rates varied with the experience and

seniority of the individuals assigned.  Ex. 141 ¶ 19, ECF No. 1020 at 10.  These are Clifford

Chance's standard hourly rates,[38] Ex. 9 ¶ 13, ECF No. 212 at 7, and are the ones that Clifford

Chance used with the Debtors prior to the Petition Date, Ex. 141 ¶ 19, ECF No. 1020 at 10.  These

rates are consistent with market rates for comparable services.  Ex. 9 ¶ 14, ECF No. 212 at 8; *see*

11 U.S.C. § 330(a)(3)(F).  The terms of the compensation are consistent with the terms approved

in the Clifford Chance Employment Order.

The Debtors are in the aviation industry, and Clifford Chance provided services to the

Debtors on matters related to (i) aircraft owned by the Debtors, including financing and the

restructure, negotiation, or termination of such financing, (ii) aircraft leased by the Debtors,

including the restructure, negotiation, or termination of such leases, (iii) contracts relating to the

purchase or sale of aircraft, (iv) non-U.S. local law issues relating to the enforcement, recognition,

and employment of security agreements, (v) the boards of directors and management relating to

advising on corporate and finance matters, (vi) the terms and documentation relating to corporate

and financing transactions, and (vii) the assistance of general bankruptcy counsel with pleadings

related to the foregoing.  Ex. 141 ¶ 24, ECF No. 1020 at 11-12.  Given the fact that the Debtors

---

[37]    A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Clifford Chance Fee
Application.  Ex. 141 Ex. C, ECF No. 1020 at 55-67.

[38]    Considering Clifford Chance billed at its standard rate, its opportunity cost would be roughly equal to its bill in
this case.  However, the Court notes that Clifford Chance provided extensive services to the Debtors on numerous
matters that often fully occupied the time of its attorneys.  *Id.* ¶ 84, ECF No. 1020 at 38.  As such, the opportunity
cost of this engagement also includes the lost revenue from other engagements that these attorneys may have
otherwise been able to work on.

were engaged in the aviation industry through the leasing of regional aircraft, these services were

critical to the Debtors' successful restructuring.  Clifford Chance also provided advised as to the

laws of nations around the globe whose laws impacted the Debtors' business, such as France,

Singapore, and Russia.[39]  *See id.* ¶¶ 61-62, 70, ECF No. 1020 at 30-31, 33-34.  Clifford Chance's

services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.

*See* 11 U.S.C. § 330(a)(3)(C).

Clifford Chance's services were performed within a reasonable amount of time

commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex

restructuring of multiple international debtors engaged in a specialized industry.  Clifford Chance's

role enabled the Debtors to navigate that specialized industry on a global basis.  The hours billed

by Clifford Chance are commensurate with that level of work, and therefore weigh in favor of

granting the compensation sought.

The Court did not receive any evidence as to Clifford Chance's certifications.  *See* 11

U.S.C. § 330(a)(3)(E).    Nonetheless, as described herein, Clifford Chance is extremely

experienced in aviation restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Clifford

Chance is entitled to the compensation it has requested.  This view is apparently shared by the

creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that Clifford

Chance is entitled to an award in the aggregate amount of $9,021,116.42 in fees and expenses for

its work in these Chapter 11 Cases.

---

[39]    Russia's invasion of Ukraine and the imposition of international sanctions presented their own unique challenges.

E.    **Gorrissen**

Gorrissen served as special Danish counsel to the Debtors.  Gorrissen is a full-service Danish law firm that ranks among the best firms in Denmark and has expertise in a wide range of corporate areas, including, among other things, corporate governance and compliance, financial regulation, tax and restructuring and insolvency.  Hr'g Tr. 20:14-19, Sept. 14, 2022, ECF No. 1132 at 20.  Gorrissen has represented the Debtors in various Danish matters since 2005.  Ex. 30 at ¶ 7, ECF No. 349 at 4.  If Debtors were required to retain different counsel to replace Gorrissen, they would have had to expend significant resources finding, educating, and integrating new counsel into the restructuring.  *Id.*

On February 10, 2022, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing Retention and Employment of Gorrissen Federspiel Advokatpartnerselskab as Special Danish Counsel Effective as of the Petition Date* [ECF No. 349] (the "Gorrissen Employment Application").  *Id.*  The Gorrissen Employment Application clearly disclosed the services that Gorrissen intended to provide and the terms of compensation for such services, including the hourly rates that Gorrissen would charge.  *Id.*  Notice of the Gorrissen Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Gorrissen Employment Application, on February 23, 2022, the Court entered the *Order Granting Debtors' Application for Entry of an Order Authorizing Retention and Employment of Gorrissen Federspiel Advokatpartnerselskab as Special Danish Counsel Effective as of the Petition Date* [ECF No. 434] (the "Gorrissen Employment Order").  Ex. 52, ECF No. 434.  As more fully detailed in the Gorrissen Employment Order, the Debtors were authorized to retain and employ Gorrissen as their special Danish counsel effective as of the Petition Date in accordance with the terms and conditions set forth in the Gorrissen Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 434 at 2-3.

Gorrissen's services included advising the Debtors on certain matters under Danish law arising in the course of these Chapter 11 Cases, such as employee and aircraft issues and matters concerning the Debtors' Danish entities, assets, and liabilities.  Hr'g Tr. 20:20-24, Sept. 14, 2022, ECF No. 1132 at 20.   The services rendered and functions performed by Gorrissen are special Danish services and were not duplicative of work performed by other attorneys retained by the Debtors. Ex. 30 ¶ 10, ECF No. 349 at 5.  Gorrissen was, nevertheless, required to apply for compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code.  Ex. 52 ¶ 4, ECF No. 434 at 3.

In accordance with the Interim Compensation Order, Gorrissen timely and properly filed and served a Monthly Fee Statement.  Ex. 100, ECF No. 882.  Gorrissen's Monthly Fee Statement fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to Gorrissen's Monthly Fee Statement.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the Gorrissen Fee Application.  Ex. 144, ECF No. 1025. The Gorrissen Fee Application seeks compensation in the total amount of DKK 928,203.30 and €19,045.59 and reimbursement of actual and necessary expenses in the amount of DKK 0.00 and €40.59 that Gorrissen incurred for the period from December 17, 2021, through and including June 1, 2022.  *Id.* ¶ 12, ECF No. 1025 at 8.  The Gorrissen Fee Application complies with the USTP Guidelines.

Pursuant to issues informally raised by the United States Trustee, Gorrissen agreed to a voluntary reduction of DKK 56,111.90 and €754.86 from the amounts initially sought in the Gorrissen Fee Application. Ex. 172 § 11, ECF No. 1078 at 16. In light of the negotiated reduction, the United States Trustee had no objection to the allowance of fees in the reduced amount of DKK 872,091.4 and €18,290.73 and expenses in the amount of and DKK 0.00 and €40.59. *Id.*

The Debtors served the Gorrissen Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures. *See* Certification of No Obj. Regarding Gorrissen Fee Appl., ECF No. 1092. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Gorrissen Fee Application were due on or before August 5, 2022. *See id*. There were no objections filed with respect to the Gorrissen Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the Gorrissen Fee Application under the § 330 Factors and the *Johnson* factors.

Gorrissen billed 252.41 hours in connection with the services for which it seeks compensation. Ex. 144 ¶ 12, ECF No. 1025 at 8. Given the scope of Gorrissen's employment, this was a reasonable amount of labor for which to charge. 11 U.S.C. § 330(a)(3)(A). Gorrissen billed at a blended rate of DKK 4,350.61 or €487.60 for all timekeepers.[40] Ex. 144 Ex. D, ECF No. 1025 at 37-38*.* It billed at a blended rate of DKK 4,504.92 or €488.99 for all attorneys. *Id.*; *see* 11 U.S.C. § 330(a)(3)(B). Hourly rates varied with the experience and seniority of the individuals assigned. Ex. 144 ¶ 23, ECF No. 1025 at 14. Gorrissen billed at its standard hourly rates,[41] which are consistent with market rates for comparable services. Ex. 30 ¶¶ 13, 14, ECF No.

---

[40] A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Gorrissen Fee Application. Ex. 144 Ex. D, ECF No. 1025 at 36.

[41] Considering Gorrissen billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

349 at 5-6; *see* 11 U.S.C. § 330(a)(3)(F). The hourly rates and corresponding rate structure utilized by Gorrissen in these Chapter 11 Cases are equivalent to the hourly rates and corresponding rate structure used by Gorrissen for comparable matters, regardless of whether a fee application is required. Ex. 144 ¶ 22, ECF No. 1025 at 14. The terms of the compensation are consistent with the terms approved in the Gorrissen Employment Order.

Gorrissen's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). Specifically, NAC A/S (a parent company of sixty Debtor entities) and many of its subsidiaries are incorporated under the laws of Denmark. *See* Bickle Decl. ¶¶ 1, 43, Ex. B, ECF No. 6 at 1, 26, 287. Gorrissen provided services to the Debtors on (i) Danish legal considerations relevant to the restructuring transactions and these Chapter 11 Cases, including but not limited to the RSA, the Disclosure Statement, the Plan, post-Petition Date operations, and exit financing; (ii) Danish implications for aircraft mortgages, executory contracts, and unexpired leases; (iii) Danish corporate governance issues, particularly with respect to the Debtors' Danish entities; and (vi) Danish employment law. Ex. 144 ¶ 17, ECF No. 1025 at 10-12. Gorrissen also assisted with the sale of one aircraft under Danish law and the deregistration of another aircraft. *Id.* ¶ 18, ECF No. 1025 at 12. As this restructuring involved Danish entities, assets, and liabilities, these services were critical to the Debtors' successful restructuring.

Gorrissen's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. *See* 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. Gorrissen's role enabled the Debtors to address these issues so far as the laws of Denmark applied. Ex. 144 ¶ 17, ECF No.

1025 at 10-12.  The hours billed by Gorrissen are commensurate with the level of work performed

by it, and therefore this factor weighs in favor of granting the compensation sought.

The Court did not receive any evidence as to Gorrissen's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).  Nonetheless, as described herein, Gorrissen is experienced in Danish law.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors, Gorrissen is entitled to

the compensation sought.  This view is apparently shared by the creditors and the U.S. Trustee,

who have not objected.  The Court therefore finds that Gorrissen is entitled to the aggregate

amounts of DKK 872,091.40 and €18,331.32 in fees and expenses for its work in the Chapter 11

Cases.

### III.    Disinterested Directors' Counsel

The Court now turns to the Fee Applications filed by the various attorneys engaged by the

Disinterested Directors, i.e., Quinn Emanuel, Katten Muchin, McDonald Hopkins, Spiro &

Browne, Cole Schotz, Ronald Page, Cozen, Canfield Wells, McDermott, Klehr Harrison, and

Hirschler (collectively, "Disinterested Directors' Counsel").  As a preliminary matter, the Court

finds that it was necessary and proper for each of the Disinterested Directors to engage separate,

independent legal counsel.  Given the complex organizational structure of the Debtors, each silo

had its own assets and liabilities, along with intercompany claims.  In effectuating a global

restructuring, as a matter of corporate governance, the Boards responsible for directing each silo

needed to ensure that it was acting in the best interests of the creditors for that silo, thus

necessitating the appointment of the Disinterested Directors.  In order to evaluate available options

and exercise reasonable business judgments, each Disinterested Director needed the assistance of

competent counsel.[42]  Hr'g Tr. 30:20-21, Sept. 14, 2022, ECF No. 1132 at 30.  The availability of and access to independent counsel provided creditors the peace of mind needed to reach the 99%-approved deal that was struck in this case.  *Id.* 30:9-19.  Further, as described below in the independent analysis for each of the Disinterested Directors' Counsel, the services each performed were both reasonably likely to benefit the Debtors' estate and necessary to the administration of these Chapter 11 Cases.  Grounded on that background and based on the specific factual findings set forth below, the Court now holds that each is entitled to the compensation that has been requested.

A.     **Quinn Emanuel as Special Counsel for the NAC DAC Disinterested Directors**

On March 29, 2021, NAC DAC appointed Paul Keglevic and Stefan Selig to act as Disinterested Directors on the Board of Directors of NAC DAC (the "NAC DAC Board").  Decl. of Paul Keglevic in Supp. of Confirmation of Debtors' Third Am. Plan ¶ 3, ECF No. 705 at 2 [hereinafter "Keglevic Declaration"].  On or about April 1, 2021, NAC DAC retained Quinn Emanuel to advise NAC DAC at the direction of the Disinterested Directors solely with respect to any matters that might arise in connection with the Debtors' restructuring efforts in which a conflict exists between the Debtor(s) for which the Disinterested Directors served, on the one hand, and the other Debtors and constituents, on the other hand (the "Conflict Matters").  *Id.* ¶ 4, ECF No. 705 at 2.  Conflict Matters included transactional diligence and advice, corporate governance advice, fact investigation, legal research, briefing, argument, discovery, negotiation regarding motions and orders and the terms of the restructuring or any reorganization and related plan of reorganization and disclosure statement, appearance and participation in hearings, and

---

[42]    There were indeed small conflicts between Debtor silos, "but they were all resolved by having a good dialogue, by having good directors, [and by having] advice [from] really good advisors," the Retained Professionals.  Hr'g Tr. 30:21-24, Sept. 14, 2022, ECF No. 1132 at 30.

communications and meetings with parties in interest, in each case as related to Conflict Matters. *Id.*, ECF No. 705 at 2-3. Quinn Emanuel has significant experience representing and advising the spectrum of constituents in Chapter 11 cases and related proceedings, including debtors, official and ad hoc committees, secured and unsecured creditors, independent or disinterested directors, special committees, shareholders, and others, as well as providing advice with respect to fiduciary duties in connection with Chapter 11 proceedings. Hr'g Tr. 22:18-24, Sept. 14, 2022, ECF No. 1132 at 22.

Pre-Petition Date, the NAC DAC Disinterested Directors and Quinn Emanuel dedicated significant time conducting diligence to gain a thorough understanding of the Debtors' capital structure, intercompany claims involving NAC DAC, and NAC DAC's reorganization prospects. Keglevic Decl. ¶ 5, ECF No. 705 at 3. This included, among other things, reviewing (i) NAC DAC's funded-debt obligations and the various guarantee claims against NAC DAC; (ii) actual or potential intercompany claims and transactions among NAC DAC and its subsidiaries; (iii) NAC DAC's cash-management system; and (iv) issues relating to vendor payments under original equipment manufacturer contracts. *Id.*

Quinn Emanuel met with the professionals retained by the other Disinterested Directors for various subsidiary entities as well as the Debtors' lead counsel, Kirkland, its aviation counsel, Clifford Chance, its investment banker, Rothschild, its financial advisor, EY, and its Irish counsel, William Fry, on weekly calls typically scheduled for Thursdays. *Id.* ¶ 6, ECF No. 705 at 3-4. Quinn Emanuel engaged in a variety of diligence efforts, including routine review of materials the Debtors loaded onto their data room as well as reports prepared by EY. *Id.* ¶ 7, ECF No. 705 at 4. On behalf of NAC DAC's Disinterested Directors, the firm also propounded document requests on the Debtors by letters dated April 28 and June 14, 2021, as well as additional periodic document

requests.  *Id.* ¶ 7.  The Debtors responded to Quinn Emanuel's requests either informally through emails from Kirkland, by providing documents either directly or uploading them into the data room, or by hosting conference calls among the Retained Professionals.  *Id.*

Quinn Emanuel also attended various NAC DAC-specific diligence sessions with the Retained Professionals on at least the following dates:  April 16, 2021, April 30, 2021, May 4, 2021, June 29, 2021, July 1, 2021, August 31, 2021, September 13, 2021, September 15, 2021, February 8, 2022, March 25, 2022, and April 13, 2022.  *Id.* ¶ 8 & n.7.  Quinn Emanuel also held stand-alone meetings with the Disinterested Directors.  *Id.* ¶ 8.

On January 26, 2022, the Debtors filed their *Application of Debtor Nordic Aviation Capital Designated Activity Company for Entry of an Order Authorizing Retention and Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Counsel Pursuant to Sections 327(e), 328(e), and 1107(b) of the Bankruptcy Code, Effective as of December 19, 2021* [ECF No. 229] (the "Quinn Emanuel Employment Application").  Ex. 10, ECF No. 229.  The Quinn Emanuel Employment Application clearly disclosed the services that Quinn Emanuel intended to provide and the terms of compensation for such services, including the hourly rates that Quinn Emanuel would charge. *Id.*  Notice of the Quinn Emanuel Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Quinn Emanuel Employment Application, on February 23, 2022, the Court entered the *Order Granting Application of Debtor Nordic Aviation Capital Designated Activity Company for Entry of an Order Authorizing Retention and Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Counsel Pursuant to Sections 327(e), 328(e), and 1107(b) of the Bankruptcy Code, Effective as of December 19, 2021* [ECF No. 439] (the "Quinn Emanuel Employment Order").  Ex. 56, ECF No. 439.  As more fully detailed in the

Quinn Emanuel Employment Order, the Debtors were authorized to retain and employ Quinn Emanuel as special counsel for the Disinterested Directors of NAC DAC effective as of December 19, 2021, in accordance with the terms and conditions set forth in the Quinn Emanuel Employment Application and engagement letter submitted therewith. *Id.* ¶ 2, ECF No. 439 at 3. Quinn Emanuel was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code. *Id.* ¶ 4, ECF No. 439 at 3-4.

Post-Petition Date, Quinn Emanuel's services included advising Messrs. Keglevic and Selig with respect to matters that arose in connection with NAC DAC's restructuring efforts in which a potential conflict existed between NAC DAC, on the one hand, and its shareholders, affiliates, or directors and officers, on the other. Hr'g Tr. 22:25-22:5, Sept. 14, 2022, ECF No. 1132 at 22-23. The Disinterested Directors tasked Quinn Emanuel with examining various intercompany transactions to determine whether they might give NAC DAC claims or causes of action against its various subsidiaries or otherwise provide a basis for its affiliates (and their respective creditors) to contribute assets to NAC DAC in a restructuring. Keglevic Decl. ¶ 14, ECF No. 705 at 9. After investigation, Quinn Emanuel did not find any compelling intercompany claims – and certainly none that could, through a litigated outcome, provide more value than the Plan. Keglevic Decl. ¶ 14, ECF No. 705 at 9.

Quinn Emanuel was also tasked with reviewing NAC DAC's guarantee obligations. Quinn Emanuel reviewed nearly seventy different guaranty agreements to which NAC DAC is a party, all of which appeared facially valid and were reaffirmed during the Scheme in July 2020. *Id.* ¶ 17, ECF No. 705 at 10. Specifically, because reaffirming the guarantees was simply duplicating debt for which NAC DAC already was obligated, Quinn Emanuel determined that any actual or

constructive fraudulent transfer claims would fail as a matter of law. *Id.* Accordingly, Quinn Emanuel determined that no viable challenges could be mounted to the guarantees. *Id.*

Quinn Emanuel also assisted the Disinterested Directors in determining that NAC DAC had no viable options for a stand-alone restructuring or for any value-maximizing alternative to the creditor-led settlements contained in the Plan. *Id.* ¶ 19, ECF No. 705 at 10-11. Given that NAC DAC is inextricably linked to its subsidiaries (and the aircraft they own) and has no ability to generate cash on its own, NAC DAC did not have an independent business around which it could reorganize unilaterally. *Id.*, ECF No. 705 at 11.

Finally, Quinn Emanuel advised the Disinterested Directors on the merits of the RSA and the Plan, including the settlements contained therein. *Id.* ¶ 24, ECF No. 705 at 13. Based on the advice provided by Quinn Emanuel, the NAC DAC Disinterested Directors supported the Plan and RSA, particularly because of the benefit they conferred on NAC DAC specifically. *Id.*

In accordance with the Interim Compensation Order, Quinn Emanuel timely and properly filed and served its Monthly Fee Statements. Ex. 89, ECF No. 781; Ex. 121, ECF No. 957. Quinn Emanuel's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 13, 2022, the Debtors timely filed the Quinn Emanuel Fee Application. Ex. 140, ECF No. 1015. Quinn Emanuel seeks compensation in the total amount of $420,500.50 and reimbursement

of actual and necessary expenses in the amount of $51.15 that Quinn Emanuel incurred for the period from December 19, 2021, through and including June 1, 2022. *Id.* The Quinn Emanuel Fee Application complies with the USTP Guidelines.

The Quinn Emanuel Fee Application already included a voluntary reduction of $3,719.00. Ex. 172 § 12, ECF No. 1078 at 17-18. In addition to the pre-filing voluntary reduction, pursuant to issues informally raised by the United States Trustee, Quinn Emanuel agreed to a further voluntary reduction of $5,263.20 from the amounts initially sought in the Quinn Emanuel Fee Application. *Id.*, ECF No. 1078 at 18. In light of these voluntary and negotiated reductions, the United States Trustee had no objection to the allowance of fees in the reduced amount of $415,237.30 and expenses in the amount of $51.15. *Id.*

The Debtors served the Quinn Emanuel Fee Application on all necessary parties on July 13, 2022, in accordance with the Case Management Procedures. *See* Ex. 167, ECF No. 1072. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Quinn Emanuel Fee Application were due on or before August 3, 2022. *See id.* There were no objections filed with respect to the Quinn Emanuel Fee Application. *See id.* Nonetheless, the Court has independently evaluated the merits of the Quinn Emanuel Fee Application under the § 330 Factors and the *Johnson* factors.

Quinn Emanuel billed 274.8 hours in connection with the services for which it seeks compensation. Ex. 140 Ex. B, ECF No. 1015 at 29. Given the scope of Quinn Emanuel's employment, this was a reasonable amount of labor to have devoted to these cases. 11 U.S.C. § 330(a)(3)(A). Quinn Emanuel billed at a blended rate of $1,543.74 for all timekeepers.[43] Ex.

---

[43] A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Quinn Emanuel Fee Application. Ex. 140 Ex. B, ECF No. 1015 at 29.

140 Ex. D, ECF No. 1015 at 31.  Quinn Emanuel billed at a blended rate of $1,611.50 for attorneys.

*Id.*; *see* 11 U.S.C. § 330(a)(3)(B).  These rates were Quinn Emanuel's standard hourly rates,[44] which are consistent with market rates for comparable services.  Ex. 10 ¶¶ 16-17, ECF No. 229 at 6; *see* 11 U.S.C. § 330(a)(3)(F).  The hourly rates used by Quinn Emanuel in representing these Disinterested Directors were consistent with the rates that Quinn Emanuel charges other comparable Chapter 11 clients, regardless of the location of the Chapter 11 case.  Ex. 10 Tecce Decl. ¶ 30, ECF No. 229 at 38.  The hourly rates and corresponding rate structure utilized by Quinn Emanuel in these Chapter 11 Cases are comparable to the hourly rates and corresponding rate structure that Quinn Emanuel uses for corporate, securities, and litigation matters whether in court or otherwise, regardless of whether a fee application is required.  Ex. 140 ¶ 16, ECF No. 1015 at 10.  The terms of the compensation are consistent with the terms approved in the Quinn Emanuel Employment Order.  The fees charged by Quinn Emanuel are consistent with the amounts for which were budgeted for the case.  *Id.* n.3, ECF No. 1015 at 2 (forecasting post-Petition Date fees between $217,000 and $402,200 through March 31, 2022).

As more fully discussed herein, Quinn Emanuel advised the Disinterested Directors of NAC DAC on Conflict Matters, which enabled the Disinterested Directors to fulfil their fiduciary duties.  This was a critical role in securing the overwhelming creditor support for the RSA and the Plan.  As such, not only were Quinn Emanuel's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.  Quinn Emanuel's services were necessary, essential, and beneficial to the administration of these Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).

---

[44]    Considering Quinn Emanuel billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

Quinn Emanuel's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry.  Quinn Emanuel was counsel to the Disinterested Directors of NAC DAC, the central entity, and was therefore fully immersed in these Chapter 11 Cases.  Quinn Emanuel's role empowered the Disinterested Directors of NAC DAC to engage in good corporate governance and properly assess any and all Conflict Matters.  *See* Ex. 140 ¶¶ 21-25, ECF No. 1015 at 12-15.  The hours billed by Quinn Emanuel were commensurate with that level of work performed, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to Quinn Emanuel's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, Quinn Emanuel has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Quinn Emanuel is entitled to the compensation it has requested be approved.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that Quinn Emanuel is entitled to an award of compensation in the amount of $415,237.30 and to reimbursement of the expenses it incurred in the amount of $51.15 for its work in the Chapter 11 Cases.

### B.    Katten Muchin as Special Counsel for the NAC 29 Disinterested Directors

Effective March 15, 2021, Jeffrey Stein and Jeff Dane were appointed as Disinterested Directors for NAC 29.  Decl. of Jeffrey Stein in Supp. of Confirmation of Third Am. Joint Ch. 11 Plan ¶ 4, ECF No. 726 at 2 [hereinafter "Stein Declaration"].  To assist the Disinterested Directors in evaluating alternatives to maximize the value of the NAC 29 estate, NAC 29 engaged Katten

Muchin as special counsel as of April 5, 2021. *Id.* ¶ 5, ECF No. 726 at 2-3. Katten Muchin lawyers have significant experience representing and advising the spectrum of constituents in Chapter 11 proceedings, including debtors, committees, secured and unsecured creditors, independent or disinterested directors, special committees, shareholders, and others, as well as providing advice with respective to fiduciary duties in connection with Chapter 11 proceedings. Hr'g Tr. 23:7-14, Sept. 14, 2022, ECF No. 1132 at 23. Specifically, Katten Muchin provided advice and assistance regarding analysis of: (i) the structure and value allocation of proposed restructuring transactions being negotiated by the Debtors and their creditors; (ii) the Debtors' historical transactions and potential claims held by NAC 29; and (iii) the Plan and its releases. Stein Decl. ¶ 7, ECF No. 726 at 3. In providing such advice, Katten Muchin conducted substantial diligence, including the review of thousands of pages of documents, presentations, and analyses from the Debtors' legal and financial advisors regarding the Debtors' restructuring, intercompany transactions, and business plan. *Id.*, ECF No. 726 at 3-4.

Based on the advices provided by Katten Muchin, the Disinterested Directors determined that the RSA, and the restructuring transactions contemplated therein, would allow NAC 29 to deleverage its capital structure, preserve the going-concern value of its business, preserve the jobs of its employees and commercial relationships with its vendors and customers, and maximize recoveries available to its creditors through the issuance of new debt at reorganized NAC 29 and through the payment of its general unsecured creditors in full. *Id.* ¶ 8, ECF No. 726 at 4. Accordingly, Katten Muchin assisted the Disinterested Directors in determining that the RSA was the best available option to NAC 29, and authorized NAC 29's entry into the RSA. *Id.* Later, based on Katten Muchin's advice, the Disinterested Directors determined that the Plan was in the best interests of NAC 29 and its creditors. *Id.* ¶ 11, ECF No. 726 at 5.

On February 7, 2022, the Debtors filed their *Application of NAC Aviation 29 Designated Activity Company, at the Sole Direction of Its Disinterested Directors, for Entry of an Order Authorizing the Employment and Retention of Katten Muchin Rosenman LLP as Special Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code Effective as of December 19, 2021* [ECF No. 324] (the "Katten Muchin Employment Application").  Ex. 29, ECF No. 324. The Katten Muchin Employment Application clearly disclosed the services that Katten Muchin intended to provide and the terms of compensation for such services, including the hourly rates that Katten Muchin would charge.   Ex. 29, ECF No. 324.   Notice of the Katten Muchin Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Katten Muchin Employment Application, on February 28, 2022, the Court entered the *Order Granting the Application of NAC Aviation 29 Designated Activity Company, at the Sole Direction of Its Disinterested Directors, Authorizing the Employment and Retention of Katten Muchin Rosenman LLP as Special Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code Effective as of December 19, 2021* [ECF No. 456] (the "Katten Muchin Employment Order").  Ex. 61, ECF No. 456.  As more fully detailed in the Katten Muchin Employment Order, the Debtors were authorized to retain and employ Katten Muchin as special counsel for the Disinterested Directors of NAC 29 effective as of December 19, 2021, in accordance with the terms and conditions set forth in the Katten Muchin Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 456 at 2-3.  Katten Muchin's services included advising Messrs. Dane and Stein with respect to any matters that arose in connection with NAC 29's restructuring efforts in which a potential or actual conflict existed between NAC 29, on the one hand, and its shareholders, affiliates, or directors and officers,

on the other.  Hr'g Tr. 23:15-20, Sept. 14, 2022, ECF No. 1132 at 23.  Katten Muchin was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  Ex. 61 ¶ 4, ECF No. 456 at 3.

In accordance with the Interim Compensation Order, Katten Muchin timely and properly filed and served its Monthly Fee Statements.  Ex. 96, ECF No. 793; Ex. 115; ECF No. 936; Ex. 116, ECF No. 938; Ex. 134, ECF No. 999; Ex. 142, ECF No. 1023.  Katten Muchin's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the Katten Muchin Fee Application.  Ex. 143, ECF No. 1024.  Katten Muchin seeks compensation in the total amount of $747,046.25 and reimbursement of actual and necessary expenses in the amount of $1,201.14 that Katten Muchin incurred for the period from December 19, 2021, through and including June 1, 2022.  Ex. 143 ¶ 18, ECF No. 1024 at 10.  The Katten Muchin Fee Application complies with the USTP Guidelines.

The Katten Muchin Fee Application already included a voluntary reduction of $10,949.75.  Ex. 172 § 17, ECF No. 1078 at 19.  In addition to the pre-filing voluntary reduction, pursuant to issues informally raised by the United States Trustee, Katten Muchin agreed to a further voluntary reduction of $35,000.00 from the amounts initially sought in the Katten Muchin Fee Application.  *Id.*  In light of the voluntary and negotiated reductions, the United States Trustee had no objection

to the allowance of fees in the reduced amount of $712,046.25 and expenses in the amount of $1,201.14. *Id.*

The Debtors served the Katten Muchin Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures. *See* Ex. 169, ECF No. 1074. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Katten Muchin Fee Application were due on or before August 5, 2022. *See id*. There were no objections filed with respect to the Katten Muchin Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the Katten Muchin Fee Application under the § 330 Factors and the *Johnson* factors.

Katten Muchin billed 667.5 hours in connection with the services for which it seeks compensation. Ex. 143 Ex. E, ECF No. 1024 at 53. As discussed herein, given the scope of Katten Muchin's employment, this was a reasonable amount of labor to have expended in connection with these Chapter 11 Cases. 11 U.S.C. § 330(a)(3)(A). Katten Muchin billed at a blended rate of $1,080.50 for all timekeepers.[45] Ex. 143 Ex. D, ECF No. 1024 at 53. It billed at a blended rate of $1,115.26 for all attorneys. *Id.* Ex. E, ECF No. 1024 at 53; *see* 11 U.S.C. § 330(a)(3)(B). These are Katten Muchin's standard hourly rates,[46] which are consistent with market rates for comparable services. Ex. 29 ¶¶ 14, 16, ECF No. 324 at 7, 8; *see* 11 U.S.C. § 330(a)(3)(F). These hourly rates are the same hourly rates that Katten Muchin uses in non-restructuring matters. Ex. 29 ¶ 15, ECF No. 324 at 8. The terms of the compensation are consistent with the terms approved in the Katten Muchin Employment Order.

---

[45]    A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Katten Muchin Fee Application. Ex. 143 Ex. E, ECF No. 1024 at 53.

[46]    Considering Katten Muchin billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

As more fully discussed herein, Katten Muchin advised the Disinterested Directors of NAC 29 on Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties.  This was a critical role in securing the overwhelming creditors support for the RSA and the Plan.  As such, not only were Katten Muchin's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.  Furthermore, given Katten Muchin's significant expertise in providing these services, as well as its substantive involvement in such matters pre-Petition Date on behalf of the Disinterested Directors of NAC 29, Katten had institutional knowledge, which resulted in certain cost efficiencies. Ex. 29 ¶ 29, ECF No. 324 at 11.  Katten Muchin's services were necessary, essential, and beneficial to the administration of these Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).

Katten Muchin's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry.  Katten Muchin's role empowered the Disinterested Directors of NAC 29 to engage in good corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of NAC 29, its estates, and its creditors.  *See* Ex. 170 ¶¶ 29-36, ECF No. 1024 at 14-16.  The hours billed by Katten Muchin are commensurate with that level of work performed, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to Katten Muchin's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, Katten Muchin has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Katten Muchin is entitled to the compensation it has requested. This view is apparently shared by the creditors and the U.S. Trustee, who have not objected. The Court therefore finds that Katten Muchin is entitled to $713,247.39 in fees and expenses for its work in these Chapter 11 Cases.

## C.   Special Counsel for the NAC A/S Debtors' Disinterested Directors

### 1.   McDonald Hopkins

On March 29, 2021, Jame Donath and Anthony Horton were appointed as Disinterested Directors for the NAC A/S Debtors. Decl. of Anthony Horton in Supp. of Confirmation of Third Am. Joint Ch. 11 Plan ¶ 5, ECF No. 724 at 2-3 [hereinafter "Horton Declaration"]. At the request of the Disinterested Directors, the NAC A/S Debtors retained McDonald Hopkins as special counsel to advise on Conflict Matters. *Id.* ¶ 6, ECF No. 724 at 3. McDonald Hopkins has significant experience representing and advising the spectrum of constituents in Chapter 11 proceedings, including debtors, committees, secured and unsecured creditors, independent or disinterested directors, special committees, shareholders, and others, as well as providing advice with respect to fiduciary duties in connection with Chapter 11 proceedings. Hr'g Tr. 25:3-9, Sept. 14, 2022, ECF No. 1132 at 25.

Through multiple meetings and calls, McDonald Hopkins provided analysis and advice regarding (i) the status of creditor negotiations; (ii) investigations of potential claims: (iii) the proposed terms of the RSA and alternatives for the NAC A/S Debtors; and (iv) the proposed terms of the Plan, including the releases contained therein. Horton Decl. ¶ 7, ECF No. 724 at 3. Based on McDonald Hopkins' recommendations, the Disinterested Directors for the NAC A/S Debtors determined that the RSA represented an extensively negotiated, arm's-length, and hard-fought agreement between the Debtors and their key creditor constituencies and shareholders, which

provided substantial value to NAC A/S Debtors and, accordingly, the NAC A/S Debtors entered

into the RSA on December 17, 2021. *Id.* ¶ 8, ECF No. 724 at 3-4.

On January 20, 2022, the Debtors filed their *Application of the Represented Entities for

Entry of an Order Authorizing the Employment and Retention of McDonald Hopkins LLC as

Special Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code,

Effective as of December 19, 2021* [ECF No. 202] (the "McDonald Hopkins Employment

Application"). Ex. 8, ECF No. 202. The McDonald Hopkins Employment Application clearly

disclosed the services that McDonald Hopkins intended to provide and the terms of compensation

for such services, including the hourly rates that McDonald Hopkins would charge. *Id.* Notice of

the McDonald Hopkins Employment Application was provided to all requisite notice parties in

accordance with the Case Management Procedures.

As no objection was timely filed to the McDonald Hopkins Employment Application, on

February 3, 2022, the Court entered the *Order Granting the Application of the Represented Entities

Authorizing the Employment and Retention of McDonald Hopkins LLC as Special Counsel

Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code, Effective as of

December 19, 2021* [ECF No. 303] (the "McDonald Hopkins Employment Order"). Ex. 27, ECF

No. 303. As more fully detailed in the McDonald Hopkins Employment Order, the Debtors were

authorized to retain and employ McDonald Hopkins as special counsel for the Disinterested

Directors of the NAC A/S Debtors effective as of December 19, 2021, in accordance with the

terms and conditions set forth in the McDonald Hopkins Employment Application and engagement

letter submitted therewith. *Id.* ¶ 2, ECF No. 303 at 3. McDonald Hopkins was, nevertheless,

required to apply for compensation and reimbursement of expenses in accordance with sections

330 and 331 of the Bankruptcy Code. *Id.* ¶ 4, ECF No. 303 at 3.

McDonald Hopkins' services included conducting investigations and analysis sufficient to advise Messrs. Donath and Horton regarding complex issues. Hr'g Tr. 25:10-12, Sept. 14, 2022, ECF No. 1132 at 25. Post-Petition Date, McDonald Hopkins reviewed the settlement of various intercompany claims contemplated by the Plan. Horton Decl. ¶ 12, ECF No. 724 at 5. At the direction of the Disinterested Directors, McDonald Hopkins made diligence requests to the Debtors, and, on behalf of the Disinterested Directors, McDonald Hopkins has reviewed and analyzed documents provided in response to their requests. *Id.* ¶ 13. McDonald Hopkins has also reviewed materials provided to them by the Debtors, including materials in the data room, board materials, and publicly available documents. *Id.* The investigation included legal and factual analyses of potential claims and causes of action, and evaluation of the strengths and weaknesses of such claims and causes of action. *Id.* Based on the advice provided by McDonald Hopkins, the Disinterested Directors of the NAC A/S Debtors supported confirmation of the Plan. *Id.* ¶ 1, ECF No. 724 at 1.

In accordance with the Interim Compensation Order, McDonald Hopkins timely and properly filed and served its Monthly Fee Statements. Ex. 44, ECF No. 415; Ex. 68; ECF No. 568; Ex. 86, ECF No. 759; Ex. 102, ECF No. 904; Ex. 122, ECF No. 969. McDonald Hopkins' Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on June 27, 2022, the Debtors timely filed the McDonald Hopkins Fee Application. Ex. 127, ECF No. 977. McDonald Hopkins seeks compensation in the total amount of $274,958.75 and reimbursement of actual and necessary expenses in the amount of $0.00 that McDonald Hopkins incurred for the period from December 17, 2021, through and including June 1, 2022. *Id.*, ECF No. 977 at 6-7. The McDonald Hopkins Fee Application complies with the USTP Guidelines.

The McDonald Hopkins Fee Application already included a voluntary reduction of $22,899.75 based on prior discussions between McDonald Hopkins and the United States Trustee. Ex. 172 § 19, ECF No. 1078 at 19. In light of the negotiated reduction, the United States Trustee had no objection to the McDonald Hopkins Fee Application as filed. *Id.*

The Debtors served the McDonald Hopkins Fee Application on all necessary parties on June 27, 2022, in accordance with the Case Management Procedures. *See* Ex. 161, ECF No. 1065. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the McDonald Hopkins Fee Application were due on or before July 18, 2022. *See id.* There were no objections filed with respect to the McDonald Hopkins Fee Application. *See id.* Nonetheless, the Court independently evaluated the merits of the McDonald Hopkins Fee Application under the § 330 Factors and the *Johnson* factors.

McDonald Hopkins billed 529 hours in connection with the services for which it seeks compensation. Ex. 127 ¶ 529, ECF No. 977 at 15. Given the scope of McDonald Hopkins' employment, this was a reasonable amount of labor. 11 U.S.C. § 330(a)(3)(A). McDonald Hopkins billed at a blended rate of $563.00 for all attorneys.[47] Ex. 127 Ex. E, ECF No. 977 at 53;

---

[47] A full breakdown of the hourly rates charged by each attorney timekeeper is available in the McDonald Hopkins Fee Application. Ex. 127 Ex. F, ECF No. 977 at 55.

*see* 11 U.S.C. § 330(a)(3)(B). McDonald Hopkins did not bill for non-attorneys. *See generally*

Ex. 127, ECF No. 977. Actual hourly rates for attorneys ranges from $400.00 to $760.00. *Id.*

¶ 46, ECF No. 977 at 24. These rates are its standard hourly rates[48] and are consistent with market

rates for comparable services. Ex. 8 ¶¶ 14-15, ECF No. 202 at 7; *see* 11 U.S.C. § 330(a)(3)(F).

The rates are the same as the hourly rates charged pre-Petition Date. Ex. 8 Ajay Decl. ¶ 35, ECF

No. 202 at 15. These rates are the same hourly rates that McDonald Hopkins uses in comparable

non-restructuring matters. *Id.* Ajay Decl. ¶ 32, ECF No. 202 at 14; Ex. 127 ¶ 25, ECF No. 977 at

16. The terms of the compensation are consistent with the terms approved in the McDonald

Hopkins Employment Order.

McDonald Hopkins' services were necessary, essential, and beneficial to the

administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). As more fully discussed

herein, McDonald Hopkins advised the Disinterested Directors of the NAC A/S Debtors on

Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties. This

was a critical role in securing the overwhelming creditors support for the RSA and the Plan. As

such, not only were McDonald Hopkins' services necessary and essential, they helped create value

for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.

McDonald Hopkins' services were performed within a reasonable amount of time

commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed. *See* 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex

restructuring of multiple international debtors engaged in a specialized industry. McDonald

Hopkins' role empowered the Disinterested Directors of the NAC A/S Debtors to engage in good

---

[48]    Considering McDonald Hopkins billed at its standard rate, its opportunity cost is roughly equal to its bill in this
case.

corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of NAC A/S, its estates, and its creditors.  *See* Ex. 127 ¶¶ 30-39, ECF No. 977 at 19-39.  Their hours billed are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to McDonald Hopkins' certifications.  *See* 11 U.S.C.  § 330(a)(3)(E).   Nonetheless, as described herein, McDonald Hopkins has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors, McDonald Hopkins is entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that McDonald Hopkins is entitled to a total fee award of $274,958.75 for its work in these Chapter 11 Cases.

### 2.    *Spiro & Browne*

Spiro & Browne served as local special counsel to the Disinterested Directors of the NAC A/S Debtors.  Spiro & Browne has extensive experience representing and advising a wide variety of constituents in Chapter 11 proceedings, including debtors, committees, secured and unsecured creditors, directors and officers, and other interested parties, as well as providing advice with respect to fiduciaries in connection with Chapter 11 proceedings.  Hr'g Tr. 25:18-23, Sept. 14, 2022, ECF No. 1132 at 25.   On March 8, 2022, the Debtors filed their *Application of the Represented Entities for Entry of an Order Authorizing the Employment and Retention of Spiro & Browne PLC as Special Local Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code, Effective as of February 23, 2022* [ECF No. 493] (the "Spiro & Browne Employment Application").  Ex. 66, ECF No. 493.  The Spiro & Browne Employment Application

clearly disclosed the services that Spiro & Browne intended to provide and the terms of compensation for such services, including the hourly rates that Spiro & Browne would charge. *Id.* Notice of the Spiro & Browne Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Spiro & Browne Employment Application, on March 31, 2022, the Court entered the *Order Granting Application of the Represented Entities Authorizing the Employment and Retention of Spiro & Browne PLC as Special Local Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code, Effective as of February 23, 2022* [ECF No. 627] (the "Spiro & Browne Employment Order"). Ex. 76, ECF No. 627. As more fully detailed in the Spiro & Browne Employment Order, the Debtors were authorized to retain and employ Spiro & Browne as their local special counsel for the Disinterested Directors of the NAC A/S Debtors effective as of February 23, 2022, in accordance with the terms and conditions set forth in the Spiro & Browne Employment Application. *Id.* ¶ 2, ECF No. 627 at 3. Spiro & Browne's services included conducting investigations and analysis sufficient to advise Messrs. Donath and Horton regarding Conflicts Matters. Hr'g Tr. 25:24-26:1, Sept. 14, 2022, ECF No. 1132 at 25-26. Spiro & Browne was, nevertheless, required to apply for compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code. Ex. 76 ¶ 3, ECF No. 627 at 3.

In accordance with the Interim Compensation Order, Spiro & Browne timely and properly filed and served its Monthly Fee Statements. Ex. 87, ECF No. 760; Ex. 106, ECF No. 910; Ex. 123, ECF No. 970. Spiro & Browne's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex.

3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating

budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No

objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on

July 5, 2022, the Debtors timely filed the Spiro & Browne Fee Application.  Ex. 129, ECF No.

987.  Spiro & Browne seeks compensation in the total amount of $7,800.00 and reimbursement of

actual and necessary expenses in the amount of $0.00 that Spiro & Browne incurred for the period

from February 23, 2022, through and including June 1, 2022.  *Id.* ¶ 20, ECF No. 987 at 13.

After review, United States Trustee had no objection to the Spiro & Browne Fee

Application as filed.  Ex. 172 § 20, ECF No. 1078 at 20.

The Debtors served the Spiro & Browne Fee Application on all necessary parties on July

5, 2022, in accordance with the Case Management Procedures.  *See* Ex. 162, ECF No. 1066.

Pursuant to the Case Management Procedures, all objections to the approval of the relief requested

in the Spiro & Browne Fee Application were due on or before July 26, 2022.  *See id.*  There were

no objections filed with respect to the Spiro & Browne Fee Application.  *See id.*  Nonetheless, the

Court independently evaluated the merits of the Spiro & Browne Fee Application under the § 330

Factors and the *Johnson* factors.

Spiro & Browne billed 19.5 hours in connection with the services for which it seeks

compensation.  Ex. 129 ¶ 20, ECF No. 987 at 13.  As discussed herein, given the scope of Spiro &

Browne's employment, this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  Spiro

& Browne billed at a blended rate of $400.00 for all attorneys.  Ex. 129 ¶ 24, ECF No. 987 at 14;

*see* 11 U.S.C. § 330(a)(3)(B).  Spiro & Browne did not bill for non-attorneys.  *See* Ex. 129 ¶ 24,

ECF No. 987 at 14.  The rate charged was Spiro & Browne's standard hourly rate,[49] which is consistent with market rates for comparable services.  Ex. 66 ¶¶ 12-13, ECF No. 493 at 6.  Spiro & Browne's hourly rate in these Chapter 11 Cases was consistent and competitive with rates charged by other attorneys with similar experience who practice before this Court and who provided similar services in these Chapter 11 Cases.  Ex. 129 ¶ 30, ECF No. 987 at 16; *see* 11 U.S.C. § 330(a)(3)(F).  This hourly rate utilized by Spiro & Browne in these Chapter 11 Cases was equivalent to the hourly rate used by Spiro & Browne for restructuring, workout, bankruptcy, insolvency, and comparable matters, and related litigation matters, whether in court or otherwise, including "local counsel" engagements, regardless of whether a fee application is required.  Ex. 129 ¶¶ 24, 30, ECF No. 987 at 14, 16.  The terms of the compensation sought are consistent with the terms approved in the Spiro & Browne Employment Order.

Spiro & Browne provided customary professional services as local counsel to the NAC A/S Debtors, at the sole discretion of the Disinterested Directors, in connection with these Chapter 11 Cases.  *Id.* ¶ 25, ECF No. 987 at 14.  These services were necessary to assist the Disinterested Directors of the NAC A/S Debtors and their primary counsel in addressing a multitude of critical issues both unique to these Chapter 11 Cases and in light of the numerous parties in interest in these complex bankruptcy cases.  *Id.*  Spiro & Browne's services allowed the NAC A/S Debtors to appear and participate in these Chapter 11 Cases in compliance with this Court's rules.  *See* Local Bankr. R. 2090-1(E)(3).  Spiro & Browne's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).

Spiro & Browne's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task

---

[49]    Considering Spiro & Browne billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

addressed.  *See* 11 U.S.C. § 330(a)(3)(D).  Spiro & Browne performed the services for the NAC

A/S Debtors, at the sole discretion of the Disinterested Directors, economically, effectively, and

efficiently, and the results obtained benefited not only the Disinterested Directors and the NAC

A/S Debtors, but also the constituents of the NAC A/S Debtors.  Ex. 129 ¶ 29, ECF No. 987 at 16.

Their hours billed are commensurate with that work, and therefore weigh in favor of granting Spiro

& Browne its sought compensation.

The Court did not receive any evidence as to Spiro & Browne's certifications.  *See* 11

U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, Spiro & Browne has extensive

experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors, Spiro & Browne is

entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S.

Trustee, who have not objected.  The Court therefore finds that Spiro & Browne is entitled to a

total award of $7,800.00 in fees for its work in the Chapter 11 Cases.

## D.    Special Counsel for the NAC 33/34 Debtors' Disinterested Directors

### 1.    Cole Schotz

In March 2021, Jake Wood and Jonathan Foster were appointed as Disinterested Directors

to the board of directors for the NAC 33/34 Debtors.  Decl. of Jake Wood in Supp. of Third Am.

Joint Ch. 11 Plan ¶ 3, ECF No. 720 at 2 [hereinafter "Wood Declaration"].  The NAC 33/34

Debtors' Disinterested Directors engaged Cole Schotz to assist them in identifying and addressing

Conflicts Matters.  *Id.* ¶ 4.  Cole Schotz has significant experience representing and advising the

spectrum of constituents in Chapter 11 proceedings, including debtors, secured and unsecured

creditors, independent or disinterested directors, special committees, and others, as well as

providing advice with respect to fiduciary duties in connection with Chapter 11 proceedings.  Hr'g

Tr. 23:23-24:4, Sept. 14, 2022, ECF No. 1132 at 23-24.  Specifically, Cole Schotz advised the

Disinterested Directors as to the terms of the RSA, namely the legal and economic separation of the NAC 33/34 Debtors from NAC DAC.  Wood Decl. ¶ 8, ECF No. 720 at 3.  With the advice provided by Cole Schotz, the NAC 33/34 Debtors' board of directors approved the RSA on December 16, 2021.  *Id.*

On January 20, 2022, the Debtors filed the *Application for Entry of an Order Authorizing the Retention and Employment of Cole Schotz P.C. as Conflicts Counsel to Debtors NAC Aviation 33 Limited and NAC Aviation 34 Limited Effective as of December 19, 2021* [ECF No. 197] (the "Cole Schotz Employment Application").  Ex. 5, ECF No. 197.  The Cole Schotz Employment Application clearly disclosed the services that Cole Schotz intended to provide and the terms of compensation for such services, including the hourly rates that Cole Schotz would charge.  *Id.*  Notice of the Cole Schotz Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Cole Schotz Employment Application, on February 2, 2022, the Court entered the *Order Authorizing the Retention and Employment of Cole Schotz P.C. as Conflicts Counsel to Debtors NAC Aviation 33 Limited and NAC Aviation 34 Limited Effective as of December 19, 2021* [ECF No. 285] (the "Cole Schotz Employment Order").  Ex. 23, ECF No. 285.  As more fully detailed in the Cole Schotz Employment Order, the Debtors were authorized to retain and employ Cole Schotz as their special counsel for the Disinterested Directors of the NAC 33/34 Debtors effective as of December 19, 2022, in accordance with the terms and conditions set forth in the Cole Schotz Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 285 at 2.  Cole Schotz was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  *Id.* ¶ 5, ECF No. 285 at 3.

Cole Schotz's services included conducting investigations and analysis sufficient to advise Messrs. Foster and Wood regarding Conflicts Matters.  Hr'g Tr. 24:5-7, Sept. 14, 2022, ECF No. 1132 at 24.  Cole Schotz also provided legal advice concerning the terms of the Plan, including the releases contained therein.  Wood Decl. ¶ 9, ECF No. 720 at 3-4.  Based on the analysis Cole Schotz provided, the Disinterested Directors determined that the Plan, including the releases contained therein, was in the best interest of the NAC 33/34 Debtors, their estates and stakeholders and would deliver significant value to the NAC 33/34 Debtors' estates and stakeholders.  *Id.* ¶¶ 12-13, ECF No. 720 at 4.

In accordance with the Interim Compensation Order, Cole Schotz timely and properly filed and served its Monthly Fee Statements.  Ex. 62, ECF No. 464; Ex. 73, ECF No. 607; Ex. 90, ECF No. 782; Ex. 111, ECF No. 927; Ex. 117, ECF No. 950.  Cole Schotz's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 8, 2022, the Debtors timely filed the Cole Schotz Fee Application.  Ex. 130, ECF No. 992. The Cole Schotz Fee Application seeks compensation in the total amount of $212,259.50 and reimbursement of actual and necessary expenses in the amount of $8.40 that Cole Schotz incurred for the period from December 19, 2022, through and including June 1, 2022.  *Id.* ¶ 13, ECF No. 992 at 7.  The Cole Schotz Fee Application complies with the USTP Guidelines.

The Cole Schotz Fee Application already included a voluntary reduction of $9,051.00. Ex. 172 § 14, ECF No. 1078 at 17. In addition to the pre-filing voluntary reduction, pursuant to issues informally raised by the United States Trustee, Cole Schotz agreed to a further voluntary reduction of $5,670.00 from the amounts initially sought in the Cole Schotz Fee Application. *Id.* In light of the voluntary and negotiated reductions, the United States Trustee had no objection to the allowance of fees in the reduced amount of $206,589.50 and to the reimbursement of expenses in the amount of $8.40. *Id.*

The Debtors served the Cole Schotz Fee Application on all necessary parties on July 12, 2022, in accordance with the Case Management Procedures. *See* Ex. 153, ECF No. 1050. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Cole Schotz Fee Application were due on or before July 29, 2022. *See id.* There were no objections filed with respect to the Cole Schotz Fee Application. *See id.* Nonetheless, the Court independently conducted its evaluation of the merits of the Cole Schotz Fee Application under the § 330 Factors and the *Johnson* factors.

Cole Schotz billed 375.1 hours in connection with the services for which it seeks compensation. Ex. 130 ¶ 14, ECF No. 992 at 2. Given the scope of Cole Schotz's employment, this was a reasonable amount of labor to have devoted to these Chapter 11 Cases. 11 U.S.C. § 330(a)(3)(A). Cole Schotz billed at a blended rate of $565.87 for all timekeepers.[50] Ex. 130 Ex. C, ECF No. 992 at 29. It billed at a blended rate of $572.00 for all attorneys. *Id.*, ECF No. 992 at 2; *see* 11 U.S.C. § 330(a)(3)(B). Cole Schotz's actual hourly billing rates for attorneys ranged from $275.00 to $1,120.00. Ex. 130 ¶ 36, ECF No. 992 at 14. Hourly rates varied with the

---

[50]    A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Cole Schotz Fee Application. Ex. 130 Ex. D, ECF No. 992 at 30.

experience and seniority of the individuals assigned. *Id.*, ECF No. 992 at 15. The rates charged are Cole Schotz's standard rates.[51] *Id.* ¶ 40, ECF No. 992 at 15. Cole Schotz's rates in these cases are consistent with the rates charged by Cole Schotz to its non-bankruptcy clients. *Id.* ¶¶ 17, 36, ECF No. 992 at 8, 14. These rates are similar to the customary compensation charged by comparably skilled practitioners in comparable non-bankruptcy and bankruptcy cases in a competitive national legal market. *Id.* ¶ 17, ECF No. 992 at 8; *see* 11 U.S.C. § 330(a)(3)(F).

Cole Schotz's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). As more fully discussed herein, Cole Schotz advised the Disinterested Directors of the NAC 33/34 Debtors on Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties. This was a critical role in securing the overwhelming creditors support for the RSA and the Plan. As such, not only were Cole Schotz's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.

Cole Schotz's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. Cole Schotz's role empowered the Disinterested Directors of the NAC 33/34 Debtors to engage in good corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of the NAC 33/34 Debtors, their estates, and their creditors. *See* Ex. 130 ¶¶ 27-33, ECF No. 992 at 11-13. The hours billed by Cole Schotz were commensurate with that level of work, and therefore weigh in favor of

---

[51]    Considering Cole Schotz billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

granting the compensation sought.  Significantly, the amount billed fell well below the amount

budgeted for this engagement.  *Id.*, ECF No. 992 at 2 (noting amount budgeted was $620,250.00).

The professional services provided by Cole Schotz on behalf of the Disinterested Directors

of the NAC 33/34 Debtors were necessary and appropriate given the complexity of these Chapter

11 Cases, the time expended by Cole Schotz, the nature and extent of Cole Schotz's services

provided, the value of Cole Schotz's services, and the cost of comparable services outside of

bankruptcy.  *Id.* ¶ 38, ECF No. 992 at 15.

The Court did not receive any evidence as to Cole Schotz's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).   Nonetheless, as described herein, Cole Schotz has extensive experience in

complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Cole Schotz

is entitled to the compensation that it has requested.  This view is apparently shared by the creditors

and the U.S. Trustee, who have not objected.  The Court therefore finds that Cole Schotz is entitled

to final compensation in the amount of $206,589.50 and reimbursement of expenses in the amount

of $8.40 for its work in the Chapter 11 Cases.

## 2.    *Ronald Page*

Ronald Page served as local special counsel to the Disinterested Directors of the NAC

33/34 Debtors.  Ronald Page has significant experience representing and advising the spectrum of

constituents in Chapter 11 proceedings, including debtors, secured and unsecured creditors,

independent or disinterested directors, special committees, and others, as well as providing advice

with respect to fiduciary duties in connection with Chapter 11.  Hr'g Tr. 24:10-15, Sept. 14, 2022,

ECF No. 1132 at 24.  On January 20, 2022, the Debtors filed the *Application for Entry of an Order*

*Authorizing the Retention and Employment of Ronald Page, PLC as Virginia Conflicts Counsel to*

*Debtors NAC Aviation 33 Limited and NAC Aviation 34 Limited Effective as of January 10, 2022*
[ECF No. 198] (the "Ronald Page Employment Application").  Ex. 6, ECF No. 198.  The Ronald
Page Employment Application clearly disclosed the services that Ronald Page intended to provide
and the terms of compensation for such services, including the hourly rates that Ronald Page would
charge.  *Id.*  Notice of the Ronald Page Employment Application was provided to all requisite
notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Ronald Page Employment Application, on February
2, 2022, the Court entered the *Order Authorizing the Retention and Employment of Ronald Page,
PLC as Virginia Conflicts Counsel to Debtors NAC Aviation 33 Limited and NAC Aviation 34
Limited Effective as of January 10, 2022* [ECF No. 286] (the "Ronald Page Employment Order").
Ex. 24, ECF No. 286.  As more fully detailed in the Ronald Page Employment Order, the Debtors
were authorized to retain and employ Ronald Page as their local special counsel for the
Disinterested Directors of the NAC 33/34 Debtors effective as of January 10, 2022, in accordance
with the terms and conditions set forth in the Ronald Page Employment Application.  *Id.* ¶ 2, ECF
No. 286 at 2.  Ronald Page's services included providing legal advice and services regarding local
rules, practices, and procedures in this Court, as well as conducting investigations and analysis
sufficient to advise Messrs. Foster and Wood regarding potential Conflicts Matters.  Hr'g Tr.
24:17-22, Sept. 14, 2022, ECF No. 1132 at 24.  Ronald Page was, nevertheless, required to apply
for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the
Bankruptcy Code.  Ex. 24 ¶ 4, ECF No. 286 at 4.

In accordance with the Interim Compensation Order, Ronald Page timely and properly filed
and served its Monthly Fee Statements.  Ex. 63, ECF No. 465; Ex. 74, ECF No. 608; Ex. 91, ECF
No. 783; Ex. 112, ECF No. 928; Ex. 118, ECF No. 951.  Ronald Page's Monthly Fee Statements

fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 8, 2022, the Debtors timely filed the Ronald Page Fee Application. Ex. 131, ECF No. 993. The Ronald Page Fee Application seeks compensation in the total amount of $45,028.00 and reimbursement of actual and necessary expenses in the amount of $161.30 that Ronald Page incurred for the period from January 10, 2022, through and including June 1, 2022. *Id.* ¶ 9, ECF No. 993 at 7. The Ronald Page Fee Application complies with the USTP Guidelines.

The Ronald Page Fee Application already included a voluntary reduction of $4,234.20 based on prior discussions between Ronald Page and the United States Trustee. Ex. 172 § 18, ECF No. 1078 at 19. In light of the voluntary reduction, the United States Trustee had no objection to the Ronald Page Fee Application as filed. *Id.*

The Debtors served the Ronald Page Fee Application on all necessary parties on July 8, 2022, in accordance with the Case Management Procedures. *See* Ex. 154, ECF No. 1051. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Ronald Page Fee Application were due on or before July 29, 2022. *See id*. There were no objections filed with respect to the Ronald Page Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the Ronald Page Fee Application under the § 330 Factors and the *Johnson* factors.

Ronald Page billed 122.6 hours in connection with the services for which he seeks compensation. Ex. 131 Ex. C, ECF No. 993 at 28. As discussed herein, given the scope of Ronald Page's employment, this was a reasonable amount of labor. 11 U.S.C. § 330(a)(3)(A). Ronald Page billed at an actual rate of $400.00 for his time. Ex. 131 Ex. C, ECF No. 993 at 28; *see* 11 U.S.C. § 330(a)(3)(B). Ronald Page did not bill for non-attorneys. *See generally* Ex. 131, ECF No. 993. The hourly rate was consistent with Ronald Page's standard rate,[52] *id.* ¶ 38, ECF No. 993 at 16, which is consistent with market rates for comparable services. As more fully detailed herein, Ronald Page's hourly rate in these Chapter 11 Cases was consistent and competitive with rates charged by other attorneys with similar experience who practice before this Court and who provided similar services in these Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(F). The hourly rates and corresponding rate structure utilized by Ronald Page in these Chapter 11 Cases are the same as the hourly rates and corresponding rate structure Ronald Page uses for other restructuring matters. Ex. 131 ¶ 19, ECF No. 993 at 10. The terms of the compensation sought are consistent with the terms approved in the Ronald Page Employment Order.

Ronald Page's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). Ronald Page, as local counsel, assisted Cole Schotz in its duties on behalf of the Disinterested Directors of the NAC 33/34 Debtors. These services were necessary to assist the Disinterested Directors and their lead counsel in addressing a multitude of critical issues both unique to these Chapter 11 Cases and in light of the numerous parties in interest in these complex bankruptcy cases. Ronald Page's services allowed the NAC 33/34 Debtors to appear and participate in these Chapter 11 Cases in compliance with this Court's rules. *See* Local Bankr. R. 2090-1(E)(3).

---

[52] Considering Ronald Page billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

Ronald Page's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C. § 330(a)(3)(D).  Ronald Page performed the services for the NAC 33/34 Debtors, at the sole discretion of the Disinterested Directors, economically, effectively, and efficiently, and the results obtained benefited not only the Disinterested Directors and the NAC 33/34 Debtors, but also the constituents of the NAC 33/34 Debtors.  His hours billed are commensurate with that work, and therefore weigh in favor of granting Ronald Page its sought compensation.

The Court did not receive any evidence as to Ronald Page's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, Ronald Page has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Ronald Page is entitled to the compensation he has requested.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that Ronald Page is entitled to compensation in the amount of $45,028.00 and reimbursement of expenses in the amount of $161.30 for his work in these Chapter 11 Cases.

### E.    Special Counsel for the NAC Pte. Debtors' Disinterested Directors

#### 1.    Cozen

Pre-Petition Date, Mark Cox and Harvey Tepner were appointed as the Disinterested Directors of the NAC Pte. Debtors.  Decl. of Harvey Tepner in Supp. of Conformation of the Third Am. Plan ¶ 1, ECF No. 717 at 2 [hereinafter "Tepner Declaration"].  At the direction of the Disinterested Directors, pre-Petition Date, the NAC Pte. Debtors engaged Cozen as their independent legal counsel to provide legal advice with respect to Conflict Matters affecting the NAC Pte. Debtors.  *Id.* ¶ 7, ECF No. 717 at 3-4.  Cozen is recognized for its extensive experience and knowledge in the fields of debtors' protections, creditors' rights, and business reorganizations

under Chapter 11 of the Bankruptcy Code.  Hr'g Tr. 26:24-27:2, Sept. 14, 2022, ECF No. 1132 at 26-27.

On February 10, 2022, the Debtors filed the *Application of Nordic Aviation Capital Pte. Ltd. and Certain Related Debtors for Entry of an Order Authorizing the Retention and Employment of Cozen O'Connor as Conflicts Counsel Effective as of the Petition Date* [ECF No. 358] (the "Cozen Employment Application").  Ex. 32, ECF No. 358.  The Cozen Employment Application clearly disclosed the services that Cozen intended to provide and the terms of compensation for such services, including the hourly rates that Cozen would charge.  *Id.*  Notice of the Cozen Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Cozen Employment Application, on February 2, 2022, the Court entered the *Order Authorizing the Retention and Employment of Cozen O'Connor as Conflicts Counsel to Nordic Aviation Capital Pte. Ltd. and Certain Related Debtors Effective as of the Petition Date* [ECF No. 436] (the "Cozen Employment Order").  Ex. 54, ECF No. 436. As more fully detailed in the Cozen Employment Order, the Debtors were authorized to retain and employ Cozen as their special counsel for the Disinterested Directors of the NAC Pte. Debtors effective as of the Petition Date in accordance with the terms and conditions set forth in the Cozen Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 436 at 3. Cozen was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  *Id.* 54 ¶ 5, ECF No. 436 at 4.

Cozen's services included advising Messrs. Cox and Tepner with respect to all Conflicts Matters that may potentially arise during these Chapter 11 cases.  Hr'g Tr. 27:3-5, Sept. 14, 2022, ECF No. 1132 at 27.  Among other things, Cozen assisted the Disinterested Directors in evaluating

the terms of the releases contained in the Plan.  Based on the analysis provided by Cozen, the

Disinterested Directors determined that the Plan, including the releases contained therein, was fair,

reasonable, and in the best interests of the NAC Pte. Debtors, their estates, and their stakeholders.

Tepner Decl. ¶ 13, ECF No. 717 at 5.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on

July 15, 2022, the Debtors timely filed the Cozen Fee Application.  Ex. 146, ECF No. 1028.  Cozen

seeks compensation in the total amount of $90,429.50 and reimbursement of actual and necessary

expenses in the amount of $0.00 that Cozen incurred for the period from the Petition Date through

and including June 1, 2022.  *Id.* ¶ 23, ECF No. 1028 at 14.  The Cozen Fee Application complies

with the USTP Guidelines.

Pursuant to issues informally raised by the United States Trustee, Cozen agreed to a

voluntary reduction of $252.50 from the amounts initially sought in the Cozen Fee Application.

Ex. 172 § 13, ECF No. 1078 at 17.  In light of the voluntary reduction, the United States Trustee

had no objection to the allowance of fees in the reduced amount of $90,177.00 and expenses in the

amount of $0.00.  *Id.*

The Debtors served the Cozen Fee Application on all necessary parties on July 15, 2022,

in accordance with the Case Management Procedures.  *See* Ex. 165, ECF No. 1070.  Pursuant to

the Case Management Procedures, all objections to the approval of the relief requested in the

Cozen Fee Application were due on or before August 5, 2022.  *See id*.  There were no objections

filed with respect to the Cozen Fee Application.  *See id*.  Nonetheless, the Court independently

evaluated the merits of the Cozen Fee Application under the § 330 Factors and the *Johnson* factors.

Cozen billed 115.0 hours in connection with the services for which it seeks compensation.

Ex. 146 ¶ 23, ECF No. 1028 at 14.  As discussed herein, given the scope of Cozen's employment,

this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  Cozen billed at a blended rate of $786.00 for all attorneys.[53]  Ex. 146 Ex. D, ECF No. 1028 at 51; *see* 11 U.S.C. § 330(a)(3)(B).  Cozen did not bill for non-attorneys.  *See generally* Ex. 146, ECF No. 1028.  Cozen's actual hourly billing rates for attorneys ranged from $505.00 to $930.00.  *Id.* ¶ 41, ECF No. 1028 at 19.  Hourly rates varied with the experience and seniority of the individuals assigned.  Ex. 32 ¶ 13-14, ECF No. 358 at 6-7; Ex. 146 ¶ 42, ECF No. 1028 at 20.  These rates are Cozen's standard billing rates.[54]  Ex. 32 Fishman Decl. ¶ 19, ECF No. 358-2 at 9; Ex. 146 ¶ 19, ECF No. 1028 at 12.  Subject to an annual adjustment, the rates charged are consistent with the rates Cozen charged prior to the Petition Date.  Ex. 32 ¶ 14, ECF No. 358 at 7.  The hourly rates and corresponding rate structure Cozen used in the Chapter 11 Cases are the same as the hourly rates and corresponding rate structure that they use in other restructuring matters, as well as similar complex corporate, securities, and litigation matters whether in court or otherwise, regardless of whether a fee application is required.  *Id.* ¶ 10, ECF No. 358 at 6; Ex. 146 ¶¶ 18, 41, ECF No. 1028 at 11-12, 19.  The rates structures provided by Cozen are consistent with the rates that other comparable counsel would charge to do work substantially similar to the work that Cozen performed in these Chapter 11 Cases.  Ex. 32 Fishman Decl. ¶ 12, ECF No. 358-2 at 6-7; *see* 11 U.S.C. § 330(a)(3)(F).

Cozen's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  As more fully discussed herein, Cozen advised the Disinterested Directors of the NAC Pte. Debtors on Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties.  This was a critical role in securing the

---

[53]  A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Cozen Fee Application. Ex. 146 Ex. D, ECF No. 1028 at 53.

[54]  Considering Cozen billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

overwhelming creditors support for the RSA and the Plan. As such, not only were Cozen's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.

Cozen's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. Cozen's role empowered the Disinterested Directors of the NAC Pte. Debtors to engage in good corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of the NAC Pte. Debtors, their estates, and their creditors. Ex. 146 ¶¶ 27-34, ECF No. 1028 at 15-17. The hours billed by Cozen are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought. Significantly, the amount billed fell well below the amount budgeted for this engagement. *Id.* Ex. F, ECF No. 1028 at 55 (noting amount budgeted was $190,000).

Cozen provided extensive and important professional services to the NAC Pte. Debtors with respect to the Conflict Matters in connection with these Cases. *Id.* ¶ 22, ECF No. 1028 at 14. These services were often performed under time constraints and were necessary to address critical issues in these Chapter 11 Cases and typically faced by large corporate debtors in similar cases of this magnitude and complexity. *Id.* The professional services provided by Cozen on behalf of the Disinterested Directors of the NAC Pte. Debtors were, at the time rendered, necessary for and beneficial to the NAC Pte. Debtors and their estates and were rendered to protect and preserve the NAC Pte. Debtors' estates. *Id.* ¶ 40, ECF No. 1028 at 19. Cozen performed the services for the NAC Pte. Debtors economically, effectively, and efficiently, and the results obtained benefitted

not only the NAC Pte. Debtors, but also the NAC Pte. Debtors' estates and the NAC Pte. Debtors'

constituents.  *Id.*  The compensation requested by Cozen is reasonable in light of the nature, extent,

and value of such services to the NAC Pte. Debtors, their estates, and all parties in interest.  *Id.*

¶¶ 40, 43, ECF No. 1028 at 19, 20.

The Court did not receive any evidence as to Cozen's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).  Nonetheless, as described herein, Cozen has extensive experience in complex

restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Cozen is

entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S.

Trustee, who have not objected.  The Court therefore finds that Cozen is entitled to a total fee

award of $90,177.00 for its work in these Chapter 11 Cases.

### 2.    *Canfield Wells*

Canfield Wells served as local special counsel to the disinterested directors of the NAC

Pte. Debtors.  Canfield Wells is recognized for its expertise and extensive experience and

knowledge in the field of debtors' protections, creditors' rights, and business reorganizations under

Chapter 11s.  Hr'g Tr. 27:9-12, Sept. 14, 2022, ECF No. 1132 at 27.  On February 24, 2022, the

Debtors filed the *Application of Nordic Aviation Capital Pte. Ltd. and Certain Related Debtors for*

*Entry of an Order Authorizing the Retention and Employment of Canfield Wells, LLP as Virginia*

*Conflicts Counsel Effective as of the Petition Date* [ECF No. 446] (the "Canfield Wells

Employment Application").  Ex. 58, ECF No. 446.  The Canfield Wells Employment Application

clearly disclosed the services that Canfield Wells intended to provide and the terms of

compensation for such services, including the hourly rates that Canfield Wells would charge.  *Id.*

Notice of the Canfield Wells Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Canfield Wells Employment Application, on March 9, 2022, the Court entered the *Order Authorizing the Retention and Employment of Canfield Wells, LLP as Virginia Conflicts Counsel to Nordic Aviation Capital Pte. Ltd. and Certain Related Debtors Effective as of the Date of Engagement* [ECF No. 510] (the "Canfield Wells Employment Order"). Ex. 67, ECF No. 510. As more fully detailed in the Canfield Wells Employment Order, the Debtors were authorized to retain and employ Canfield Wells as their local special counsel for the Disinterested Directors of the NAC Pte. Debtors effective as of January 4, 2022, in accordance with the terms and conditions set forth in the Canfield Wells Employment Application. *Id.* ¶ 2, ECF No. 510 at 3. Canfield Wells' services included advising Messrs. Cox and Tepner with respect to all Conflict Matters that may arise during these Chapter 11 cases. Hr'g Tr. 27:13-15, Sept. 14, 2022, ECF No. 1132 at 27. Canfield Wells was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code. Ex. 67 ¶ 5, ECF No. 510 at 4.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the Canfield Wells Fee Application. Ex. 148, ECF No. 1030. Canfield Wells seeks compensation in the total amount of $8,880.00 and reimbursement of actual and necessary expenses in the amount of $0.00 that Canfield Wells incurred for the period from January 4, 2022, through and including June 1, 2022. *Id.*, ECF No. 1030 at 6. The Canfield Wells Fee Application complies with the USTP Guidelines.

After review, United States Trustee had no objection to the Canfield Wells Fee Application as filed. Ex. 172 § 21, ECF No. 1078 at 20.

The Debtors served the Canfield Wells Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures. *See* Ex. 166, ECF No. 1071. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Canfield Wells Fee Application were due on or before August 5, 2022. *See id*. There were no objections filed with respect to the Canfield Wells Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the Canfield Wells Fee Application under the § 330 Factors and the *Johnson* factors.

Canfield Wells billed 22.2 hours in connection with the services for which it seeks compensation. Ex. 148 Ex. C, ECF No. 1030 at 35. Given the scope of Canfield Wells' employment, this is a reasonable amount of time to have devoted to these cases. 11 U.S.C. § 330(a)(3)(A). Canfield Wells billed at an actual rate of $400.00 for its one attorney timekeeper. Ex. 148 Ex. C, ECF No. 1030 at 35; *see* 11 U.S.C. § 330(a)(3)(B). Canfield Wells did not bill for non-attorneys. *See generally* Ex. 148, ECF No. 1030. The hourly rate charged is Canfield Wells' standard hourly rate,[55] Ex. 58 Wells Decl. ¶ 14, ECF No. 446 at 27, which is consistent with market rates for comparable services. The hourly rate is consistent with the rates that other comparable counsel would charge to do work substantially similar to the work that Canfield Wells performed in these Chapter 11 Cases. *Id.* ¶ 15, ECF No. 446 at 6-7; *see* 11 U.S.C. § 330(a)(3)(F). The hourly rate and corresponding rate structure Canfield Wells used in these Chapter 11 Cases is the same as the hourly rate and corresponding rate structure Canfield Wells uses in other restructuring matters, as well as similar complex corporate, securities, and litigation matters whether in court or otherwise, regardless of whether a fee application is required. Ex. 58 ¶ 11, ECF No. 446 at 6. The

---

[55] Considering Canfield Wells billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

terms of the compensation sought are consistent with the terms approved in the Canfield Wells Employment Order.

Canfield Wells' services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). Canfield Wells, as local counsel, assisted Cozen in its duties on behalf of the Disinterested Directors of the NAC Pte. Debtors. These services were necessary to assist the Disinterested Directors and their lead counsel in addressing a multitude of critical issues both unique to these Chapter 11 Cases and in light of the numerous parties in interest in these complex bankruptcy cases. Canfield Wells' services allowed the NAC Pte. Debtors to appear and participate in these Chapter 11 Cases in compliance with this Court's rules. *See* Local Bankr. R. 2090-1(E)(3).

Canfield Wells' services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). Canfield Wells performed the services for the NAC Pte. Debtors, at the sole discretion of the Disinterested Directors, economically, effectively, and efficiently, and the results obtained benefited not only the Disinterested Directors and the NAC Pte. Debtors, but also the constituents of the NAC Pte. Debtors. The hours billed by Canfield Wells are commensurate with that work, and therefore weigh in favor of granting Canfield Wells its sought compensation.

The Court did not receive any evidence as to Canfield Wells' certifications. *See* 11 U.S.C. § 330(a)(3)(E). Nonetheless, as described herein, Canfield Wells has extensive experience in complex restructurings. *See id.*

Taking the section 330 analysis together with the *Johnson* factors, Canfield Wells is entitled to the compensation sought. This view is apparently shared by the creditors and the U.S.

Trustee, who have not objected.  The Court therefore finds that Canfield Wells is entitled to a total

award of $8,800.00 in fees for its work in the Chapter 11 Cases.

### F.    McDermott as Special Counsel for the JOLCO Entities' Disinterested Directors

In March 2021, Gary Begeman and Julian Markby were appointed as Disinterested

Directors for the JOLCO Entities.  Decl. of Julian Markby in Supp. of Confirmation of Third Am.

Joint Ch. 11 Plan ¶ 2, ECF No. 723 at 2 [hereinafter "Markby Declaration"].  In May 2021, Mssrs.

Begeman and Markby were subsequently appointed as Disinterested Directors for the ECA

Debtors.[56]  *Id.*, ECF No. 723 at 2-3.

McDermott served as special counsel to Julian Markby and Gary Begeman, in their

capacity as Disinterested Directors of the JOLCO Debtors and the ECA Debtors.  Hr'g Tr. 21:22-

24, Sept. 14, 2022, ECF No. 1132 at 21.  Initially, in April 2021, McDermott was engaged by the

JOLCO Debtors.  Ex. 7 Perlman Decl. ¶ 4, ECF No. 200-2 at 4.  Subsequently, in June 2021, the

ECA Debtors also engaged McDermott.  *Id.*  McDermott's business restructuring group is a global

team, knowledgeable in all aspects of distressed transactions, and has experience advising the full

range of interested parties domestically and internationally, from debtors requiring relief to

interested stakeholders lining up to recoup their positions.  Hr'g Tr. 21:25-22:5, Sept. 14, 2022,

ECF No. 1132 at 21-22.  McDermott lawyers have significant experience representing and

advising the spectrum of constituents in Chapter 11 proceedings, including debtors, committees,

secured and unsecured creditors, independent or disinterested directors, special committees,

---

[56]    The "ECA Debtors" refers to NAC Aviation Cyprus 1 Limited; NAC Aviation 10 Limited; NAC Aviation 11 Limited; NAC Aviation 18 Limited; NAC Aviation 3 Limited; Nordic Aviation Leasing Sixteen Pte. Ltd.; Nordic Aviation Leasing Two Pte. Ltd.; Nordic Aviation Leasing Six Pte. Ltd.; and Nordic Aviation Leasing Eleven Pte. Ltd.

shareholders, and others, as well as providing advice with respect to fiduciary duties in connection with Chapter 11 proceedings.  *Id.* 22:6-12, ECF No. 1132 at 22.

On January 20, 2022, the Debtors filed *The Represented Entities' Application for Entry of an Order Authorizing the Employment and Retention of McDermott Will & Emery LLP as Special Counsel to the Represented Entities, Effective as of December 19, 2021* [ECF No. 200] (the "McDermott Employment Application").  Ex. 7, ECF No. 200.  The McDermott Employment Application clearly disclosed the services that McDermott intended to provide and the terms of compensation for such services, including the hourly rates that McDermott would charge.  *Id.* Notice of the McDermott Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the McDermott Employment Application, on February 3, 2022, the Court entered the *Order Authorizing the Employment and Retention of McDermott Will & Emery LLP as Special Counsel to the Represented Entities, Effective as of December 19, 2021* [ECF No. 302] (the "McDermott Employment Order").  Ex. 26, ECF No. 302.  As more fully detailed in the McDermott Employment Order, the Debtors were authorized to retain and employ McDermott as their special counsel for the Disinterested Directors of the JOLCO and ECA Debtors effective as of the Petition Date in accordance with the terms and conditions set forth in the McDermott Employment Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 302 at 3.  McDermott was, nevertheless, required to apply for compensation and reimbursement of expenses in accordance with sections 330 and 331 of the Bankruptcy Code.  *Id.* ¶ 4.

McDermott's services included conducting investigations and analysis sufficient to advise Messrs. Markby and Begeman regarding Conflict Matters.  Hr'g Tr. 22:13-15, Sept. 14, 2022, ECF

No. 1132 at 22.  McDermott provided the Disinterested Directors for the JOLCO Entities and the

ECA Debtors with analysis and advice regarding the proposed treatment of claims related to the

JOLCO Entities and the ECA Debtors, including the proposed settlements with those Debtors'

lenders.  Markby Decl. ¶ 3, ECF No. 723 at 3.  Based on the advices provided by McDermott, the

Disinterested Directors for the JOLCO Entities and the ECA Debtors decided to support the Plan

and the releases therein.  *Id.* ¶ 1, ECF No. 723 at 2.

In accordance with the Interim Compensation Order, McDermott timely and properly filed

and served its Monthly Fee Statements.  Ex. 59, ECF No. 450; Ex. 69, ECF No. 571; Ex. 88, ECF

No. 762; Ex. 107, ECF No. 911; Ex. 120, ECF No. 956.  McDermott's Monthly Fee Statements

fell within the budgetary parameters established under the Courts' DIP orders.  *See* Final NAC

DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim

NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638

at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF

No. 542 at 124.  No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on

July 13, 2022, the Debtors timely filed the McDermott Fee Application.  Ex. 139, ECF No. 1012.

The McDermott Fee Application seeks compensation in the total amount of $344,170.00 and

reimbursement of actual and necessary expenses in the amount of $4,170.00 that McDermott

incurred for the period from the Petition Date through and including June 1, 2022.  *Id.* ¶ 20, ECF

No. 1012 at 14.  The McDermott Fee Application complies with the USTP Guidelines.

The McDermott Fee Application already included a voluntary reduction of $11,988.50

based on prior discussions between McDermott and the United States Trustee.  Ex. 172 § 15, ECF

No. 1078 at 18.  In addition to the pre-filing voluntary reduction, pursuant to issues informally

raised by the United States Trustee, McDermott agreed to a further voluntary reduction of $6,128.20 from the amounts initially sought in the McDermott Fee Application. *Id.* In light of the voluntary and negotiated reductions, the United States Trustee had no objection to the allowance of fees in the reduced amount of $338,041.80 and expenses in the amount of $4,170.10. *Id.*

The Debtors served the McDermott Fee Application on all necessary parties on July 13, 2022, in accordance with the Case Management Procedures. *See* Ex. 157, ECF No. 1058. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the McDermott Fee Application were due on or before August 3, 2022. *See id*. There were no objections filed with respect to the McDermott Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the McDermott Fee Application under the § 330 Factors and the *Johnson* factors.

McDermott billed 272.6 hours in connection with the services for which it seeks compensation. Ex. 139 ¶ 20, ECF No. 1012 at 14. Given the scope of McDermott's employment, this was a reasonable amount of labor. 11 U.S.C. § 330(a)(3)(A). McDermott billed at a blended rate of $1,306.52 for all timekeepers.[57] Ex. 139 Ex. D, ECF No. 1012-4 at 1. It billed at a blended rate of $1,364.68 for all attorneys. *Id.*, ECF No. 1012 at 4; *see* 11 U.S.C. § 330(a)(3)(B). McDermott's actual hourly billing rates for attorneys ranged from $825.00 to $1,795.00. Ex. 139 ¶ 46, ECF No. 1012 at 23. Hourly rates varied with the experience and seniority of the individuals assigned. Ex. 7 Perlman Decl. ¶ 11, ECF No. 200-2 at 7; Ex. 139 ¶ 46, ECF No. 1012 at 23. The rates charged are McDermott's standard rates.[58] Ex. 7 Perlman Decl. ¶ 19, ECF No. 200-2 at 10.

---

[57] A full breakdown of the hourly rates charged by each attorney timekeeper is available in the McDermott Fee Application. Ex. 139, ECF No. 1012 at 4.

[58] Considering McDermott billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

Subject to an annual adjustment, the rates charged are consistent with the rates McDermott charged prior to the Petition Date. *Id.* The hourly rates and corresponding rate structure utilized by McDermott in these Chapter 11 Cases are equivalent to the hourly rates and corresponding rate structure used by McDermott for other restructuring matters, as well as similar complex, corporate, securities, and litigation matters whether in court or otherwise, regardless of whether a fee application is required. Ex. 139 ¶¶ 24, 46, ECF No. 1012 at 15, 23. McDermott's rates are consistent with the rates that comparable counsel would charge to do work substantially similar to the work that McDermott performed in these Chapter 11 Cases. Ex. 7 ¶¶ 10, 20, ECF No. 200 at 6, 11-12; *see* 11 U.S.C. § 330(a)(3)(F).

McDermott's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). As more fully discussed herein, McDermott advised the Disinterested Directors of the JOLCO Debtors and the ECA Debtors on Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties. This was a critical role in securing the overwhelming creditors support for the RSA and the Plan. As such, not only were McDermott's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.

McDermott's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. McDermott's role empowered the Disinterested Directors of the JOLCO Debtors and the ECA Debtors to engage in good corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of the JOLCO

Debtors, the ECA Debtors, their estates, and their creditors.  Ex. 139 ¶¶ 31-41, ECF No. 1012 at

18-20.  The hours billed by McDermott are commensurate with that level of work, and therefore

weigh in favor of granting the compensation sought.

The services for which McDermott seeks compensation were, at the time rendered,

necessary for and beneficial to the JOLCO Debtors and ECA Debtors and were rendered to protect

and preserve their estates.  *Id.* ¶ 45, ECF No. 1012 at 22.  McDermott performed the services for

the JOLCO Debtors and the ECA Debtors at the sole direction of the Disinterested Directors

economically, effectively, and efficiently, and the results obtained benefitted not only the JOLCO

Debtors and the ECA Debtors, but also the Debtors' estates and the Debtors' constituents.  *Id.*  The

professional services provided by McDermott on behalf of the Debtors and their estates during

these Chapter 11 Cases were necessary and appropriate given the complexity of these Chapter 11

Cases, the time expended by McDermott, the nature and extent of McDermott's services provided,

the value of McDermott's services, and the cost of comparable services outside of bankruptcy.  *Id.*

¶ 48, ECF No. 1012 at 23.  The compensation requested herein is reasonable in light of the nature,

extent, and value of such services to the JOLCO Debtors, the ECA Debtors, their estates, and all

parties in interest.  *Id.* ¶ 45, ECF No. 1012 at 22.

The Court did not receive any evidence as to McDermott's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).  Nonetheless, as described herein, McDermott has extensive experience in complex

restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, McDermott

is entitled to the compensation sought.  This view is apparently shared by the creditors and the

U.S. Trustee, who have not objected.  The Court therefore finds that McDermott is entitled to a

total award of $342,211.90 in fees and expenses for its work in these Chapter 11 Cases.

### G.    Special Counsel for the NAC 17/20 Debtors' Disinterested Directors

#### 1.    *Klehr Harrison*

Klehr Harrison served as special counsel to the Disinterested Directors of the NAC 17/20

Debtors.  Klehr Harrison has experience in, among other areas, debtors' protections, creditors'

rights, business reorganization under Chapter 11 of the Bankruptcy Code, and fiduciary duties of

directors.  Hr'g Tr. 26:5-8, Sept. 14, 2022, ECF No. 1132 at 26. On February 1, 2022, the Debtors

filed the *Application of NAC Aviation 17 Limited and NAC Aviation 20 Limited for Entry of an*

*Order Authorizing the Employment and Retention of Klehr Harrison Harvey Branzburg LLP as*

*Special Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of the Bankruptcy Code,*

*Effective as of January 1, 2022* [ECF No. 268] (the "Klehr Harrison Employment Application").

Ex. 18, ECF No. 268.  The Klehr Harrison Employment Application clearly disclosed the services

that Klehr Harrison intended to provide and the terms of compensation for such services, including

the hourly rates that Klehr Harrison would charge.  *Id.*  Notice of the Klehr Harrison Employment

Application was provided to all requisite notice parties in accordance with the Case Management

Procedures.

As no objection was timely filed to the Klehr Harrison Employment Application, on

February 23, 2022, the Court entered the *Order Granting Application of NAC Aviation 17 Limited*

*and NAC Aviation 20 Limited Authorizing the Employment and Retention of Klehr Harrison*

*Harvey Branzburg LLP as Special Counsel Pursuant to Sections 327(e), 328(a), and 1107(b) of*

*the Bankruptcy Code, Effective as of January 1, 2022* [ECF No. 431] (the "Klehr Harrison

Employment Order").  Ex. 50, ECF No. 431.  As more fully detailed in the Klehr Harrison

Employment Order, the Debtors were authorized to retain and employ Klehr Harrison as their

special counsel for the Disinterested Directors of the NAC 17/20 Debtors effective as of January

1, 2022, in accordance with the terms and conditions set forth in the Klehr Harrison Employment

Application and engagement letter submitted therewith.  *Id.* ¶ 2, ECF No. 431 at 3.  Klehr

Harrison's services included advising Messrs. Meltzer and Regan with respect to Conflict Matters.

Hr'g Tr. 26:9-11, Sept. 14, 2022, ECF No. 1132 at 26.  Klehr Harrison was, nevertheless, required

to apply for compensation and reimbursement of expenses under sections 330 and 331 of the

Bankruptcy Code.  *Id.*

In accordance with the Interim Compensation Order, Klehr Harrison timely and properly

filed and served its Monthly Fee Statements.  Ex. 70, ECF No. 574; Ex. 83, ECF No. 754; Ex. 103,

ECF No. 905.  Klehr Harrison's Monthly Fee Statements fell within the budgetary parameters

established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at

3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No.

171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached

to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No objections were

filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on

July 12, 2022, the Debtors timely filed the Klehr Harrison Fee Application.  Ex. 136, ECF No.

1001.  The Klehr Harrison Fee Application seeks compensation in the total amount of $95,581.00

and reimbursement of actual and necessary expenses in the amount of $5.26 that Klehr Harrison

incurred for the period from January 1, 2022, through and including June 1, 2022.  *Id.*, ECF No.

1001 at 7.  The Klehr Harrison Fee Application complies with the USTP Guidelines.

The Klehr Harrison Fee Application already included a voluntary reduction of $1,000.00.

Ex. 172 § 16, ECF No. 1078 at 18.  In addition to the pre-filing voluntary reduction, pursuant to

issues informally raised by the United States Trustee, Klehr Harrison agreed to a further voluntary

reduction of $1,600.00 from the amounts initially sought in the Klehr Harrison Fee Application.

*Id.*  In light of the voluntary and negotiated reductions, the United States Trustee had no objection to the allowance of fees in the reduced amount of $93,981.00 and expenses in the amount of $5.26. *Id.*

The Debtors served the Klehr Harrison Fee Application on all necessary parties on July 12, 2022, in accordance with the Case Management Procedures. *See* Ex. 160, ECF No. 1063.  Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Klehr Harrison Fee Application were due on or before August 2, 2022. *See id.*  There were no objections filed with respect to the Klehr Harrison Fee Application. *See id.*  Nonetheless, the Court has independently evaluated the merits of the Klehr Harrison Fee Application under the § 330 Factors and the *Johnson* factors.

Klehr Harrison billed 131.1 hours in connection with the services for which it seeks compensation. Ex. 136 Ex. D-1, ECF No. 1001 at 29.  As discussed herein, given the scope of Klehr Harrison's employment, this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A). Klehr Harrison billed at a blended rate of $720.30 for all timekeepers.[59]  Ex. 136 Ex. E, ECF No. 1001 at 33.  Klehr Harrison billed at a blended rate of $791.52 for all attorneys. *Id.*; *see* 11 U.S.C. § 330(a)(3)(B).  The rates charged are Klehr Harrison's standard rates,[60] Ex. 18 ¶ 13, ECF No. 268 at 6, and are consistent with market rates for comparable services, Ex. 18 ¶ 15 & Branzburg Decl. ¶ 23, ECF No. 268 at 6, 42; *see* 11 U.S.C. § 330(a)(3)(F).  The hourly rates that Klehr Harrison used in these Chapter 11 Cases are the same hourly rates that Klehr Harrison uses in non-restructuring matters, Ex. 18 ¶ 14 & Branzburg Decl. ¶ 22, ECF No. 268 at 6, 42, whether in

---

[59]    A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Klehr Harrison Fee Application.  Ex. 136 Ex. B, ECF No. 1001 at 23.

[60]    Considering Klehr Harrison billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

court or otherwise, regardless of whether a fee application is required, *id.* Branzburg Decl. ¶ 20, ECF No. 268 at 41.

Klehr Harrison's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). As more fully discussed herein, Klehr Harrison advised the Disinterested Directors of the NAC 17/20 Debtors on Conflict Matters, which enabled the Disinterested Directors to fulfill their fiduciary duties. This was a critical role in securing the overwhelming creditors support for the RSA and the Plan. As such, not only were Klehr Harrison's services necessary and essential, they helped create value for the benefit of the Debtors' estates for the benefit of all creditors and parties in interest.

Klehr Harrison's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. Klehr Harrison's role empowered the Disinterested Directors of the NAC 17/20 Debtors to engage in good corporate governance, properly assess any and all Conflict Matters, and ensure that the RSA, the Plan, and all actions taken in connection with these Chapter 11 Cases were in the best interests of the NAC 17/20 Debtors, their estates, and their creditors. Ex. 136 ¶ 18-24, ECF No. 1001 at 12-13. The hours billed by Klehr Harrison are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought. Significantly, the amount billed fell well below the amount budgeted for this engagement. *Id.* Ex. C-1, ECF No. 1001 at 25 (noting amount budgeted was $280,000.00)

The Court did not receive any evidence as to Klehr Harrison's certifications. *See* 11 U.S.C. § 330(a)(3)(E).   Nonetheless, as described herein, Klehr Harrison has extensive experience in complex restructurings. *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Klehr Harrison is entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that Klehr Harrison is entitled to compensation in the amount of $93,981.00 and reimbursement of expenses in the amount of $5.26 for its work in these Chapter 11 Cases.

### 2. *Hirschler*

Hirschler served as local special counsel to the disinterested directors of the NAC 17/20 Debtors.  Hirschler has a significant bankruptcy practice, including participation in local, regional, and national cases across its three offices.  Hr'g Tr. 26:15-17, Sept. 14, 2022, ECF No. 1132 at 26. On February 7, 2022, the Debtors filed their *Application of NAC Aviation 17 Limited and NAC Aviation 20 Limited for Entry of an Order Authorizing the Employment and Retention of Hirschler Fleischer, P.C. as Special Counsel Pursuant to Sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code, Effective as of January 18, 2022* [ECF No. 319] (the "Hirschler Employment Application").  Ex. 28, ECF No. 319.  The Hirschler Employment Application clearly disclosed the services that Hirschler intended to provide and the terms of compensation for such services, including the hourly rates that Hirschler would charge.  *Id.*  Notice of the Hirschler Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the Hirschler Employment Application, on March 9, 2022, the Court entered the *Order Granting Application of NAC Aviation 17 Limited and NAC*

117

*Aviation 20 Limited Authorizing the Employment and Retention of Hirschler Fleischer, P.C. as Special Counsel Pursuant to Sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code, Effective as of January 18, 2022* [ECF No. 433] (the "Hirschler Employment Order"). Ex. 51, ECF No. 433. As more fully detailed in the Hirschler Employment Order, the Debtors were authorized to retain and employ Hirschler as their local special counsel for the Disinterested Directors of the NAC 17/20 Debtors effective as of January 18, 2022, in accordance with the terms and conditions set forth in the Hirschler Employment Application and engagement letter submitted therewith. *Id.* ¶ 2, ECF No. 433 at 3. Hirschler's services included advising Messrs. Meltzer and Regan with respect to any potential or actual intercompany conflicts. Hr'g Tr. 26:18-20, Sept. 14, 2022, ECF No. 1132 at 26. Hirschler was, nevertheless, required to apply for compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code. *Id.* ¶ 3, ECF No. 433 at 3.

In accordance with the Interim Compensation Order, Hirschler timely and properly filed and served its Monthly Fee Statements. Ex. 71, ECF No. 575; ECF No. 84, ECF No. 755; Ex. 104, ECF No. 906. Hirschler's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 12, 2022, the Debtors timely filed the Hirschler Fee Application. Ex. 135, ECF No. 1000. The Hirschler Fee Application seeks compensation in the total amount of $16,652.50 and

reimbursement of actual and necessary expenses in the amount of $165.63 that Hirschler incurred for the period from January 18, 2022, through and including June 1, 2022. *Id.* ¶ 23, ECF No. 1000 at 13.  The Hirschler Fee Application complies with the USTP Guidelines.

The Hirschler Fee Application already included a voluntary reduction of $428.00 based on prior discussions between Hirschler and the United States Trustee.  Ex. 172 § 22, ECF No. 1078 at 20.   In light of the voluntary reduction, the United States Trustee had no objection to the Hirschler Fee Application as filed.  *Id.*

The Debtors served the Hirschler Fee Application on all necessary parties on July 12, 2022, in accordance with the Case Management Procedures.  *See* Ex. 159, ECF No. 1062.  Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Hirschler Fee Application were due on or before August 2, 2022.  *See id*.  There were no objections filed with respect to the Hirschler Fee Application.   *See id*.   Nonetheless, the Court has independently evaluated the merits of the Hirschler Fee Application under the § 330 Factors and the *Johnson* factors.

Hirschler billed 36.6 hours in connection with the services for which it seeks compensation. Ex. 135 Ex. B, ECF No. 1000 at 23.  Given the scope of Hirschler's employment, this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  Hirschler billed at a blended rate of $454.99 for all timekeepers.[61]  Ex. 135 Ex. E, ECF No. 1000 at 31.  It billed at a blended rate of $486.18 for all attorneys.  *Id.*; *see* 11 U.S.C. § 330(a)(3)(B).  The hourly rates charged are Hirschler's standard rates,[62] Ex. 28 Westermann Decl. ¶ 27, ECF No. 319 at 34, which are

---

[61]   A full breakdown of the hourly rates charged by each attorney timekeeper is available in the Hirschler Fee Application.  Ex. 135 Ex. A, ECF No. 1000 at 21.

[62]   Considering Hirschler billed at its standard rate, its opportunity cost is roughly equal to its bill in this case.

consistent with market rates for comparable services, *id.* ¶ 13, ECF No. 319 at 6; *see* 11 U.S.C. § 330(a)(3)(F).  These hourly rates are consistent with the rates that other comparable counsel would charge to do work substantially similar to the work that Hirschler performed in these Chapter 11 Cases.  The hourly rates and corresponding rate structure Hirschler used in these Chapter 11 Cases are the same as the hourly rates and corresponding rate structure that Hirschler uses in other similar restructuring matters, as well as in non-restructuring matters, whether in court or otherwise, regardless of whether a fee application is required.  Ex. 28 Westermann Decl. ¶ 20, ECF No. 319 at 33.  The terms of the compensation sought are consistent with the terms approved in the Hirschler Employment Order.

Hirschler's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  Hirschler, as local counsel, assisted Klehr Harrison in its duties on behalf of the Disinterested Directors of the NAC 17/20 Debtors.  These services were necessary to assist the Disinterested Directors and their lead counsel in addressing a multitude of critical issues both unique to these Chapter 11 Cases and in light of the numerous parties in interest in these complex bankruptcy cases.  Hirschler's services allowed the NAC 17/20 Debtors to appear and participate in these Chapter 11 Cases in compliance with this Court's rules. *See* Local Bankr. R. 2090-1(E)(3).

Hirschler's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C. § 330(a)(3)(D).  Hirschler performed the services for the NAC 17/20 Debtors, at the sole discretion of the Disinterested Directors, economically, effectively, and efficiently, and the results obtained benefited not only the Disinterested Directors and the NAC 17/20 Debtors, but also the constituents

of the NAC 17/20 Debtors.  The hours billed by Hirschler are commensurate with that work, and therefore weigh in favor of granting Hirschler its sought compensation.

The Court did not receive any evidence as to Hirschler's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, Hirschler has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Hirschler is entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that Hirschler is entitled to compensation in the amount of $16,652.50 and reimbursement of expenses in the amount of $165.63 for its work in these Chapter 11 Cases.

## IV.    Financial Professionals

The Court now turns to the applications of Rothschild, KPMG Ireland, EY UK, EY Denmark, EY Ireland, and EY US (collectively, the "Financial Professionals").  As a preliminary matter, the Court takes the 11 U.S.C. § 330(a)(4)(A) analysis out of turn and collectively finds that the work of the Financial Professionals was not unnecessarily duplicative.  As this Court explained previously:

> While the roles of a financial advisor and investment banker may seem similar, in the context of complex restructurings, they are different and distinct.  Financial advisors are hired to provide general financial advice and are typically compensated on an hourly basis. For financial advisors hired by the estate, these professionals are retained under section 327 of the Bankruptcy Code.  In contrast, investment bankers are hired to assist with the marketing and negotiation of a specific transaction and are typically compensated by a monthly flat fee and a "success fee" upon completion of the transaction.  For investment bankers hired by the estate, these professionals are retained under section 328 of the Bankruptcy Code.

*In re Alpha Media Holdings LLC*, No. 21-30209-KRH, 2021 WL 1234452, at *10 n.13, 2021 Bankr. LEXIS 763, at *31 n.13 (Bankr. E.D. Va. Mar. 26, 2021).  Consistent with the foregoing, in these Chapter 11 Cases, the Debtors engaged Rothschild as their investment banker under section 328 of the Bankruptcy Code and the remaining Financial Professionals under section 327 of the Bankruptcy Code.

Although the remaining Financial Professionals were engaged under section 327, they each provided distinct, non-duplicative services.  As more fully discussed herein, KPMG provided auditing services, while EY provided tax and restructuring services.  As a matter of good corporate governance, the Debtors would need to retain an auditor separate and apart from the financial advisors providing the services to be audited.  The services of KPMG Ireland and EY, therefore, were not duplicative, because auditing, on the one hand, and restructuring advice and tax services, on the other hand, are discrete services.  Finally, the four EY Financial Professionals are four member firms of EYGL.  Hr'g Tr. 19:4-9, Sept. 14, 2022, ECF No. 1132 at 19.  As discussed below, they each provided their services in different jurisdictions – and as such, under different tax regimes.  The EY professionals' services were thus not duplicative with regard to one another.  For the reasons stated herein, the services each Financial Professional performed were both reasonably likely to benefit the Debtors' estate and necessary to the administration of the case.  As such, the Court may proceed to evaluate whether each of the Financial Professionals is entitled to the compensation that has been requested.

A.     **Rothschild**

Rothschild served as financial advisor and investment banker to the Debtors.  Rothschild has expertise in domestic and cross-border restructurings, mergers and acquisitions, new capital raises and other investment banking services, and a particular experience in providing high quality advice to financially troubled companies. Hr'g Tr. 17:19-23, Sept. 14, 2022, ECF No. 1132 at 17.

The Debtors had retained Rothschild prior to the Petition Date.  Ex. 4 ¶ 1 n.2, ECF No. 184 at 2.

In providing the Pre-Petition Date services, Rothschild became well-acquainted with the Debtors'

operations, debt structure, creditors, businesses and operations, and related matters, including

(i) the Debtors' assets and operations; (ii) the Debtors' liquidity and cash flow projections;

(iii) various potential strategic alternatives; (iv) negotiations with key creditor constituencies; and

(v) additional financial-advisory and investment-banking services in preparation for the filing of

the Chapter 11 Cases.  *Id.* ¶ 10, ECF No. 184 at 6.

On January 18, 2022, the Debtors filed the *Debtors' Application for Entry of an Order*

*(I) Authorizing the Retention and Employment of Rothschild & Co US Inc. and N.M. Rothschild &*

*Sons Limited as Debtors Financial Advisor and Investment Banker Effective as of the Petition*

*Date and (II) Granting Related Relief* [ECF No. 184] (the "Rothschild Employment Application").

Ex. 4, ECF No. 184.  The Rothschild Employment Application clearly disclosed the services that

Rothschild intended to provide and the terms of compensation for such services.  *Id.*  Notice of the

Rothschild Employment Application was provided to all requisite notice parties in accordance with

the Case Management Procedures.

As no objection was timely filed to the Rothschild Fee Application, on February 2, 2022,

the Court entered the *Order (I) Authorizing the Retention and Employment of Rothschild & Co US*

*Inc. and N.M. Rothschild & Sons Limited as Debtors Financial Advisor and Investment Banker*

*Effective as of the Petition Date and (II) Granting Related Relief* [ECF No. 284] (the "Rothschild

Employment Order").  Ex. 22, ECF No. 284.  As more fully detailed in the Rothschild Employment

Order, the Debtors were authorized to retain and employ Rothschild as their investment banker

effective as of the Petition Date in accordance with the terms and conditions set forth in the

Case 21-33693-KRH    Doc 1135    Filed 10/18/22    Entered 10/18/22 15:01:51    Desc Main
Document    Page 124 of 151

Rothschild Employment Application and engagement letter, as modified by the Rothschild Employment Order. *Id.* ¶ 2, ECF No. 284 at 3.

Rothschild's services included identifying and/or initiating potential restructuring transactions (each, a "Transaction"), reviewing and analyzing the Debtors' assets and operating and financial strategies of the Debtors, and reviewing and analyzing the business plans and financial projections prepared by the Debtors. Hr'g Tr. 17:23-18:3, Sept. 14, 2022, ECF No. 1132 at 17-18. Unlike the other Retained Professionals, Rothschild sought employment under section 328 of the Bankruptcy Code. Under section 328 of the Bankruptcy Code, the Court fixes the professional's compensation at the time of employment, including on a fixed or percentage fee basis. *See* 11 U.S.C. § 328(a). Accordingly, Rothschild's engagement was structured as follows:

- A monthly flat fee (the "Monthly Flat Fee") of $175,000;

- One completion fee of $14,000,000 (the "Completion Fee") payable upon the earlier of (i) the confirmation and effectiveness of a Plan or (ii) the closing of a Transaction, subject to various credits;

- A new capital fee (each, a "New Capital Fee") equal to (i) 1.0% of the face amount of any senior secured debt raised including, without limitation, any debtor-in-possession financing raised; (ii) 3.0% of the face amount of any junior secured or senior or subordinated unsecured debt raised; and (iii) 4.0% of any equity capital, capital convertible into equity or hybrid capital raised, including, without limitation, equity underlying any warrants, purchase rights or similar contingent equity securities, subject to certain conditions; and

- Reimbursement of reasonable and documented expenses.

Ex. 4 ¶ 14, ECF No. 184 at 8-10.  This fee structure is consistent with Rothschild's normal and

customary billing practices for comparably sized and complex cases and transactions, both in and

out of court, involving the services provided in these Chapter 11 Cases.  *Id.* ¶ 21, ECF No. 184 at

12.  The fee structure is consistent with and typical of arrangement into which investment banks

enter in connection with the rendering of comparable services to clients such as the Debtors.  *Id.*

While the Court approved the foregoing fee structure by the Rothschild Employment Order,

Rothschild was, nevertheless, required to apply for compensation and reimbursement of expenses

subject to review under section 328 of the Bankruptcy Code, not section 330.  Ex. 22 ¶ 3, ECF No.

284 at 3-4.

In accordance with the Interim Compensation Order, Rothschild timely and properly filed

and served its Monthly Fee Statements.  Ex. 46, ECF No. 424; Ex. 72, ECF No. 580; Ex. 95, ECF

No. 791; Ex. 105, ECF No. 907.  Rothschild's Monthly Fee Statements fell within the budgetary

parameters established under the Courts' DIP orders.  *See* Final NAC DAC DIP Order ¶ (c), ECF

No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex.

3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating

budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124.  No

objections were filed to any of the Monthly Fee Statements.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on

June 24, 2022, the Debtors timely filed the Rothschild Fee Application.  Ex. 126, ECF No. 973.

The Rothschild Fee Application seeks compensation in the total amount of $18,346,344.17 and

reimbursement of actual and necessary expenses in the amount of $69,488.17 that Rothschild

incurred for the period from the Petition Date through and including June 1, 2022. *Id.*, ECF No.

973 at 2.[63]

The Rothschild Fee Application already included a voluntary reduction of $13,415.74

based on prior discussions between Rothschild and the United States Trustee. Ex. 172 § 3, ECF

No. 1078 at 13-14. In light of the voluntary reduction, the United States Trustee had no objection

to the Rothschild Fee Application as filed. *Id.*, ECF No. 1078 at 14.

The Debtors served the Rothschild Fee Application on all necessary parties on June 24,

2022, in accordance with the Case Management Procedures. *See* Ex. 164, ECF No. 1069. Pursuant

to the Case Management Procedures, all objections to the approval of the relief requested in the

Rothschild Fee Application were due on or before July 15, 2022. *See id.* There were no objections

filed with respect to the Rothschild Fee Application. *See id.* Nonetheless, the Court has

independently evaluated the merits of the Rothschild Fee Application under section 328 of the

Bankruptcy Code.

The Rothschild Fee Application seeks compensation in the amounts previously fixed by

the Rothschild Employment Order, namely: the sum of (i) $175,000.00 for the May Monthly Flat

Fee, (ii) $5,833.33 for a pro-rated June Monthly Flat Fee, (iii) $14 million Completion Fee, (iv) $2

million New Capital Fee (1% of $200 million), (v) $13,488,467.92 New Capital Fee (4% of

$337,211,698.01); less (vi) -$440,416.67 Monthly Fee Credit, (vii) -$2.275 million Prior

Engagement Fee Credit, (viii) -$138,306.45 Pro Rata December 2021 Retainer Fee Credit,

(ix) -$8,669,233.96 New Capital Fee Credit and (x) -$2.35 million RSA Rights Offering Credit;

---

[63]    By its express terms, the USTP Guidelines applies to attorneys only. That being said, the Rothschild Fee
Application substantially complies with the USTP Guidelines.

as each of the foregoing capitalized terms were defined in the Rothschild Employment Application.

As Rothschild seeks compensation and expenses solely in the amounts previously approved by the Court in the Rothschild Employment Order and given that there are no unanticipated facts in the record that have rendered the payment of this fixed fee improvident, *see* 11 U.S.C. § 328(a), the Court finds Rothschild is therefore entitled to a fee award in the total amount of $18,415,832.34 for the services it provided in these Chapter 11 Cases.

**B.    KPMG Ireland**

KPMG Ireland provided auditing services to the Debtors incorporated in Ireland and the United Kingdom.[64]  The Irish/UK Debtors have employed KPMG Ireland since 2008 to provide certain audit and other services and, in this capacity, KPMG Ireland became generally familiar with the Irish/UK Debtors' business.  Ex. 85 ¶ 8, ECF No. 756 at 4.  KPMG Ireland is a highly respected and experienced professional services firm and is well recognized for providing audit services in Ireland and United Kingdom.  Hr'g Tr. 21:10-13, Sept. 14, 2022, ECF No. 1132 at 21.

---

[64]    The following entities are the "Irish/UK Debtors": Aldus Portfolio B Limited; Aldus Portfolio Leasing Limited; Fortuna Aviation Designated Activity Company; Freyja Aviation Four Ireland Limited; Freyja Aviation One Ireland Designated Activity Company; Freyja Aviation Three Ireland Limited; Freyja Aviation Two Ireland Limited; NAC Aviation 10 Limited; NAC Aviation 11 Limited; NAC Aviation 12 Limited; NAC Aviation 14 Limited; NAC Aviation 15 Limited; NAC Aviation 16 Limited; NAC Aviation 17 Limited; NAC Aviation 18 Limited; NAC Aviation 19 Limited; NAC Aviation 2 Limited; NAC Aviation 20 Limited; NAC Aviation 21 Limited; NAC Aviation 22 Limited; NAC Aviation 23 Limited; NAC Aviation 24 Limited; NAC Aviation 25 Limited; NAC Aviation 26 Limited; NAC Aviation 27 Limited; NAC Aviation 28 Limited; NAC Aviation 29 Designated Activity Company; NAC Aviation 3 Limited; NAC Aviation 30 Limited; NAC Aviation 31 Limited; NAC Aviation 32 Limited; NAC Aviation 33 Limited; NAC Aviation 34 Limited; NAC Aviation 35 Limited; NAC Aviation 36 Limited; NAC Aviation 4 Limited; NAC Aviation 6 Limited; NAC Aviation 7 Limited; NAC Aviation 8 Limited; NK Aviation Limited; Nordic Aviation Capital Designated Activity Company; Nordic Aviation Contractor (Ireland) Limited; Nordic Aviation Services Limited; Tiradentes Portfolio A Limited; Tiradentes Portfolio B Limited; Tiradentes Portfolio C Limited; Tiradentes Portfolio D Limited; Tyche Aviation Designated Activity Company; NK Leasing Limited; NAC Aviation UK 1 Limited; NAC Aviation UK 2 Limited; NAC Aviation UK 3 Limited; and NAC Services UK Limited.

On April 21, 2022, the Debtors filed the *Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of KPMG Ireland to Provide Audit Services to the Irish/UK Debtors, Effective as of April 4, 2022* [ECF No. 756] (the "KPMG Ireland Employment Application"). Ex. 85, ECF No. 756. The KPMG Ireland Employment Application clearly disclosed the services that KPMG Ireland intended to provide and the terms of compensation for such services, including the nature of the fixed fee arrangement and the hourly rates that KPMG Ireland would charge for other services. *Id.* Notice of the KPMG Ireland Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the KPMG Ireland Employment Application, on February 23, 2022, the Court entered the *Order Authorizing and Approving the Employment and Retention of KPMG (Ireland) to Provide Audit Services to the Irish/UK Debtors, Effective as of April 4, 2022* [ECF No. 857] (the "KPMG Ireland Employment Order"). Ex. 99, ECF No. 857. As more fully detailed in the KPMG Ireland Employment Order, the Debtors were authorized to retain and employ KPMG Ireland to provide audit services to the Irish/UK Debtors effective as of April 4, 2022, in accordance with the terms and conditions set forth in the KPMG Ireland Employment Application and engagement letter submitted therewith. *Id.* ¶ 3, ECF No. 857 at 2-3.

KPMG Ireland's services included conducting audits for the period ending on December 31, 2021, of financial statements in Ireland under the Companies Act 2014 and audits of financial statements in the UK under the Companies Act 2006, in accordance with international standards on auditing issued by the Irish Auditing and Accounting Supervisory Authority Ireland and international standards on UK auditing as applicable to the relevant Irish/UK Debtor (the "Audit Services"). Hr'g Tr. 21:14-21, Sept. 14, 2022, ECF No. 1132 at 21. As to the Audit Services,

KPMG Ireland was engaged pursuant to section 328 of the Bankruptcy Code and charged a fixed fee in the amount of €700,000.00, due in periodic installments. Ex. 85 ¶ 17, ECF No. 756 at 6. As to any non-Audit Services, KPMG Ireland was engaged pursuant to section 327 of the Bankruptcy Code and agreed to be compensated on an hourly basis. *Id.* ¶ 18, ECF No. 756 at 7. While the Court approved the foregoing fee structure by the KPMG Ireland Employment Order, KPMG Ireland was, nevertheless, required to apply for compensation and reimbursement of expenses. Ex. 99 ¶ 4-5, ECF No. 857 at 3. Fixed fees for Audit Services are subject to review under section 328 of the Bankruptcy Code, not section 330, whereas hourly fees for non-Audit services are subject to review under section 330 of the Bankruptcy Code. Ex. 99 ¶ 5, ECF No. 857 at 3.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the KPMG Ireland Fee Application. Ex. 147, ECF No. 1029. The KPMG Ireland Fee Application seeks compensation in the total amount of $314,841.08 and reimbursement of actual and necessary expenses in the amount of $114,553.91 that KPMG Ireland incurred for the period from April 4, 2022, through and including June 1, 2022. *Id.* ¶ 8, ECF No. 1029 at 9.[65]

Pursuant to issues informally raised by the United States Trustee, KPMG Ireland agreed to a voluntary reduction of $5,741.88 from the amounts initially sought in the KPMG Ireland Fee Application. Ex. 172 § 8, ECF No. 1078 at 15. In light of the negotiated reduction, the United

---

[65] By its express terms, the USTP Guidelines apply to attorneys only. That being said, the KPMG Ireland Fee Application substantially complies with the USTP Guidelines.

States Trustee had no objection to the allowance of fees in the reduced amount of $309,099.20 and

expenses in the amount of $114,553.91.[66]  *Id.*

The Debtors served the KPMG Ireland Fee Application on all necessary parties on July 15,

2022, in accordance with the Case Management Procedures.  *See* Ex. 163, ECF No. 1067.  Pursuant

to the Case Management Procedures, all objections to the approval of the relief requested in the

KPMG Ireland Fee Application were due on or before August 5, 2022.  *See id*.  There were no

objections filed with respect to the KPMG Ireland Fee Application.  *See id*.  Nonetheless, the Court

independently evaluated the merits of the KPMG Ireland Fee Application (i) as to Audit Services,

under section 328 of the Bankruptcy Code; and (ii) as to non-Audit Services, under the § 330

Factors and the *Johnson* factors.

### 1.    *Audit Services*

The KPMG Ireland Fee Application seeks partial payment of the previously agreed-upon

fixed fee in the amount of $296,800 for Audit Services performed during the Chapter 11 Cases.

Ex. 147 ¶ 10, ECF No. 1029 at 10.  As these fees are entirely consistent with the fixed fees

previously approved by this Court in the KPMG Ireland Employment Order, and, given that there

are no unanticipated facts in the record that would have rendered the payment of this fixed fee

improvident, *see* 11 U.S.C. § 328(a), the Court finds that KPMG Ireland is therefore entitled to the

fixed fee of $296,800 for the Audit Services it provided in these Chapter 11 Cases.

---

[66]    KPMG Ireland's actual and documented expenses fall into two categories.  First, Ireland has a national value
added tax ("VAT") in the amount of 23% assessed against most goods and services – including professional
services.  Ex. 147 ¶ 19, n.7, ECF No. 1029 at 13.  Second, KPMG Ireland seeks reimbursement of necessary legal
fees it incurred when it retained U.S. counsel to advise it in connection with its retention.  *Id.*  Because KPMG
Ireland is not familiar with the Bankruptcy Code, it was reasonable and necessary for KPMG Ireland to engage
counsel to ensure its compliance with the Bankruptcy Code.  *See id.*

## 2.    Non. Audit Services

KPMG Ireland billed 65.6 hours in connection with the non-Audit Services for which it seeks compensation.  Ex. 147 Ex. C, ECF No. 1029 at 18.  Given the scope of KPMG Ireland's employment, this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  For non-Audit Services, KPMG Ireland billed at a blended rate of $275.02.  Ex. 147 ¶ 11, ECF No. 1029 at 11; *see* 11 U.S.C. § 330(a)(3)(B).[67]  The majority of the hourly rates reflect a 30% reduction from KPMG's normal and customary rates.[68]  Ex. 85 ¶ 18, ECF No. 756 at 7.  These rates are well within market rates for comparable services.  *See* 11 U.S.C. § 330(a)(3)(F).

KPMG Ireland's non-Audit Services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  The non-Audit Services included retention related services and fee application preparation.  Ex. 147 ¶ 9, ECF No. 1029 at 10.  These non-Audit Services were necessary for the Debtors to engage KPMG Ireland under applicable bankruptcy law in order to permit KPMG Ireland to perform the required audits.  Because these non-Audit Services were a necessary precursor to the vital Audit Services KPMG Ireland performed, they, in turn, were necessary, essential, and beneficial to the estates.

KPMG Ireland's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C. § 330(a)(3)(D).  The billing procedures required in Chapter 11 Cases differ from KPMG Ireland's normal billing procedures and as such, in order to comply with the Local Rules, the KPMG Ireland Employment Order, and the Interim Compensation Order, KPMG

---

[67]  A full breakdown of the hourly rates charged by each timekeeper is available in the KPMG Ireland Fee Application.  Ex. 147 Ex. B, ECF No. 1029 at 17.

[68]  Because KPMG Ireland billed at a discounted rate, KPMG Ireland had an opportunity cost in this engagement. This weighs in favor of granting the requested compensation.

Ireland had to make a significant effort to inform the timekeepers of their responsibilities, to compile the detailed time and expenses entries, to begin preparation of the detailed and summary schedules of fees and expenses incurred, and to draft the schedules included in the KPMG Fee Application.  Ex. 147 ¶ 9, ECF No. 1029 at 10.  The hours billed by KPMG Ireland are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to KPMG Ireland's certifications.  *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, KPMG Ireland has extensive experience in complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, KPMG Ireland is entitled to the compensation sought for the non-Audit Services.  Additionally, KPMG Ireland is entitled to the compensation sought for the Audit Services pursuant to section 328 of the Bankruptcy Code.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that KPMG Ireland is entitled to the total award of $423,653.113/€399,672.74, in fees and expenses for its work in the Chapter 11 Cases.

**C.      EY**

EY served as the Debtors' restructuring advisors and tax services providers.  Hr'g Tr. 19:3-4, Sept. 14, 2022, ECF No. 1132 at 19.  The four member firms of EY involved in this case were all part of EYGL, a global leader with deep aviation finance sector knowledge and insurance, tax, transaction, and consulting services with significant experience advising clients in the Chapter 11 process.  *Id.* 19:4-9.  This global network comprises independent professional services practices organized in separate legal entities, four of which were retained by the Debtors in these Chapter 11 Cases.  *Id.* 19:9-12.  Each of the four EY firms had a pre-Petition Date relationship with the Debtors and provided pre-Petition Date services to the Debtors.  Ex. 15 ¶ 6, ECF No. 248 at 5.

Indeed, EY had assisted with the formulation and implementation of the Scheme.  Bickle Decl. ¶ 13 n.9, ECF No. 6 at 8.

On January 29, 2022, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Ernst & Young LLP, Ernst & Young Business Consultants, Ernst & Young LLP, and EY Godkendt Revisionspartnerselskab as the Debtors' Restructuring Advisors and Tax Services Providers Effective as of the Petition Date and (II) Granting Related Relief* [ECF No. 248] (the "EY Employment Application").  Ex. 15, ECF No. 248.  The EY Employment Application clearly disclosed the services that each EY member firm intended to provide and the terms of compensation for such services, including the hourly rate to be charged.  *Id.*  Notice of the EY Employment Application was provided to all requisite notice parties in accordance with the Case Management Procedures.

As no objection was timely filed to the EY Employment Application, on February 23, 2022, the Court entered the *Order (I) Authorizing the Retention and Employment of Ernst & Young LLP, Ernst & Young Business Consultants, Ernst & Young LLP, and EY Godkendt Revisionspartnerselskab as the Debtors' Restructuring Advisors and Tax Services Providers Effective as of the Petition Date and (II) Granting Related Relief* [ECF No. 430] (the "EY Employment Order").  Ex. 49, ECF No. 430.  As more fully detailed in the EY Employment Order, the Debtors were authorized to retain and employ each of the EY member firms as the Debtors' restructuring advisors and tax services providers effective as of the Petition Date, in accordance with the terms and conditions set forth in the EY Employment Application and engagement letter submitted therewith.  Ex. 49 ¶ 2, ECF No. 430 at 3.

As more fully discussed for each EY firm below, EY's professional services included (i) assisting with development and preparation of the Plan and Disclosure Statement;

(ii) supporting the Debtors' various motions; (iii) assisting with the development and monitoring of liquidity and business plan projections and financial analysis; and (iv) assisting in the preparation of reporting requirements and response materials for diligence requests.  Hr'g Tr. 19:13-20, Sept. 14, 2022, ECF No. 1132 at 19.

Each of the four EY member firms filed a separate Fee Application.  With this background, the Court considers each Fee Application in turn.

### 1.    EY US

EY US served as tax and restructuring advisors to the Debtors.  EY US submitted a *First and Final Fee Application of Ernst & Young LLP a Member Firm of EYGL as the Debtors' Restructuring Advisors and Tax Services Providers for Compensation and Reimbursement of Expenses for the Period from December 19, 2021, Through June 1, 2022*, Ex. 152, and a *Proposed Order Granting First and Final Fee Application of Ernst & Young LLP a Member Firm of EYGL as the Debtors' Restructuring Advisors and Tax Services Providers for Compensation and Reimbursement of Expenses for the Period From December 19, 2021 Through June 1, 2022* [ECF No. 1101] (collectively the "EY US Application").

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the EY US Fee Application.  Ex. 152, ECF No. 1036.  EY US seeks compensation in the total amount of $6,504,708.50[69] and reimbursement of actual and

---

[69] This amount includes a fixed fee for tax return preparation as disclosed in the EY Employment Application.  Ex. 15 ¶ 11, ECF No. 248 at 12.  Despite the inclusion of a fixed fee, EY US was engaged pursuant to section 327 only, not section 328.  Accordingly, the Court will review the entirety of the requested compensation as part of its section 330 analysis below.

necessary expenses in the amount of $0.00 that EY US incurred for the period from the Petition

Date through and including June 1, 2022. *Id.* ¶ 10, ECF No. 1036 at 10.[70]

Pursuant to issues informally raised by the United States Trustee, EY US agreed to a

voluntary reduction of $81,918.58 from the amounts initially sought in the EY US Fee Application.

Ex. 172 § 4, ECF No. 1078 at 14.  In light of the negotiated reduction, the United States Trustee

had no objection to the allowance of fees in the reduced amount of $6,422,789.92 and expenses in

the amount of $0.00.  *Id.*

The Debtors served the EY US Fee Application on all necessary parties on July 15, 2022,

in accordance with the Case Management Procedures.  *See* Certification of No Obj. Regarding EY

US Appl., ECF No. 1091.  Pursuant to the Case Management Procedures, all objections to the

approval of the relief requested in the EY US Fee Application were due on or before August 5,

2022.  *See id*.  There were no objections filed with respect to the EY US Fee Application.  *See id*.

Nonetheless, the Court independently evaluated the merits of the EY US Fee Application under

the § 330 Factors and the *Johnson* factors.

EY US billed 8,514.3 hours in connection with the services for which it seeks

compensation. Ex. 152 ¶ 10, ECF No. 1036 at 10.[71]  Given the scope of EY US's employment,

this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  EY US billed at a blended rate

of $763.97 for all timekeepers.[72]  Ex. 152 ¶ 10, ECF No. 1036 at 10; *see* 11 U.S.C. § 330(a)(3)(B).

The hourly rates varied with the experience and seniority of the individuals assigned.  Ex. 15 ¶ 19,

---

[70]   By its express terms, the USTP Guidelines apply to attorneys only.  That being said, the EY US Fee Application
substantially complies with the USTP Guidelines.

[71]   This figure includes 238 hours attributable to fixed-fee work.  Ex. 152 Ex. A, ECF No. 1036 at 177.

[72]   A full breakdown of the hourly rates charged by each timekeeper is available in the EY US Fee Application.  Ex.
152, ECF No. 1036 at 3.

ECF No. 248 at 14.  The hourly rates and corresponding rate structure that EY used in these Chapter 11 Cases is the same that EY uses in similar matters regardless of whether a fee application is required and reflect the normal and customary billing practices for engagements of this complexity and magnitude.[73]  *Id.*  This fee structure and these hourly fees are market-based, consistent with the market, and reasonable considering the vast knowledge and experience of each of the EY Retained Professionals.  *Id.* ¶ 20; *see* 11 U.S.C. § 330(a)(3)(F).  The fee structure is consistent with and typical of compensation arrangements of comparable firms in connection with the rendering of similar services under similar circumstances.  Ex. 15 ¶ 20, ECF No. 248 at 14; 11 U.S.C. § 330(a)(3)(F).

EY US's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  The specific services provided by EY US included: (i) developing various financial disclosures and projections, including the statements, schedules, monthly operating reports, required financial reporting for creditors, 13-week cash-flow budgets; (ii) assisting with claims analysis and reconciliation, including but not limited to critical vendors, 503(b)(9) administrative claims, and reclamation claims; (iii) assisting with analysis of executory contracts and the associated impact of rejection; (iv) advising and assisting in the development of the Debtors' business plan and financial forecast, including the Plan and Disclosure Statement; and (v) providing U.S. tax advice and preparing U.S. federal and state income tax returns for certain Debtor entities.  Ex. 15 ¶ 8, ECF No. 248 at 7-9.  The foregoing services were necessary for the administration and prosecution of these Chapter 11 Cases and inured to the benefit of the Debtors, their estates, and all parties in interest.

---

[73]   Considering EY US billed at its normal and customary rates, its opportunity cost is roughly equal to its bill in these Chapter 11 Cases.

EY US's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. EY US needed to fully understand the Debtors' business operations to offer restructuring and tax advice. The hours billed by EY US are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to EY US's certifications. *See* 11 U.S.C. § 330(a)(3)(E). Nonetheless, as described herein, EY US has extensive experience in complex restructurings. *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, EY US is entitled to the compensation sought. This view is apparently shared by the creditors and the U.S. Trustee, who have not objected. The Court therefore finds that EY US is entitled to $6,422,789.92 in fees for its work in the Chapter 11 Cases.

### 2.    *EY UK*

EY UK served as UK restructuring and tax advisors to the Debtors. In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the EY UK Fee Application. Ex. 149, ECF No. 1033. The EY UK Fee Application seeks compensation in the total amount of £415,447.20 and reimbursement of actual and necessary expenses in the amount of £0.00 that EY UK incurred for the period from the Petition Date through and including June 1, 2022. *Id.* ¶ 10, ECF No. 1033 at 10.[74]

---

[74] By its express terms, the USTP Guidelines apply to attorneys only. That being said, the EY UK Fee Application substantially complies with the USTP Guidelines.

Pursuant to issues informally raised by the United States Trustee, EY UK agreed to a voluntary reduction of £8,773.14 from the amounts initially sought in the EY UK Fee Application. Ex. 172 § 5, ECF No. 1078 at 14. In light of the negotiated reduction, the United States Trustee had no objection to the allowance of fees in the reduced amount of £406,674.06 and expenses in the amount of £0.00. *Id.*

The Debtors served the EY UK Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures. *See* Certification of No Obj. Regarding EY UK Fee Appl., ECF No. 1090. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the EY UK Fee Application were due on or before August 5, 2022. *See id*. There were no objections filed with respect to the EY UK Fee Application. *See id*. Nonetheless, the Court independently evaluated the merits of the EY UK Fee Application under the § 330 Factors and the *Johnson* factors.

EY UK billed 477.7 hours in connection with the services for which it seeks compensation. Ex. 149 ¶ 10, ECF No. 1033 at 10. Given the scope of EY UK's employment, this was a reasonable amount of labor. 11 U.S.C. § 330(a)(3)(A). EY UK billed at a blended rate of £724.74 for all timekeepers. [75] Ex. 149 ¶ 10, ECF No. 1033 at 10; *see* 11 U.S.C. § 330(a)(3)(B). The hourly rates varied with the experience and seniority of the individuals assigned. Ex. 15 ¶ 19, ECF No. 248 at 14. The hourly rates and corresponding rate structure that EY used in these Chapter 11 Cases is the same that EY uses in similar matters regardless of whether a fee application is required and reflect the normal and customary billing practices for engagements of this complexity and

---

[75] A full breakdown of the hourly rates charged by each timekeeper is available in the EY UK Fee Application. Ex. 149, ECF No. 1033 at 3.

magnitude.[76]  *Id.*  This fee structure and these hourly fees are market-based, consistent with the market, and reasonable considering the vast knowledge and experience of each of the EY Retained Professionals.  *Id.* ¶ 20; *see* 11 U.S.C. § 330(a)(3)(F).  The fee structure is consistent with and typical of compensation arrangements of comparable firms in connection with the rendering of similar services under similar circumstances.  Ex. 15 ¶ 20, ECF No. 248 at 14; 11 U.S.C. § 330(a)(3)(F).

EY UK's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  The specific services provided by EY UK included:  (i) updating the entity priority analysis, which assessed the potential illustrative values for individual creditors according to their respective rights and priorities; (ii) providing internal project management of Chapter 11 process and management of lender Q&A process; and (iii) providing additional assistance and advice as required.  Ex. 15 ¶ 8, ECF No. 248 at 9.  The foregoing services were necessary for the administration and prosecution of these Chapter 11 Cases and inured to the benefit of the Debtors, their estates, and all parties in interest.

EY UK's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C. § 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry.  EY UK needed to fully understand the Debtors' business operations to offer restructuring and tax advice.  The hours billed by EY UK are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

---

[76]   Considering EY UK billed at its normal and customary rates, its opportunity cost is roughly equal to its bill in these Chapter 11 Cases.

The Court did not receive any evidence as to EY UK's certifications. *See* 11 U.S.C. § 330(a)(3)(E).  Nonetheless, as described herein, EY UK has extensive experience in complex restructurings. *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, EY UK is entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S. Trustee, who have not objected.  The Court therefore finds that EY UK is entitled to the total award of £404,919.43 in fees for its work in these Chapter 11 Cases.

### 3.   *EY Ireland*

EY Ireland served as Irish tax and restructuring advisors to the Debtors.  In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the Debtors timely filed the EY Ireland Fee Application.  Ex. 151, ECF No. 1035.  EY Ireland seeks compensation in the total amount of €2,035,457.14 and reimbursement of actual and necessary expenses in the amount of €0.00 that EY Ireland incurred for the period from the Petition Date through and including June 1, 2022. *Id.* ¶ 10, ECF No. 1035 at 11.[77]

Pursuant to issues informally raised by the United States Trustee, EY Ireland agreed to a voluntary reduction of €27,406.56 from the amounts initially sought in the EY Ireland Fee Application.  Ex. 172 § 7, ECF No. 1078 at 15.  In light of the negotiated reduction, the United States Trustee had no objection to the allowance of fees in the reduced amount of €2,008,050.58 and expenses in the amount of €0.00. *Id.*

The Debtors served the EY Ireland Fee Application on all necessary parties on July 15, 2022, in accordance with the Case Management Procedures. *See* Certification of No Obj.

---

[77] By its express terms, the USTP Guidelines applies to attorneys only.  That being said, the EY Ireland Fee Application substantially complies with the USTP Guidelines.

Regarding EY Ireland Appl., ECF No. 1089.  Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the EY Ireland Fee Application were due on or before August 5, 2022.  *See id*.  There were no objections filed with respect to the EY Ireland Fee Application.  *See id*.  Nonetheless, the Court independently evaluated the merits of the EY Ireland Fee Application under the § 330 Factors and the *Johnson* factors.

EY Ireland billed 2,783.7 hours in connection with the services for which it seeks compensation. Ex. 151 ¶ 10, ECF No. 1035 at 11.  Given the scope of EY Ireland's employment, this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  EY Ireland billed at a blended rate of €594.48 for all timekeepers.[78]  Ex. 151 ¶ 10, ECF No. 1035 at 11; *see* 11 U.S.C. § 330(a)(3)(B).  The hourly rates varied with the experience and seniority of the individuals assigned. Ex. 15 ¶ 19, ECF No. 248 at 14.  The hourly rates and corresponding rate structure that EY used in these Chapter 11 Cases is the same that EY uses in similar matters regardless of whether a fee application is required and reflect the normal and customary billing practices for engagements of this complexity and magnitude.[79]  *Id.*  This fee structure and these hourly fees are market-based, consistent with the market, and reasonable considering the vast knowledge and experience of each of the EY Retained Professionals.  *Id.* ¶ 20; *see* 11 U.S.C. § 330(a)(3)(F).  The fee structure is consistent with and typical of compensation arrangements of comparable firms in connection with the rendering of similar services under similar circumstances. Ex. 15 ¶ 20, ECF No. 248 at 14; 11 U.S.C. § 330(a)(3)(F).

---

[78] A full breakdown of the hourly rates charged by each timekeeper is available in the EY Ireland Fee Application. Ex. 151, ECF No. 1035 at 3-4.

[79] Considering EY Ireland billed at its normal and customary rates, its opportunity cost is roughly equal to its bill in these Chapter 11 Cases.

EY Ireland's services were necessary, essential, and beneficial to the administration of the Chapter 11 Cases. *See* 11 U.S.C. § 330(a)(3)(C). The specific services provided by EY Ireland included: (i) providing independent financial information on the Debtors; (ii) preparing an independent business review; (iii) updating the company financial model to facilitate finalization of the Plan; (iv) advising as to Irish tax implications; and (v) assisting with respect to accounting standards issued by the International Accounting Standards Board. Ex. 15 ¶ 8, ECF No. 248 at 9-10. A great deal of the Debtors' business was governed by Irish law, *see* Bickle Decl. ¶ 1, ECF No. 6 at 1-2 (noting NAC DAC is incorporated under the laws of Ireland), and, as such, EY Ireland's role was crucial for a successful restructuring. But EY Ireland also provided general financial advising which allowed for transparency and trust in the financial projections provided by the Debtors. This was a critical role in securing the overwhelming creditors support for the RSA and the Plan.

EY Ireland's services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. 11 U.S.C. § 330(a)(3)(D). As discussed above, this was an enormously complex restructuring of multiple international debtors engaged in a specialized industry. Many of the Debtors' entities, assets, and liabilities were Irish. EY Ireland needed to fully understand the Debtors' business operations to offer restructuring and tax advice. Their hours billed are commensurate with that level of work, and therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to EY Ireland's certifications. *See* 11 U.S.C. § 330(a)(3)(E). Nonetheless, as described herein, EY Ireland has extensive experience in complex restructurings. *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, EY Ireland

is entitled to the compensation sought.  This view is apparently shared by the creditors and the

U.S. Trustee, who have not objected.  The Court therefore finds that EY Ireland is entitled to the

total award of €2,001,747.07 in fees for its work in these Chapter 11 Cases.

### 4.    *EY Denmark*

EY Denmark served as Danish restructuring and tax advisors to the Debtors.  In accordance

with the terms of the Plan, as implemented by the Confirmation Order, on July 15, 2022, the

Debtors timely filed the EY Denmark Fee Application.  Ex. 150, ECF No. 1034.  EY Denmark

seeks compensation in the total amount of €107,178.26 and reimbursement of actual and necessary

expenses in the amount of €2,169.03 that EY Denmark incurred for the period from the Petition

Date through and including June 1, 2022.  *Id.* ¶ 10, ECF No. 1034 at 9.[80]

Pursuant to issues informally raised by the United States Trustee, EY Denmark agreed to

a voluntary reduction of €1,282.56 from the amounts initially sought in the EY Denmark Fee

Application.  Ex. 172 § 6, ECF No. 1078 at 14.  In light of the negotiated reduction, the United

States Trustee had no objection to the allowance of fees in the reduced amount of €105,600.72[81]

and expenses in the amount of €2,169.03.  *Id.*

The Debtors served the EY Denmark Fee Application on all necessary parties on July 15,

2022, in accordance with the Case Management Procedures.  *See* Certification of No Obj.

Regarding EY Denmark Appl., ECF No. 1088.  Pursuant to the Case Management Procedures, all

objections to the approval of the relief requested in the EY Denmark Fee Application were due on

---

[80]   By its express terms, the USTP Guidelines apply to attorneys only.  That being said, the EY Denmark Fee
Application substantially complies with the USTP Guidelines.

[81]   This reflects the modification at the Hearing to account for a corresponding decrease in VAT given the
agreed-upon reduction.

or before August 5, 2022.  *See id*.  There were no objections filed with respect to the EY Denmark

Fee Application.  *See id*.  Nonetheless, the Court independently evaluated the merits of the EY

Denmark Fee Application under the § 330 Factors and the *Johnson* factors.

EY Denmark billed 125.5 hours in connection with the services for which it seeks

compensation. Ex. 150 ¶ 10, ECF No. 1034 at 9.  Given the scope of EY Denmark's employment,

this was a reasonable amount of labor.  11 U.S.C. § 330(a)(3)(A).  EY Denmark billed at a blended

rate of €694.32 for all timekeepers.[82]   Ex. 150 ¶ 10, ECF No. 1034 at 9; *see* 11 U.S.C.

§ 330(a)(3)(B).  The hourly rates varied with the experience and seniority of the individuals

assigned. Ex. 15 ¶ 19, ECF No. 248 at 14.  The hourly rates and corresponding rate structure that

EY used in these Chapter 11 Cases is the same that EY uses in similar matters regardless of whether

a fee application is required and reflect the normal and customary billing practices for engagements

of this complexity and magnitude.[83]  *Id.*  This fee structure and these hourly fees are market-based,

consistent with the market, and reasonable considering the vast knowledge and experience of each

of the EY Retained Professionals.  *Id.* ¶ 20; *see* 11 U.S.C. § 330(a)(3)(F).  The fee structure is

consistent with and typical of compensation arrangements of comparable firms in connection with

the rendering of similar services under similar circumstances.  Ex. 15 ¶ 20, ECF No. 248 at 14; 11

U.S.C. § 330(a)(3)(F).

EY Denmark's services were necessary, essential, and beneficial to the administration of

the Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  The specific services provided by EY

Denmark mainly involved providing Danish tax assistance and guidance.  Ex. 15 ¶ 8, ECF No.

---

[82]   A full breakdown of the hourly rates charged by each timekeeper is available in the EY Denmark Fee Application.
Ex. 150, ECF No. 1034 at 3.

[83]   Considering EY Denmark billed at its normal and customary rates, its opportunity cost is roughly equal to its bill
in these Chapter 11 Cases.

248 at 11.  NAC A/S (a parent company of sixty Debtor entities) and many of its subsidiaries are

incorporated under the laws of Denmark, *see* Bickle Decl. ¶¶ 1, 43, Ex. B, ECF No. 6 at 1, 26, 287.

As this restructuring involved Danish entities, assets, and liabilities, EY Denmark's Danish-

specific services were critical to the Debtors' successful restructuring.

EY Denmark's services were performed within a reasonable amount of time commensurate

with the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C.

§ 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple

international debtors engaged in a specialized industry.  EY Denmark needed to fully understand

the Debtors' business operations to offer restructuring and tax advice.  Their hours billed are

commensurate with that level of work, and therefore weigh in favor of granting the compensation

sought.

The Court did not receive any evidence as to EY Denmark's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).  Nonetheless, as described herein, EY Denmark has extensive experience in

complex restructurings.  *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, EY

Denmark is entitled to the compensation sought.  This view is apparently shared by the creditors

and the U.S. Trustee, who have not objected.  The Court therefore finds that EY Denmark is

entitled to the total award of €107,769.75, in fees and expenses for its work in these Chapter 11

Cases.

## V.       Epiq as Administrative Advisor

Epiq served as administrative advisor to the Debtors.  Epiq is one of the country's leading

Chapter 11 administrators, with significant experience in noticing, claims administration,

solicitation, balloting, and facilitating other administrative aspects of Chapter 11 cases.  Hr'g Tr.

145

18:17-20, Sept. 14, 2022, ECF No. 1132 at 18. On January 18, 2022, the Debtors filed the *Debtors'*
*Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Epiq*
*Corporate Restructuring, LLC as Administrative Advisor Effective as of the Petition Date and*
*(II) Granting Related Relief* [ECF No. 183] (the "Epiq Employment Application"). Ex. 3, ECF
No. 183. The Epiq Employment Application clearly disclosed the services that Epiq intended to
provide and the terms of compensation for such services, including the hourly rate to be charged.
*Id.* Notice of the Epiq Employment Application was provided to all requisite notice parties in
accordance with the Case Management Procedures.

As no objection was timely filed to the Epiq Employment Application, on February 2,
2022, the Court entered the *Order (I) Authorizing the Debtors to Employ and Retain Epiq*
*Corporate Restructuring, LLC as Administrative Advisor Effective as of the Petition Date and*
*(II) Granting Related Relief* [ECF No. 283] (the "Epiq Employment Order"). Ex. 21, ECF No.
283. As more fully detailed in the Epiq Employment Order, the Debtors were authorized to retain
and employ Epiq as its administrative advisor effective as of the Petition Date, in accordance with
the terms and conditions set forth in the Epiq Employment Application. *Id.* ¶ 2, ECF No. 283 at
2. Epiq was, nevertheless, required to apply for compensation and reimbursement of expenses in
accordance with sections 330 and 331 of the Bankruptcy Code. *Id.* ¶ 4, ECF No. 283 at 3.

By the terms of the Epiq Employment Order, the Debtors were authorized to retain Epiq to
perform "Administrative Services," which primarily included: (i) assisting with solicitation,
balloting, tabulation, and calculation of votes; (ii) generating an official ballot certification and
testifying, if necessary, in support of the ballot tabulation results; (iii) generating, providing, and
assisting with claims objections, exhibits, claims reconciliation, and related matters; (iv) providing
assistance with preparation of the Debtors' schedules of assets and liabilities and statements of

146

financial affairs and gathering data in conjunction therewith; (v) providing a confidential data room, if requested; and (vi) managing any distributions pursuant to the Plan. Ex. 3 ¶ 7, ECF No. 183 at 4.

In accordance with the Interim Compensation Order, Epiq timely and properly filed and served a Monthly Fee Statement. Ex. 97, ECF No. 795. Epiq's Monthly Fee Statements fell within the budgetary parameters established under the Courts' DIP orders. *See* Final NAC DAC DIP Order ¶ (c), ECF No. 304 at 3 (incorporating budget attached to interim order); Interim NAC DAC DIP Order Ex. 3, ECF No. 171 at 311; Final NAC 17/20 DIP Order ¶ (c), ECF No. 638 at 2-3 (incorporating budget attached to interim order); Interim NAC 17/20 DIP Order Ex. 2, ECF No. 542 at 124. No objections were filed to Epiq's Monthly Fee Statement.

In accordance with the terms of the Plan, as implemented by the Confirmation Order, on July 11, 2022, the Debtors timely filed the Epiq Fee Application. Ex. 133, ECF No. 997. The Epiq Fee Application seeks compensation in the total amount of $233,749.20 and reimbursement of actual and necessary expenses in the amount of $0.00 that Epiq incurred for the period from the Petition Date through and including June 1, 2022. *Id.* ¶ 3, ECF No. 997 at 3.[84]

After review, United States Trustee had no objection to the Epiq Fee Application as filed. Ex. 172 § 23, ECF No. 1078 at 20.

The Debtors served the Epiq Fee Application on all necessary parties on July 11, 2022, in accordance with the Case Management Procedures. *See* Certification of No Obj. Regarding Epiq Appl., ECF No. 1087. Pursuant to the Case Management Procedures, all objections to the approval of the relief requested in the Epiq Fee Application were due on or before August 1, 2022. *See id.*

---

[84] By its express terms, the USTP Guidelines applies to attorneys only. That being said, the Epiq Fee Application substantially complies with the USTP Guidelines.

There were no objections filed with respect to the Epiq Fee Application.  *See id*.  Nonetheless, the

Court has independently evaluated the merits of the Epiq Fee Application under the § 330 Factors

and the *Johnson* factors.

Epiq billed 1,091.70 hours in connection with the services for which it seeks compensation.

Ex. 133 ¶ 11, ECF No. 997 at 10.  Given the scope of Epiq's employment, this was a reasonable

amount of labor.  11 U.S.C. § 330(a)(3)(A).  Epiq billed at a blended rate of $214.11 for all

timekeepers.[85]  Ex. 133, ECF No. 997 at 4; *see* 11 U.S.C. § 330(a)(3)(B).  The hourly rates and

corresponding rate structure utilized by Epiq in these Chapter 11 Cases are generally equivalent to

the hourly rates and corresponding rate structure predominantly used by Epiq for comparable

matters, whether in Chapter 11 or otherwise, regardless of whether a fee application is required.

Ex. 133 ¶ 12, ECF No. 997 at 10.  Epiq's rates are competitive and comparable to the rates Epiq's

competitors charge for similar services and are reasonable given the quality of Epiq's services and

Epiq's bankruptcy expertise.  Ex. 3 ¶ 12, ECF No. 183 at 6-7; *see* 11 U.S.C. § 330(a)(3)(F).

Epiq's services were necessary, essential, and beneficial to the administration of the

Chapter 11 Cases.  *See* 11 U.S.C. § 330(a)(3)(C).  Epiq's services included assisting with

solicitation, balloting, tabulation and calculation of votes, preparing certain reports as required in

furtherance of confirming the Plan, and working closely with the Debtors' personnel and legal

advisors to gather the necessary data and then analyze and compile that data into schedules and

statements.  Hr'g Tr. 18:21-19:2, Sept. 14, 2022, ECF No. 1132 at 18-19.  These services were

critical to manage administrative tasks with respect to the thousands of creditors, equity security

---

[85]    A full breakdown of hourly rates charged by each timekeeper is available in the Epiq Fee Application.  Ex. 133,
ECF No. 997 at 4.

holders, and other parties in interest involved in the Debtors' Chapter 11 Cases.  Ex. 3 ¶ 20, ECF

No. 183 at 9.

Epiq's services were performed within a reasonable amount of time commensurate with

the complexity, importance, and nature of the problem, issue, or task addressed.  11 U.S.C.

§ 330(a)(3)(D).  As discussed above, this was an enormously complex restructuring of multiple

international debtors engaged in a specialized industry.  Epiq's hours billed are commensurate with

the level of work necessary to properly provide the Administrative Services for such Debtors, and

therefore weigh in favor of granting the compensation sought.

The Court did not receive any evidence as to Epiq's certifications.  *See* 11 U.S.C.

§ 330(a)(3)(E).  Nonetheless, as described herein, Epiq has extensive experience in bankruptcy

administration. *See id.*

Taking the section 330 analysis together with the *Johnson* factors into account, Epiq is

entitled to the compensation sought.  This view is apparently shared by the creditors and the U.S.

Trustee, who have not objected.  The Court therefore finds that Epiq is entitled to a total fee award

in the aggregate amount of $233,749.20 for its work in the Chapter 11 Cases.

## Conclusion

No two business bankruptcy cases are ever the same.  While the Bankruptcy Code provides

the playing field for solving the business problem at issue, resolution of the problem is left to the

parties to negotiate.  The Court needs to maintain flexibility to be able adapt to the issues brought

before it in the context of the unique nature that the complexity of each business presents.

Business entities like the Debtors rely more and more on leverage and are increasingly multinational.[86] When they do arrive in bankruptcy, driven by some calamity such as a pandemic, they tend to come with few unencumbered assets.  The value of those assets is driven less by so-called hard assets and more by intangible assets, such as the services they provide, the contracts they have, and the intellectual property they possess.  Trade creditors and employees may not be viewed so much as liabilities as they are as assets.  They add value to the enterprise because they allow it to operate.[87]  In the case at bar, no trade creditors, employees, vendors, customers, or contract counterparties were adversely impacted by the restructuring.

This is not a case that required every dollar, pound, euro, or kroner paid to one of the Retained Professionals to be measured against every remaining dollar, pound, euro, or kroner available for distribution to creditors.  The work performed by the Retained Professionals grew the estate; payment for the services they rendered will not deplete it.[88]  The case at bar involved a balance sheet deleveraging.  No objection was raised to the payment of any of the professional fees in these Chapter 11 Cases because it was clear to all the impacted parties that the Retained Professionals brought considerable value to the restructuring process – exponentially more than they seek in fees here.  Eventually, 99% of the secured lenders agreed to participate.  They realized that there was more value to be found in the ongoing enterprise than there was to be realized in the liquidation of their individual collateral.  The Retained Professionals created the roadmap for the

---

[86]    The Retained Professionals confronted the enormous complexity of multiple businesses dealing independently with multiple creditors across multiple legal systems in a heavily regulated industry.

[87]    Although trade creditors and employees may appear to be out-of-the money from a liquidation standpoint, aircraft cannot fly if they are not maintained.  And aircraft cannot generate revenue from flying without contracts.

[88]    Payment of bankruptcy professionals is not simply a matter of cutting a slice out of a pie.  Good professionals, such as the Retained Professionals, grow the pie.  Having sophisticated professionals on all sides of the intense negotiations allowed the reorganization to work.  Everyone benefits from the contributions good professionals make to the bankruptcy restructuring process.  The estate exists due to the hard work of the Retained Professionals.

Plan to be approved.  They did so at 10% below the amounts budgeted.  The Court believes the

Retained Professionals should be paid for the work they contributed to the restructuring process.

   Separate Orders for each Retained Professional shall issue.

Dated: ____October 18, 2022_____          __/s/ Kevin R. Huennekens_____
                                                                    UNITED STATES BANKRUPTCY JUDGE

                                                                    Entered on Docket: October 18, 2022____